## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 14-50 |
| | : | |
| v. | : | |
| | : | |
| JUCONTEE THOMAS WOEWIYU | : | |

## O R D E R

AND NOW this          day of                    , 2018, upon consideration of the

government's First Motion *In Limine,* in which it moves the Court to preclude mention at trial of

defendant Jucontee Thomas Woewiyu's contact, if any, with any entity in the United States

intelligence community, and the defendant's opposition thereto, it is hereby,

ORDERED

that the government's Motion *In Limine* be, and hereby is, GRANTED, and that mention at trial

by defendant Woewiyu, of defendant Woewiyu's alleged contact with any entity in the United

States intelligence community, is hereby precluded.

BY THE COURT:

_____

**HONORABLE ANITA B. BRODY**
***Judge, United States District Court***

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 14-50 |
| | : | |
| v. | : | |
| | : | |
| JUCONTEE THOMAS WOEWIYU | : | |

**GOVERNMENT'S FIRST MOTION _IN LIMINE_**

      The United States of America, by its attorneys, Louis D. Lappen, United States Attorney for the Eastern District of Pennsylvania, and Linwood C. Wright, Jr. and Nelson S.T. Thayer, Jr., Assistant United States Attorneys for the district, respectfully moves the Court for an order precluding defendant Woewiyu's mention at trial of his contact, if any, with any entity in the United States intelligence community.  In support of its motion, the government relies on the attached memorandum.

      WHEREFORE, for the reasons articulated in the attached memorandum, the government respectfully requests that its motion be granted.

                         Respectfully submitted,

                         LOUIS D. LAPPEN
                         United States Attorney

                         /s/_Linwood C. Wright, Jr._
                         LINWOOD C. WRIGHT, JR.
                         NELSON S.T. THAYER, JR.
                         Assistant United States Attorneys

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 14-50 |
| | : | |
| v. | : | |
| | : | |
| JUCONTEE THOMAS WOEWIYU | : | |

**MEMORANDUM IN SUPPORT OF**
**GOVERNMENT'S FIRST MOTION _IN LIMINE_**

### I.     BACKGROUND

In 1822 freed American slaves settled on the western coast of Africa in the area that now encompasses Liberia, which became an independent republic in 1847.  Liberia's political landscape was dominated by the descendants of these freed slaves (known as "Americo-Liberians") although Americo-Liberians comprised only approximately five percent of Liberia's population. This was a source of some resentment on the part of at least some of Liberia's indigenous peoples, who made up approximately ninety-five percent of Liberia's population.

In 1980 Liberia's Americo-Liberian president William Tolbert's government was overthrown in a violent coup by a small contingent of soldiers from the Armed Forces of Liberia who were led by a master sergeant named Samuel Doe. Doe was a member of the Krahn tribe. Tolbert was killed. Doe became Liberia's _de facto_ ruler and maintained that position through 1985. In 1985 Doe was elected president of Liberia. Doe's government was recognized by the United States and the rest of the international community.

 Doe' s rule of Liberia, both as its _de facto_ leader and as its president, was marked by a patronage system, tribal favoritism and brutality. Doe's patronage system benefited his fellow Krahns. His administration likewise bestowed favors upon Mandingos, an Islamic tribe who

were characteristically known as traders and businessmen. Mandingos who had theretofore been considered foreigners, were officially recognized by Doe's administration as a Liberian ethnic group. While apparently favoring the Krahn and Mandingo tribes, Doe's administration persecuted members of the Gio and Mano tribes, ironically both of whom aided Doe in his initial seizure of power.

The Doe administration's favoritism and persecution fueled resentment amongst many in Liberia. Consequently, in 1985 one of Doe's former brigadier generals returned to Liberia from exile and with support from both Gios and Manos, attempted to overthrow the government by force. After the coup failed, members of Doe's army carried out indiscriminate revenge killings against hundreds if not thousands of Gio and Mano troops, and Gio and Mano civilians.

Doe's administration's misconduct engendered opposition from the exiled Liberian community. While in exile in the United States, defendant Jucontee Thomas Woewiyu formed the Association for Constitutional Democracy in Liberia ("ACDL"), an organization in opposition to the Doe administration. By his own admission, defendant Woewiyu, with its leader Charles Taylor and others, was a founder of the National Patriotic Front of Liberia ("NPFL") a military organization committed to the violent overthrow of the Doe government.

Defendant Woewiyu met with Taylor and others in Cote d'Ivoire to assess an NPFL military plan of action and to identify military bases for NPFL training. Libya president Muammar Kaddafi supplied the NPFL with both arms and financial support. NPFL fighters received military training at bases in Libya.

On December 24, 1989, NPFL forces attacked Liberia through Cote D'Ivoire. By April 1990, the NPFL controlled approximately 90% of Liberia but did not control Liberia's capital, Monrovia. Defendant Woewiyu, who was the NPFL's spokesmen, became its minister of

defense in 1990. Woewiyu held these posts through 1994.

In July 1990 numerous of Taylor's NPFL fighters left the NPFL and joined a splinter faction called the Independent National Patriotic front of Liberia ("INPFL"). The INPFL was led by Prince Yormie Johnson, a former NPFL military training officer. In September 1990, Doe was captured by INPFL forces. His captors tortured, mutilated and executed Doe.

Despite Doe's demise, the war in Liberia persisted, with several groups, including those loyal to the Doe government, vying for control of the country.

On October 15, 1992, NPFL forces attacked Monrovia in what became known as Operation Octopus. Over the ensuing days NPFL forces engaged in a pitched battle against, among others, peacekeeping forces from the Economic Community of West African States monitoring group ("ECOMOG").

During defendant Woewiyu's tenure as NPFL defense minister, the NPFL conducted a particularly heinous and brutal military campaign. It was characterized by the torture of perceived adversaries, the execution of civilians, the killing of ECOMOG peacekeepers, the rape and forced sexual slavery of girls and women, the conscription of child soldiers, the murder of humanitarian aid workers and cannibalism. Civilian members of the Krahn and Mandingo tribes, whom the NPFL had always perceived were loyal to the Doe government, were particularly subject to many of these atrocities.

In 1994, defendant Woewiyu left the NPFL and formed the splinter National Patriotic Front of Liberia Central Revolutionary Council ("NPFL-CRC"). Sometime thereafter, Woewiyu reunited with Taylor, serving as the labor minister in then President Taylor's administration.

Since approximately January 13, 1972, defendant Woewiyu has had Legal Permanent Resident status in the United States.

On or about January 23, 2006, defendant Woewiyu made application for United States citizenship by submitting an Immigration and Naturalization Service ("INS") Form N-400.

Application for United States citizenship is a multiple step process.  At least two of these steps relate directly to the Form N-400.  Firstly, the applicant seeking citizenship submits a Form N-400. The Form N-400 provides that the applicant answer a series of background questions. At the end of the Form N-400 the applicant signs the document in which he certifies under penalty of perjury that its contents are all true and correct. Secondly, the applicant has an in person interview with a United States Citizenship and Immigration Services ("USCIS") officer. This interview is conducted under oath and the officer reviews with the applicant the applicant's answers to the questions posed and information sought by the N-400. At the conclusion of the interview, the applicant certifies under penalty of perjury that the contents of the N-400, including any corrections made during the interview, are true and correct to the best of the applicant's knowledge.

When submitting his Form N-400 defendant Woewiyu certified "under penalty of perjury under the laws of the United States of America" that his "application, and the evidence submitted with it, [were] true and correct."

On January 30, 2009, defendant Woewiyu was interviewed under oath by a USCIS officer. During this interview, the officer reviewed with Woewiyu the answers given and information provided by Woewiyu in the Form N-400 that Woewiyu had submitted. At the conclusion of the interview Woewiyu signed a certification in which he swore and certified "under penalty of perjury under the laws of the United States of America" that he knew that that the contents of his "application for naturalization… including corrections… and the evidence submitted by [him]… [were] true and correct to the best of [his] knowledge and belief."

4

Woewiyu's certification encompassed, among other things, the following entries that he made or caused to be made on his Form N-400, which entries contained false, misleading and fraudulent information as follows.

a. Question 8a asked "Have you **EVER** been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?" Subpart b states: "If you answered 'Yes' list the names of each group below.  If you need more space, attach the names of the other group(s) on a separate sheet of paper." Defendant WOEWIYU had responded to this question by placing an "X" in the box marked "No."  Initially defendant WOEWIYU verbally stated that he was not a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place.  After repeated prompting, WOEWIYU responded to Question 8a and subpart b by verbally causing the listing of only the Union of Liberia Associations in the United States. He did not disclose his membership in, and association with, other organizations, including but not limited to, the NPFL and the NPFL-CRC.

b. Question 10 asked "Have you **EVER** advocated (either directly or indirectly) the overthrow of any government by force or violence?" Defendant WOEWIYU had responded to this question by placing an "X" in the box marked "No." Additionally, WOEWIYU confirmed his initial response to this question by verbally stating "no." WOEWIYU did not disclose that he had advocated the overthrow of the Doe Liberian government by force or violence.

c. Question 11 asked "Have you **EVER** persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion?" Defendant WOEWIYU had responded to this question by placing an "X" in the box marked "No."  WOEWIYU verbally confirmed this response.  WOEWIYU did not disclose that while he was a member of, among other organizations, the NPFL, he persecuted others because of their political opinions, and members of Krahn and Mandingo tribes.

d. Question 18 asked "Have you EVER been convicted of a crime or offense?"  The section below question 18 states:  "If you answered 'Yes' to any of the questions 15 through 21, complete the following table.  If you need more space, use a separate sheet

5

of paper to give the same information."  Defendant WOEWIYU
had responded to question 18 by placing an "X" in the box marked
"No."  However, he listed in the table provided that he had pled
guilty to a 1982 New York State misdemeanor receiving stolen
property charge.  WOEWIYU verbally confirmed this response.
WOEWIYU also verbally caused the listing of a dismissed 1970
New York arrest for being suspected of being associated with
organized crime.  WOEWIYU did not disclose his 1970 New York
State conviction for falsification of business records.

As a result of defendant's conduct, on January 30, 2014, a federal grand jury sitting in the

Eastern District of Pennsylvania returned an indictment charging defendant Woewiyu with two

counts of fraudulently attempting to obtain citizenship, in violation of 18 U.S.C. § 1425; four

counts of fraud in immigration documents, in violation of 18 U.S.C. § 1546(a); three counts of

false statements in relation to naturalization, in violation of 18 U.S.C. § 1015(a); and seven

counts of perjury, in violation of 18 U.S.C. § 1621.

## II.   <u>ARGUMENT</u>

### A.   **Mention at trial of defendant Woewiyu's contact, if any, with any entity in <u>the United States intelligence community, should be precluded</u>**.

Because of statements made by the defendant's counsel at a hearing before this Court

relating to desire for the government to produce classified information, it is the government's

belief that the defendant may seek to introduce at trial his relationship, if any, with entities in the

United States intelligence community. This, he should not be allowed to do. His relationship, if

any, with any entity in the United States intelligence community is: 1) pursuant to Fed. R. Evid.

401 irrelevant; and 2) assuming *arguendo* that it is relevant is, pursuant to Fed. R. Evid. 403,

inadmissible as misleading.

Rule 401defines relevant evidence as "evidence having any
tendency to make the existence of any fact that is of consequence
to the determination of the action more probable or less probable
than it would be without the evidence."  Fed. R. Evid. 401.  Rule
402 states that "[a]ll relevant evidence is admissible, except as

6

> otherwise provided by the Constitution of the United States, by Act
> of Congress, by these rules, or by other rules prescribed by the
> Supreme Court pursuant to statutory authority.  Evidence which is
> not relevant is not admissible."  Fed. R. Evid. 402.

*United States v. Lee*, 612 F.3d 170, 184 (3d Cir. 2010) n.14.

Under appropriate circumstances, relevant evidence should be excluded.

> Rule 403 states: "The court may exclude relevant evidence if its
> probative value is substantially outweighed by a danger of one or
> more of the following: unfair prejudice, confusing the issues,
> misleading the jury, undue delay, wasting time, or needlessly
> presenting cumulative evidence."  When determining whether
> evidence violates Rule 403, district courts must balance the
> probative value of the evidence against its prejudicial effect,
> clarifying its reasoning on-the-record.  This requirement not only
> provides the defendants with an explanation of the district court's
> reasoning, but also enables appellate courts to understand the
> district court's logic.

*United States v. Bailey*, 840 F.3d 99, 117 (3d Cir. 2016).The Third Circuit reviews "a district

court's decision as to the admissibility of evidence for abuse of discretion." *United States v. Lee*,

612 F.3d at 184 n.14.

The gravamen of the government's case is that the defendant, while under oath, both

affirmatively and through the strategic concealment of material facts, repeatedly lied to USCIS

officials and on required immigration forms, for the purpose of persuading USCIS officials to

approve his application to become a naturalized United States citizen.  Because of his conduct

both in Liberia and during the naturalization process, he was not entitled to citizenship.  The

government's contention is supported by significant evidence, as is summarized in its pretrial

memorandum.

To date, the defendant has not given notice of any defense, in which his contact, if any,

with anyone in the United States intelligence community is arguably remotely relevant.[1] Indeed, to date he has not, nor can he in good faith, contend that anyone in the United States intelligence community, or for that matter, anyone at the United States Department of State, with whom he may have had contact, had the authority to permit him to engage in illegal conduct by perjuring himself during the naturalization process.[2] In light of these realities, his contact, if any, with members of the United States intelligence community would not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Additionally, in light of the fact that introduction of defendant's contact, if any, with members of the United States intelligence community, is not relevant to a viable defense, its admission as general background information, or even as evidence arguably relevant on some other issue, should appropriately be excluded under Fed. R. Evid. 403, because its admission would both confuse and mislead the jury. Indeed, a jury could conclude that if the defendant had contact with members of the United States intelligence community, those members had knowledge of the conduct about which the defendant committed perjury during the naturalization process. From this premise, a jury could mistakenly infer that various government agencies including, but not limited to, entities in the United States intelligence community, the United States Department of State and USCIS are, as agencies of the United States Government, all one entity whose knowledge is imputed to one another. This is simply factually inaccurate. United States Government agencies have varying functions and responsibilities and consequently often

---

[1] If the defendant contemplates raising the inapplicable public authority affirmative defense, he must adhere to its procedural requirements. *See* Fed. R. Crim. P. 12.3.
[2] *See United States v. Pitt*, 193 F.3d 751 758 (3d Cir. 1999) (defense of public authority is limited "to those situations where the government agent in fact had the authority to empower the defendant to perform the acts in question") *abrogated on other grounds by Honeycutt v. United States*, 137 S.Ct. 1626 (2017).

never intersect with one another. Even if it was factually accurate (*i.e.*, USCIS knew that defendant was perjuring himself at the time of the naturalization process), it still provides no legitimate defense to the crimes with which the defendant is charged,[3] although a jury could mistakenly conclude that it does.

Finally, depending on how his relationship, if any, with entities in the United States intelligence community is couched, the jury could be misled into believing that he was an employee of an entity in the community, and thus had tacit government approval for his unlawful conduct. Arguably, this could result in inappropriate jury nullification.

---

[3] In any event, during the various phases of the immigration process, USCIS, to a large extent, relies on the honesty of the immigrant applicant. In this case, prior to the defendant's submission of his application for naturalization and participation in the naturalization process, USCIS had not received any information about the defendant from any entity in the United States intelligence community.

9

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, the government respectfully requests that its first motion *in limine* be granted.

Respectfully submitted,

LOUIS D. LAPPEN
United States Attorney


<u>/s/*Linwood C. Wright, Jr.*</u>
LINWOOD C. WRIGHT, JR.
NELSON S.T. THAYER, JR.
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Government's First Motion in *Limine* was filed

electronically on the Electronic Case Filing system, is available for viewing and downloading

from the ECF system, and/or was served on defense counsel as follows:

> Mark T. Wilson, Esquire
> DEFENDER ASSOCIATION OF PHILADELPHIA
> Federal Court Division
> The Curtis Center Building
> 601 Walnut Street, Suite 540 West
> Independence Square West
> Philadelphia, PA 19106
> mark_wilson@fd.org

> <u>/s/*Linwood C. Wright, Jr.*</u>
> LINWOOD C. WRIGHT, JR.
> NELSON S.T. THAYER, JR.
> Assistant United States Attorneys

Dated:  January 11, 2018