**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | **CRIMINAL NO. 14-cr-50** |
| JUCONTEE THOMAS WOEWIYU | : | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America by its attorneys, Louis D. Lappen, United States Attorney, and Linwood C. Wright, Jr. and Nelson S.T. Thayer, Jr., Assistant United States Attorneys for the Eastern District of Pennsylvania, respectfully submits its Trial Memorandum.

**I.      STATEMENT AND NATURE OF CASE**

**A.  Historical Background**

In 1822, freed American slaves settled on the western coast of Africa in the area that now encompasses Liberia, which became an independent republic in 1847.   Liberia's political landscape was dominated by the descendants of these freed slaves (known as "Americo-Liberians") although Americo-Liberians comprised only approximately five percent of Liberia's population.   This was a source of some resentment on the part of at least some of Liberia's indigenous peoples, who made up approximately ninety-five percent of Liberia's population.

In 1980, Liberia's Americo-Liberian president William Tolbert's government was overthrown in a violent coup by a small contingent of soldiers from the Armed Forces of Liberia who were led by a master sergeant named Samuel Doe.   Doe was a member of the Krahn tribe. Tolbert was killed.   Doe became Liberia's *de facto* ruler and maintained that position through 1985.   In 1985, Doe was elected president of Liberia.   Doe's government was recognized by the United States and the rest of the international community.

Doe's rule of Liberia, both as its *de facto* leader and as its president, was marked by a patronage system, tribal favoritism and brutality.   Doe's patronage system benefited his fellow Krahns.   His administration likewise bestowed favors upon Mandingos, an Islamic tribe who were characteristically known as traders and businessmen.   Mandingos, who had theretofore been considered foreigners, were officially recognized by Doe's administration as a Liberian ethnic group.   While apparently favoring the Krahn and Mandingo tribes, Doe's administration persecuted members of the Gio and Mano tribes, ironically both of whom aided Doe in his initial seizure of power.

The Doe administration's favoritism and persecution fueled resentment amongst many in Liberia.   Consequently, in 1985 one of Doe's former brigadier generals, Thomas Quiwonkpa, returned to Liberia from exile and with support from both Gios and Manos, attempted to overthrow the government by force.   After the coup failed, members of Doe's army carried out indiscriminate revenge killings against hundreds if not thousands of Gio and Mano AFL soldiers and civilians.

**B.   Summary of Formation and Conduct of the NPFL**

The Doe administration's misconduct engendered opposition from the exiled Liberian community.   While in exile in the United States, defendant Jucontee Thomas Woewiyu formed the Association for Constitutional Democracy in Liberia ("ACDL"), an organization in opposition to the Doe administration.   By his own admission, defendant Woewiyu**,** with its leader Charles Taylor and others, was a founder of the National Patriotic Front of Liberia ("NPFL") a military organization committed to the violent overthrow of the Doe government.

Defendant Woewiyu met with Taylor and others in Cote d'Ivoire to assess an NPFL

2

military plan of action and to identify military bases for NPFL training.   Libya president Muammar Gaddafi supplied the NPFL with both arms and financial support.   NPFL fighters received military training at bases in Libya.

On December 24, 1989, NPFL forces attacked Liberia through Cote D'Ivoire.   By April 1990, the NPFL controlled approximately ninety per cent of Liberia but did not control Liberia's capital, Monrovia.   Defendant Woewiyu, who was the NPFL's spokesperson, became its Minister of Defense in 1990, and held both of these posts through 1994.

In 1990, numerous of Taylor's NPFL fighters left the NPFL and joined a splinter faction called the Independent National Patriotic front of Liberia ("INPFL").   The INPFL was led by Prince Yormie Johnson, a former NPFL military training officer.   In September 1990, Doe was captured by INPFL forces.   His captors tortured, mutilated and executed Doe.

Despite Doe's demise, the war in Liberia persisted, with several groups, including those loyal to the Doe government, vying for control of the country.

On October 15, 1992, NPFL forces attacked Monrovia in what became known as Operation Octopus.   Over the ensuing days, NPFL forces engaged in a pitched battle against, among others, peacekeeping forces from the Economic Community of West African States monitoring group ("ECOMOG").

During defendant Woewiyu's tenure as NPFL Minister of Defense, the NPFL conducted a particularly heinous and brutal military campaign.   It was characterized by the torture of perceived adversaries; the execution of civilians; the killing of ECOMOG peacekeepers; the rape and forced sexual slavery of girls and women; the conscription of child soldiers who often served as guards at countless checkpoints decorated with human heads, skulls and intestines; the murder

of humanitarian aid workers; and cannibalism.   Civilian members of the Krahn and Mandingo tribes, whom the NPFL had always perceived were loyal to the Doe government, were particularly subject to many of these atrocities.

Defendant Woewiyu served as the chief spokesperson, negotiator and Minister of Defense of the NPFL (and of the government formed by the NPFL to oversee the territory it held, the National Reconstruction Assembly Government, or NPRAG) until 1994, when he left the NPFL and formed the splinter National Patriotic Front of Liberia Central Revolutionary Council ("NPFL-CRC").   Sometime thereafter Woewiyu reunited with Taylor, serving as the labor minister in then-President Taylor's administration.

## C. **The Defendant Advocated The Overthrow Of A Government By Force Or Violence**

The NPFL was an armed rebel group committed to removing the Doe government forcibly from power, and in numerous verbal and written statements, the defendant confirmed this indisputable historical fact.   Indeed, in a memorandum dated January 22, 1990 he sent to the U.S. State Department, the defendant, under the heading "Objective," stated that "[t]he military action that commenced on December 24, 1990 [*sic*] in Butuo, Nimba County has as its objective the overthrow of the Doe dictatorship and its replacement, in a two-phase process, by a democratically elected government."   In the next part of the memorandum, under the heading "Political Program," the defendant continued that "[u]pon the successfully [*sic*] completion of the military campaign, a provisional administration will be established, led by the National Patriotic Front."

Years later, in a 2005 "open letter" to Ellen Johnson-Sirleaf, Liberia's president, the defendant recounted his involvement at the earliest stages of the NPFL's formation "to assess the

level of military plan of action for the purpose of removing Doe;" his travel "to Burkino Faso to ascertain the truth to Taylor's claim that he had found the ultimate opportunity to train men for another attempt to remove the Doe Regime by force of arm[s];" that he gave the NPFL's Burkino Faso sponsors the assurance they needed that "there was a political support for an arm[ed] rebellion by civilians to remove the Samuel Doe's military junta" so that they could "kick off the process of recruitment and training;" and that once he returned to the U.S., they discussed "the issue of Taylor leading this round of arm[ed] rebellion."

In a 2006 signed, sworn statement before a Dutch judge in connection with a Dutch arms trafficking/war crimes investigation, the defendant acknowledged that "[i]n December 1989, we had started the war," and that [w]e needed money for arms," and in both statements to the Dutch, he confirmed that $75,000 from a single Dutch source was used to purchase arms for the NPFL. Later in his sworn statement before the Dutch judge, the defendant affirmed that the NPFL obtained its arms from Libya, among other sources.

### D. **The Defendant's Admissions About His Role in the NPFL**

On numerous occasions, the defendant has confirmed his prominent position in the NPFL, from being a founder, to being its chief spokesperson and negotiator, to being its Minister of Defense.   One of Charles Taylor's most trusted inner circle, the defendant was invested with the authority to speak for the rebel group, to travel around the world to organize the funding, arming and training of its fighters, and to serve as the voice and face of the NPFL.

For example, in August of 1994, even during a brief period when the defendant had split from Charles Taylor, he wrote a statement published by *West Africa* magazine and titled "Turning the Tables," in which he stated, "Gentlemen of the press, I am a founding members of

the NPFL.   I was there when there was no NPFL and we put the NPFL together along with others.   Even if I wanted to, I don't think I could get out of the NPFL . . ."   Two years later, in a sworn 1996 affidavit submitted in connection with insurance litigation emanating from the Firestone company's activities in Liberia during the war, the defendant flatly affirmed that he was "a founder of the National Patriotic Front of Liberia ('NPFL') in January 1987, a member of the NPFL from 1987 to the present, a member of the Executive Council of the NPFL from 1990 through 1994, an official spokesperson for the NPFL from 1989 through 1994, the chief negotiator from the NPFL from1990 through 1994, the Minister of Defense for the National Reconstruction Assembly Government ('NPRAG') from 1990 through 1994, the Minister of Labor for the Liberian National Transitional Government from March 1994 through August 1995 ('LNTG I') and the Minister of Labor for the LNTG from August 1995 to the present ('LNTG II')."   In the same Affidavit, the defendant declared that "[t]he NPFL was formed in the Ivory Coast in January 1987 at a two day meeting attended by myself, Charles Taylor, Moses Duopu, Harry Yuan and Yeagbe Debgon."

In the above-referenced 2004 statement to Dutch investigators, the defendant stated that "[t]ogether with Charles Taylor, I founded the NPFL."   In the related 2006 sworn, signed statement taken before the Dutch judge, the defendant referred to a period in 1990 when "we already had 90% power over Gran-Bassa and Nima [*sic*] County," and clarified that "[b]y 'we', I mean the NPFL, under the leadership of Charles Taylor and myself."

As its designated chief public spokesperson, perhaps no member of the NPFL save for Charles Taylor was more prominent in the public sphere than the defendant.   Indeed, the defendant confirmed in his 2004 statement to Dutch investigators that "I was the main negotiator

6

as well as the spokesperson for the NPFL."

The defendant also made numerous party admissions through media outlets, including newspapers and BBC radio interviews, from the early to mid-1990's.   In these admissions the defendant, among other things, confirmed his membership in the NPFL, and further demonstrated his knowledge of NPFL military activities that were designed to topple then Liberian President Samuel Doe's government.

For example, in a July 3, 1990 interview with the BBC's Robin White, the defendant opined that, among other things, when the NPFL was "done with this campaign, there will be no more Doe, no more pains."   He further stated that "we [the NPFL] have close to 15,000 armed men, and I believe the people who deal with our military strategies have the entire force at hand to do whatever is necessary to put this thing to an end."   In the BBC's November 28, 1992 "Focus on Africa," broadcast the defendant, in response to the commentator's question about the location of NPFL military hardware, stated that the hardware was not at a particular location, and further stated that "we [the NPFL] are fighting a guerrilla war in bushes and everywhere else, not on the seacoast and they know better than that."   In the October 23, 1992 BBC program "African Perspective," the defendant confirmed the existence of a unit in the NPFL's army called the Small Boys Unit.   To this end the defendant stated, "It's a very small group.   We put them all together to make sure they don't do anything that we don't want them to do and uh, to keep them disciplined.   But the small boys unit contains maybe from 13 to 14 on.   They not, they not babies, they not ten years old.   When we got here, uh, by the time we reached places from Nimba to Bassa, we saw young kids.   The former military regime had killed their parent right in front of them and they placed themselves, they had no other place to go, to fight, to do whatever

7

they had to do to defend themselves.   The AK-47 weighs, you know, maybe ten, fifteen pounds, and if this young fellow feels like, if he doesn't fight, he will be dead anyway.   Uh, he comes forward to do what he has to do."   In the September 7, 1994 BBC's "This Week in Africa" broadcast, the defendant responded to questions about whether he claimed that he had replaced NPFL leader Charles Taylor.   The defendant stated as follows:   "Well, I am not making a claim, uh, I have been appointed by the Central Revolutionary Council of the NPFL the same organization that appointed Mr. Taylor leader of the NPFL.   Uh, because Mr. Taylor has uh, uh, no control over our forces . . ."

Over local airwaves, the defendant was less polished than with the BBC, but more direct: in confirming and stoking the open and notorious tribal and ethnic dimension to the civil war, several witnesses recalling him saying that "a good Krahn is a dead Krahn."   Indeed, the defendant acknowledges that he said these words, although in a document entitled "The Woewiyu Testimony To The Liberian TRC [Truth and Reconciliation Commission] That Was Never Given," published in *African Panorama*, the defendant tries to explain his statement away by claiming that he was simply quoting Charles Taylor.

As its Minister of Defense, the defendant wielded significant influence within the NPFL and over its fighters.   The defendant stated under oath before a Dutch judge that "[a]s Minister of Defense of the NPFL, I did issue orders to fighters."   In fact, as noted in Part III below, Witness P, an NPFL officer, stated that he first heard of the defendant during training, and heard the defendant on the radio as Taylor's representative and Information Minister answering questions and allegations against the NPFL.   Witness P recalls that the defendant drove a big car and had four to five bodyguards.   Witness P stated that the defendant was a man who the money

and power to get things done, and that the defendant would issue orders and had the respect of the NPFL soldiers.   Witness P further stated that if the defendant had demanded soldiers to stop raping and looting, they would have obeyed his orders.   The defendant was second to Charles Taylor, and soldiers would comply with his commands.

Witness T stated that the defendant was a professional civilian who discussed strategy and opposed to looting.   Witness T said further that the defendant was well-respected and had command and control over the NPFL.   Significantly, Witness T recalls that the defendant attended meetings where Taylor decided that the defendant would tell the field commanders when and where to attack.   Taylor gave direct orders, but there were times when the defendant gave military instructions independently of Taylor.   The defendant knew that people were being questioned and killed because of their ethnicity but did nothing to stop it.   On multiple occasions between 1991 and 1992, Witness T met with the defendant, who was always in and out of Gbarnga.

Moreover, the defendant claimed in his 2004 statement to Dutch investigators that even in 1999, years after the first civil war was over, "I also still had a fair amount of influence in military affairs such as the NPFL."   In his 2006 signed and sworn statement before the Dutch magistrate, the defendant stated that he had trained NPFL commanders who had given orders, such as "James Vamo" known as Mosquito, Bassa-boy and Yeaten.

### E.  The Defendant's Immigration Status

Since approximately January 13, 1972, the defendant has had Legal Permanent Resident status in the United States.

On or about January 23, 2006, the defendant made application for United States

citizenship by submitting a Form N-400, Application for Naturalization, with United States

Citizenship and Immigration Services ("USCIS").

Application for United States citizenship is a multiple-step process.   At least two of these

steps relate directly to the Form N-400.   Firstly, the applicant seeking citizenship submits a

Form N-400 and documentation in support of establishing eligibility for naturalization.   The

Form N-400 provides that the applicant answer a series of questions.   At the end of the Form N-

400, the applicant signs the document in which he certifies under penalty of perjury that its

contents and submitted documents are all true and correct.   Secondly, the applicant has an in-

person interview with a USCIS officer.   This interview is conducted under oath and the officer

reviews with the applicant the applicant's answers to the questions posed in, and information

sought by, the Form N-400.   At the conclusion of the interview, the applicant certifies under

penalty of perjury that the contents of the Form N-400, including any corrections made during

the interview, are true and correct to the best of the applicant's knowledge.

The defendant signed the Form N-400 on January 23, 2006, thereby certifying "under

penalty of perjury under the laws of the United States of America" that his "application, and the

evidence submitted with it, [were] true and correct."

On January 30, 2009, the defendant was interviewed under oath by a USCIS officer.   At

the commencement of the interview, the officer placed the defendant under oath and thereafter

reviewed with him the answers and information he provided in the Form N-400.   At the

conclusion of the interview the defendant signed a certification in which he swore and certified

"under penalty of perjury under the laws of the United States of America" that he knew that that

the contents of his "application for naturalization . . . including corrections . . . and the evidence

submitted by [him]… [were] true and correct to the best of [his] knowledge and belief."

Woewiyu's certification encompassed the following entries, among others, that he made or

caused to be made on his Form N-400, which entries contained false, misleading and fraudulent

information as follows, under "Part 10. Additional Questions":[1]

> a. Question 8a asked "Have you **EVER** been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?" Subpart b states: "If you answered 'Yes' list the names of each group below.   If you need more space, attach the names of the other group(s) on a separate sheet of paper." Defendant WOEWIYU had responded to this question by placing an "X" in the box marked "No."   Initially defendant WOEWIYU verbally stated that he was not a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place.   After repeated prompting, WOEWIYU responded to Question 8a and subpart b by verbally causing the listing of only the Union of Liberia Associations in the United States. He did not disclose his membership in, and association with, other organizations, including but not limited to, the NPFL and the NPFL-CRC.

> b. Question 10 asked "Have you **EVER** advocated (either directly or indirectly) the overthrow of any government by force or violence?"   Defendant WOEWIYU had responded to this question by placing an "X" in the box marked "No."   Additionally, WOEWIYU confirmed his initial response to this question by verbally stating "no." WOEWIYU did not disclose that he had advocated the overthrow of the Doe Liberian government by force or violence.

> c. Question 11 asked "Have you **EVER** persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion?"   Defendant WOEWIYU had responded to this question by placing an "X" in the box marked "No."   WOEWIYU verbally confirmed this response.   WOEWIYU did not disclose that while

---

[1] The following entries from the defendant's Form N-400 and the commentary accompanying each entry, were excerpted from the indictment in this case.   Additionally, much of the background section of this trial memorandum is adapted from the indictment.

he was a member of, among other organizations, the NPFL, he
persecuted others because of their political opinions, and members
of Krahn and Mandingo tribes.

     d. Question 18 asked "Have you **EVER** been convicted of
a crime or offense?"   The section below question 18 states:   "If
you answered 'Yes' to any of the questions 15 through 21,
complete the following table.   If you need more space, use a
separate sheet of paper to give the same information."   Defendant
WOEWIYU had responded to question 18 by placing an "X" in the
box marked "No."   However, he listed in the table provided that
he had pled guilty to a 1982 New York State misdemeanor
receiving stolen property charge.   WOEWIYU verbally confirmed
this response.   WOEWIYU also verbally caused the listing of a
dismissed 1970 New York arrest for being suspected of being
associated with organized crime.   WOEWIYU did not disclose his
1970 New York State conviction for falsification of business
records.

As a result of defendant's conduct, on January 30, 2014, a federal grand jury sitting in the

Eastern District of Pennsylvania returned an indictment charging defendant Woewiyu with two

counts of fraudulently attempting to obtain citizenship in violation of 18 U.S.C. § 1425; four

counts of fraud in immigration documents in violation of 18 U.S.C. § 1546(a); three counts of

false statements in relation to naturalization in violation of 18 U.S.C. § 1015(a); and seven

counts of perjury in violation of 18 U.S.C. § 1621.

## II.    GOVERNMENT'S WITNESS LIST

The following are summaries of the anticipated testimony of the government's witnesses.

The government has included a separate alphabetical list of the government's witnesses

below at Part II.F.[2]   The government has already produced some Jencks Act material and

---

[2]  The government may seek leave, under the appropriate circumstances, to add witnesses in the
future.   Because its witness list errs on the side of inclusion and providing notice to the defense,
in all likelihood the government may not call every witness listed herein.

expects to produce much of the remaining Jencks material contemporaneously with the instant filing or the day following.   The government is fully mindful of its obligations under *Giglio* and *Brady*, and should it become aware of the existence of *Giglio* or *Brady* material, it will produce it to the defendant in sufficient time effectively to make use of it at trial.

### A.  Expert Historian:   Nicholai Lidow, Ph.D.

Dr. Lidow is an expert in the history of Liberia and its conflicts.   His testimony will provide the proper historical framework for the government's fact witnesses.   This framework will largely put each fact witness' testimony in its appropriate context and will aid the trier of fact in understanding the evidence.

### B.  U.S. State Department Employees

As chief spokesperson, negotiator and Minister of Defense for the NPFL, defendant Woewiyu had numerous contacts at various levels of the U.S. government in Monrovia.

### James K. Bishop

Former Ambassador James K. Bishop will testify to his interactions with the defendant, who identified himself as the NPFL's Minister of Defense.   Bishop will further testify about Taylor's December 1989 offensive to overthrow the Doe regime.   He will also testify that in April/May of 1990, he and other State Department officials met in Washington, D.C. with the defendant, who was representing the NPFL as its Minister of Defense.   Bishop also authored a memorandum to Assistant Secretary of State Herman J. Cohen on June 29, 1990, in which Bishop wrote that Taylor's spokesperson Tom Woewiyu claimed that day that they were within Monrovia city limits and that Taylor would leave the Sierra Leone road open so Doe loyalists could escape.   Bishop wrote further that the defendant also said that the NPFL had trained MPs to try to avoid repeat of the excesses which the defendant admits took place in Buchanan.

13

**William Twaddell**

Former Ambassador William Twaddell will testify that he met with the defendant at the U.S. Embassy in Monrovia approximately six times.   During this time frame the defendant identified himself as the NPF's Minister of Defense.   Twaddell considered the defendant to be very knowledgeable and a warlord who was looking out for himself and seeking personal gain in the struggle for control of resources and power that characterized the Liberian civil war.   The defendant told war stories about being trained in Libya and getting Taylor out of jail.   Twaddell will also testify about the NPFL's use of child soldiers, known as the SBU or Small Boys Unit, in extrajudicial killings, and how many child soldiers had AK-47s and were high on drugs. Twaddell will further testify about the brutality accompanying Operation Octopus. Twaddell also recalls that at times the defendant expressed that he was tired of war and wanted to work towards peace.

**Herman J. Cohen**

Former Assistant Secretary of State for African Affairs Herman "Hank" Cohen will testify that in February of 1990, after the NPFL invasion, the defendant contacted Cohen by telephone and advised that he was Taylor's representative in the U.S., and that Cohen should call him directly if he needed anything.   Despite his regular contact with Taylor, Cohen had additional contact with the defendant as a representative of the NPFL.   During his conversations with the defendant, the defendant never expressed displeasure with Taylor's activities.

**Gerald S. Rose**

Former Deputy Chief of Mission Gerald Rose will testify about his interactions with Charles Taylor and the defendant.   Rose met with the defendant both in Virginia, prior to Rose's posting in Monrovia, and in Monrovia.   Rose met with the defendant owing to his roles as the

14

NPFL's Minister of Defense and spokesperson.   Rose will also testify about the NPFL's use of child soldiers, who were high on drugs and duped with promises of spoils of war.   The child soldiers were everywhere and did not fully understand their actions and allowed the NPFL to brainwash them.   Rose had a child soldier put an AK-47 to his head at a roadblock.   Rose will further testify that in his role as Minister of Defense, the defendant could not deny that the NPFL was recruiting child soldiers and committing other crimes against humanity.   Rose will further testify about the brutality accompanying Operation Octopus.

### Tom White

Former Economic Officer Tom White will testify about a radio conversation he had with the defendant during Operation Octopus wherein White complained about the NPFL shutting down the Coast Guard radio tower site and harassing Liberian employees of the Voice of America at the VOA's site.   The defendant said that this was contrary to policy and that he would talk to Taylor about it.   White also apprised the defendant of Herman Cohen's trip and his desire to meet with Taylor in Abidjan, which the defendant said he thought was a good idea and that he would pass it on to Taylor.

### John R. Savage

Former Economic and Consular Officer Robert Savage will testify that he participated in at least two meetings at the U.S. Embassy between former ambassador William Twaddell and the defendant, who was serving as a representative of the NPFL.   The defendant and his motorcade would drive onto embassy grounds, which only a Minister or above could do.   Savage also remembers a meeting with the defendant and J. Lavela Supuwood in which Twaddell reiterated the message that the killings must stop because the events would destroy the county.   Savage

also recalls a meeting with the defendant and close Taylor associate J.T. Richardson at his apartment.

**Patrick Hatchett**

Patrick Hatchett, or another representative of the U.S. State Department's Office of Authentication, will authenticate various State Department cables, including, as noted below in Part III, a January 22, 1990 cable; a June 29, 1990 cable; a September 16, 1990 cable; and a November 2, 1992 cable.

C. **Journalists**

**Mark Huband**

Huband is a journalist who covered the Liberian civil war and spent time with the NPFL. He will testify about an occasion in June of 1990 on which he drove to a plantation, where he saw Taylor, Sam Dokie and the defendant, who was wearing a military uniform, a peaked army cap and held an AK-47 between his legs.

**Patrick Robert[3]**

Patrick Robert is a French photojournalist who was embedded with the NPFL rebel troops.   While with these troops, Robert observed persecution carried out by them and photographed some of the same.   He also observed them engage in combat.

**Gregory Stemn**

Gregory Stemn is a long time Liberian photojournalist who covered Liberia's first civil war.   While in NPFL-held territory, he observed and documented, through his photographs, the

---

[3]  Robert indicated some time ago that he will not be available for trial as currently scheduled. Accordingly, the government may seek to conduct a Rule 15 deposition of Robert. Fed.R.Crim.Proc. 15.

NPFL's widespread use of child soldiers as well as the aftermath of atrocities committed by NPFL rebels.   Additionally, Stemn had access, which he also documented through his photographs, to the leaders who controlled the NPFL.   To this end, Stemn's portfolio includes photographs of the defendant, as a prominent member of a high-ranking NPFL delegation at the third Youmoussokro peace talks, during which the defendant accompanied Charles Taylor.

### Mark Stucke

Mark Stucke was an independent journalist who traveled to Liberia to cover the civil war and filmed the NPFL as he traveled with them and through their territory for two weeks.   Many of the thirty to forty checkpoints that he passed through were decorated with skulls on sticks and manned by child soldiers, some with AK-47s.   Stucke will testify that NPFL rebels had no concern for human rights, and that the young fighters were on drugs, cross-dressed and wore amulets, engaged in gruesome torture and on occasion practiced cannibalism.   When he visited Taylor's headquarters in Gbarnga, he saw many child soldiers there, male and female, and some members of the Small Boys Unit were as young as ten years old.   Stucke will also testify that he was with ECOMOG soldiers when filmed a burned car with American nuns' decomposed bodies (*see* Part C.3. below).

### D.  Persecution Witnesses

#### 1.  Persecution of Krahns

##### a.  Witness A[4]

---

[4] Owing to security concerns for many of its witnesses, the government is currently identifying these witnesses by pseudonym.   The government is not seeking to offer anonymous testimony at trial; rather, the government seeks to withhold its witness' names and personally identifying information until shortly before the start of trial.

Witness A was in the U.S. when the civil war started in 1989, and when he returned, he passed through checkpoints with heads on stakes and intestines for ropes manned by child soldiers.   Witness A saw a Krahn man shot at an NPFL checkpoint because he was Krahn.

### b.  <u>Witnesses B, C and D</u>

Witness B's father was Krahn and his mother was Grebo.   When he tried to return to Monrovia to tend to them, he had to conceal his Krahn heritage.   Monrovia was completely divided by tribe and affiliation, and there was no freedom of movement.   At NPFL checkpoints, rebels would ask people their tribe and decide life or death based on the person's name and tribe. If a woman were pregnant, the rebels would bet on the gender of the fetus and cut it out. Witness B saw bleeding heads on posts at checkpoints and could smell fresh blood in the air.   At one point he accidentally gave his Krahn name and was tied up "duckfa tabay" style and beaten and tortured.[5]   At a town called Gutrie, Witness B saw NPFL rebels call the villagers out for an audience to watch them kill villagers, including a family of four simply because they were Mandingo.   Witness B saw that the NPFL rebels included child soldiers as young as ten years old and barely able to carry weapons.   Witness B saw a woman killed and her body displayed for declaring her support for Doe.   Witness B also heard the defendant on the radio as the NPFL Minister of Defense talking about the NPFL.   One of Witness B's sisters, Witness C, was raped and had a child by an NPFL supporter.   Another of Witness B's sisters, Witness D, was arrested and tortured by the NPFL but released because she spoke Grebo.   A family friend was arrested and tortured because he was a Doe government official, and was pushed out from a hiding place

---

[5] This method of binding, employed ubiquitously by all warring factions during the war, involved tying the prisoner's arms behind the back at the biceps so tightly that the elbows touch, forcing the prisoner's chest outwards like a duck, causing great pain and making it very difficult to breathe.

with another family because he endangered the others there.   In November of 1990, just as Witness B was at the last checkpoint before Monrovia, the NPFL arrested him and called him a "conniver."   He was tied, beaten and imprisoned for three weeks.   Witness B heard NPFL rebels say many times they would kill a Krahn if they had the chance.

### c.  Witness E

Witness E is a Krahn whose father was an official in the Doe government and who is related to Doe.   Witness E saw intestines strung up and human heads on posts at checkpoints. When Witness E tried to hide in a protected school, she was afraid that friends and classmates would tell on her for being a Krahn.   Witness E was arrested in 1994 by the NPFL for being Krahn; she was beaten, thrown in the trunk of a car and jailed, where she was raped repeatedly. While in jail, she was befriended by a young NPFL soldier who helped her escape to Monrovia. As she escaped, there were numerous checkpoints along the way to Monrovia, decorated with intestines and heads of the dead.   Hundreds of people were trying to leave, but the guards would pull the Krahn out and murder them.   The NPFL made everyone clap when a Krahn was killed. She saw an AFL soldier murdered, three Krahn murdered and children sold and thrown in the river.   In 1999 she was rescued by ECOMOG and on the plane to the U.S. she recognized the defendant, whom she remembered on the radio saying "a dead Krahn in the best Krahn."   The defendant was the Liberian equivalent of the U.S. Vice President.   Of her twelve siblings, only six survived.   She also lost four cousins at the port of Sierra Leone, where the NPFL murdered them, and her sister and her sister's husband and children were killed on the main road to Cape Mount, simply because they were associated with the Doe regime.

### d.  Witness F

Witness F is Krahn who recalls both Charles Taylor and the defendant saying on their radio broadcasts, "A good Krahn is a dead Krahn," and the defendant saying "We're [the NPFL] taking Liberia millimeter by millimeter."

**e.   Witness G**

Witness G is a Krahn who returned to Monrovia in 1989.   In 1990 he took a friend to lunch in downtown Monrovia, when a crowd began running towards them.   When he asked one what was going on and was told that the NPFL were going to invade the city sometime that day or next, his friend rejoiced at the news, pointed her finger at him and exclaimed that Charles Taylor was going to get rid of all the Krahns.   Witness G saw the NFPL invade the embassies of other countries like Nigeria whose counties were thought to support Doe, and slaughter the Krahn and Mandingo people inside.   Witness G recalls a segment on the BBC radio in which the defendant, the NPFL Minister of Defense, was asked about the embassy killings and his response was that this is war.   Witness G also recalls the defendant on the radio many times, relaying the demands of Charles Taylor and the NPFL, and saying "A good Krahn is a dead Krahn." Witness G also remembers the defendant on the radio saying that the NPFL was in control of an area called Gardnersville, and that a few days later, five American Catholic nuns were killed there.

**f.   Witness H**

Witness H saw Krahns killed on Duport Road in Monrovia, and checkpoints decorated with skulls and manned by male and female child soldiers.   She was also at the scene of the Carter Camp massacre within hours.   Witness H also saw the defendant accompanied by child soldier bodyguards.

2. **Persecution of Mandingos**

a. **Bakiedou Massacre**

**Witness I**

Witness I is a Mandingo born in Bakiedou, considered an Islamic village.   Since there was no high school in Bakiedou, he went to high school in Voinjama, which is a bigger town to the northwest.   Witness I attended the University of Liberia in Monrovia until the war broke out and he returned to Bakiedou, where his father was the town chief.   In June of 1990, Mandingos were being killed by NPFL rebels.   Witness I's father thought Bakiedou would be a safe haven, and after meeting in Voinjama about whether to leave Bakiedou to be safe from the rebels, the decision was made not to leave their homes.   On July 12, 1990, the NPFL attacked Bakiedou, and the town crier reported that NPFL had entered.   Through his window, Witness I saw his father meet with NPFL commander and offer him a cow as a peace offering.   The commander said the cow was his anyway, and the NPFL fighters began shooting at villagers. Witness I and his father fled to the bush, from where they saw fellow Mandingos killed by the NPFL.

**Witness J**

Witness J was living in Bakiedou when the NPFL entered and after shooting at the villagers, was gathered in the middle of town with other villagers, from whom the NPFL demanded money, and took a cow.   After the rebels killed a friend of Witness J for not handing over money and began shooting at the villagers again, Witness J fled to the bush, from where he

heard the shooting continue and people crying.   When he returned to the village, almost all of the people who had remained were killed, though some were alive but seriously wounded.

      **b.**  **Witness K**

Witness K was living in the village of Gbarquoitown when the NPFL arrived and ordered the villagers to line up.   When two Mandingo men were identified by the rebels, they killed the men in front of the villagers and ordered the villagers to clap.

    **3.**  **Murder of Five Sisters of the Adorers of the Blood of Christ**

       **Witnesses M, N, O, P, Q, Gregory Stemn, Mark Stucke, James Fasuekoi, Brian Brown, Fr. Michael Moran**

During Operation Octopus in October of 1992, five Catholic nuns of the missionary order the Adorers of the Blood of Christ who had been serving the local Liberian population for many years from their convent in the Gardnersville neighborhood of Monrovia, were murdered by NPFL fighters.   Sister Barbara Ann Muttra and Mary Joel Kolmer had left the convent with the convent's security guard and were killed on October 20, 1992 in their car, along with two ECOMOG peacekeepers who had joined them.   On October 23, 1992, Sisters Kathleen McGuire, Agnes Mueller and Shirley Kolmer were killed when NPFL fighters attacked the convent.   According to two aspirants who survived, Witness M and Witness N, the Sisters were resting after lunch when several NPFL rebels began firing at the convent gate.   Once inside the compound, the fighters, led by a commander named Christopher Vambo, widely known as Mosquito, yelled at them to come outside.   Sister Kathleen came out first, followed by a Lebanese man who had taken refuge in the convent with his family, and then Witness M.   One of the fighters, Black Devil, shot Sister Kathleen in the arm with an automatic weapon, and she fell down.   The Lebanese man was also shot and fell.   The other occupants of the convent had

come out and Mosquito demanded their money and the cars, and ordered his fighters to separate the white people, accusing the white people of conspiring with ECOMOG.   Mosquito then gave the order to Black Devil to kill the remaining Sisters, so Black Devil walked over to Sister Kathleen and shot her in the back of her neck with his long gun, then shot Sister Agnes and Sister Shirley.   In addition to Witness M and Witness N, these events were also witnessed by Witness O, who had taken refuge in the convent earlier.

Mosquito ordered his fighters to take the remaining occupants of the convent, including Witness M and Witness N, to another location, so they began walking.   On the way, they passed the car which Sister Barbara and Sister Joel had driven earlier in the week.   The car was burned out and the Sisters' bodies and those of the ECOMOG soldiers were still there.   In addition to Witness M and Witness N, Mark Stucke and James Fasuekoi also saw the burned-out car and human remains in the street where the Sisters were attacked.   At one of the locations where they stopped, the aspirants encountered an NPFL commander named Martina Johnson and told her that her boys had killed the nuns.   Johnson told the fighters with her that this would be a problem for "Pappy" (a nickname by which Charles Taylor was widely known).   Gregory Stemn recalls that Johnson and Mosquito, who Stemn knew also as Christopher Vambo, were in the Gardnersville during Operation Octopus, working together as commanders.   Stemn took a photograph of Mosquito with Charles Taylor in Bomi Hills, and recalls Taylor introducing Johnson to ECOMOG as General Martina Johnson.

Approximately a month after the murders, when conditions were secure enough, a team was dispatched to recover the nuns' remains.   Gerald Rose, Brian Brown and Fr. Michael Moran were involved in this effort.

**Witness P**

Witness P was an NPFL fighter who met Mosquito, whose name he recalls as Christopher Vamore or Vambo, before Operation Octopus.   Witness P's unit took control of an area of Gardnersville, and his fighters, including one nicknamed Town Devil, were ordered to take over an area they referred to as Super Market.   Martina Johnson was responsible for directing artillery to the area.   At one point, Town Devil called for reinforcements, so Witness P sent three fighters, including a child soldier name Sam, to Town Devil's location.   Later that day, Sam reported to Witness P that there was a problem and that Americans had been killed. Witness P and Sam drove to the location, which is across from a super market.   Mosquito talked about the need to cover up the murders and blamed the killings on AFL, and a few days later Mosquito called a meeting and ordered him to sign a false report blaming the AFL for killing the nuns.   Witness P did not believe Mosquito, and both Town Devil and Town Devil's bodyguard told Witness P that Town Devil had killed the nuns.

**Witness Q**

Witness Q was an NPFL child soldier radio operator.   Witness Q recalls that during Octopus, General Mosquito, "Town Dable," and other fighters went to a house with white people and questioned them about supplying information.   General Mosquito, who Witness Q knew as "Christopher Vamoe," ordered "Town Dable" to kill them.   Witness Q stated that they inserted sticks in the victims.

4.   **Carter Camp Massacre**

24

### Witnesses A, H, R, James Fasuekoi

In June 1993 several hundred displaced persons were massacred near the Firestone Plantation in the Harbel area.   Witness A, Witness H and James Fasuekoi arrived at the site after the massacre and were horrified by what they found, including people chopped into pieces and desecrated.   The killings were initially attributed to AFL, but many witnesses have stated that the perpetrators were the NPFL.

### Witness R

Witness R was an NPFL soldier and stated that an NPFL commander told him that there were civilians in Carter Camp who were collaborating with AFL soldiers in Camp Schefflein, and that they should be executed because of this.   After the massacre, Witness R heard the same commander say that the children were not spared because they were following Taylor's orders and that several hundred people were killed at Carter Camp.   Witness R also knew that the massacre was later falsely blamed on the AFL.   Witness R was also familiar with the practice of placing severed heads at checkpoints and using human intestines as gates.

### 5.  Other Evidence of Child Soldiers

### Witness L

Witness L worked for a nongovernmental organization rehabilitating child soldiers. During the war, many of the NPFL child soldiers wore red.   En route from Mt. Barclay to Gbarnga, child soldiers manned the as many as thirty checkpoints, many of which featured human skulls and dead bodies.   The first time Witness L saw the defendant was at an ECOMOG checkpoint, where the defendant was surrounded by four cars of armed child soldiers.   Witness L saw the defendant again at a Liberian National Police station in Kakata, arriving in a vehicle

with two pick-up trucks full of mostly child soldiers armed with AK-47s who were the defendant's bodyguards.   Witness L also saw the defendant at Harbel on Duchana Highway in the Firestone area with John T. Richardson; at that time, the defendant was wearing a T-shirt, jeans and was armed with a pistol with a wooden grip on his hip.   Witness L also saw the defendant on a ship going from Monrovia to Nigeria.

In the Friday October 23, 1992 BBC World Service for Africa broadcast of African Perspective, the defendant was interviewed by BBC commentator Hillary Anderson.   During this interview the defendant, the NPFL's Minister of Defense, expressly acknowledged that the NPFL had formed a Small Boys Unit consisting of child soldiers, and further, endorsed its use. Although the defendant minimized the size and impact of the Small Boys Unit, as well as the ages of its members, the NPFL's use of child soldiers was widespread.   In the interview, the defendant contended that the Small Boys Unit consisted of boys aged "maybe from thirteen to fourteen on," and "not babies . . . not ten years old."   The defendant's contention is belied by, among other things, photographic evidence which depicts several Small Boys Unit members who appear to be, at the most, ten years old.   According to numerous witnesses, the NPFL's use of members of the Small Boys Unit was pervasive, and some were indeed as young as ten.   They regularly manned innumerable NPFL checkpoints at which severed human heads and skulls were often displayed, and human intestines were used as rope.   Many of the Liberian conflict's most heinous events occurred at these checkpoints.   The NPFL regularly provided drugs to children in the Small Boys Unit, which in conjunction with the lack of judgment and fear that is a characteristic of youth, resulted in the foreseeable commission of atrocities by this army of armed children.   These armed children were pliable and followed the leads and orders of their

26

adult NPFL commanders, which resulted in the persecution of targeted groups which the NPFL perpetrated.   The defendant was intimately familiar with the children in the Small Boys Unit. On more than one occasion, these armed children served as Defense Minister Woewiyu's bodyguards and accompanied him through checkpoints, some of which were manned by other Small Boys Unit child soldiers.

Liberia's first civil war, which lasted from approximately 1990 through 1995, was distinctive almost from its inception for its brutality, its use of child soldiers, its lack of freedom of movement and the employment of these checkpoints, amid the relentless ethnic, tribal and politically-motivated violence.   Numerous witnesses will testify about the ubiquitous horror that anyone who set foot in Liberia and traveled on its roads during this period experienced.   Moving constantly to and from the NPFL headquarters in Gbarnga, the defendant undoubtedly encountered these checkpoints over and over again.   As an NPFL member of the highest prominence and authority, the defendant's use of child soldiers could only have sent the clear message throughout the entire rebel group that their use was sanctioned, and which in turn could only have served to perpetuate the persecutory atrocities committed by them.

### E.  Former NPFL Officers

#### Witness S

In 1980, Witness S was a soldier in the AFL when Doe took over.   Witness S stayed in his position until the Quiwonkpa attempted coup in 1985, after which he fled to Cote d'Ivoire, where Charles Taylor later approached him to oppose Doe.   In March 1997, Taylor asked him to serve as an officer in the NPFL.   Witness S met the defendant in 1988 in Cote d'Ivoire.   The defendant was an intermediary between Ellen Johnson Sirleaf and Taylor.   Burkina Faso agreed

to help train the NPFL in fighting and combat tactics, but had no money to support the rebels, so Burkina Faso president Thomas Sankara procured the agreement of Libya for training and supplies.   Witness S will also testify that Muammar Gaddafi sponsored the training of NPFL soldiers at the Mataba training facility in Tripoli.   Witness S met the defendant in Libya on one occasion.   Sirleaf had sent $10,000 to Libya with the defendant for the NPFL forces, but the defendant said that the money had been stolen.   When the NPFL attacked on Christmas Eve 1989, the plan was to attack military installations; however, the NPFL troops attacked Mandingo and Krahn civilians to settle longstanding tribal conflicts.   Witness S did not approve of a tribal war and made this known to Taylor, then left the NPFL.   Witness S was with the defendant on one occasion when the defendant started bragging to some strangers about his arms smuggling and role under Taylor.

**Witness T**

Witness T was an AFL officer in the summer of 1990 when he received information that the NPFL was going to capture and kill all AFL officers.   Witness T stripped off his uniform and began to flee towards the Firestone plantation.   As he fled, Witness T passed through NPFL checkpoints guarded by young boys (Small Boys Unit or SBU) and girls (Yellow Jackets), and decorated with human intestines and heads on spikes.   The NPFL located Witness T's wife and when he saw her with NPFL soldiers, he surrendered.   Witness T was taken to Kakata, where he saw former AFL turned NPFL commander Isaac Mussa, and was then taken to Gbarnga to meet Charles Taylor.   In Gbarnga Agnes Taylor recognized Witness T, and when Charles Taylor found out about Witness T's U.S. military training, as the price for Witness T's life, Taylor assigned him to train new NPFL soldiers.   Witness T then helped train NPFL soldiers in

marksmanship, ethics and basic war guidelines, including Geneva Conventions, but this was not pushed through the NPFL.

Witness T met the defendant in August of 1990.   Witness T had heard the defendant on the radio in support of NPFL.   The defendant had an office in Kakata.   The defendant was a professional civilian who discussed strategy and was opposed to looting.   The defendant was well-respected and had command and control over the NPFL.   The defendant attended meetings where Taylor decided that the defendant would tell the field commanders when and where to attack.   Taylor gave direct orders, but there were times when the defendant gave military instructions independently of Taylor.   The defendant knew that people were being questioned and killed because of their ethnicity but did nothing to stop it.   Between 1991 and 1992, Witness T met with the defendant on multiple occasions.   The defendant was always in and out of Gbarnga.   With respect to Operation Octopus, Witness T does not know if the defendant was part of the planning.   Martina Johnson was involved in Operation Octopus and was in charge of artillery.   In 1994, the defendant was at a meeting during Operation Turn the Broom when Gbarnga fell to ULIMO.   Witness T also traveled with the defendant on behalf of the NPFL to Togo, Cote d'Ivoire and Ghana for peace accords, where the defendant was spokesperson and negotiator.   Witness T wrote down the NPFL chain of command in descending order and listed the defendant as third in line behind Charles Taylor.

### F.  Law Enforcement Officers

#### 1.  The Undercover Arms Export Investigation

##### Gary Lang, William Parks, Peter Ostrovsky, Melissa Rich, Michael Verre

As previously described in Part I.C. above, one of the defendant's responsibilities on

behalf of the NPFL was to acquire arms for the NPFL fighters.   In approximately 1993, the defendant was introduced by an associate, Eugene Cox (now deceased), to individuals the defendant believed to be arms brokers who could supply the NPFL with large quantities of military machine guns such as M-16s and AK-47s, ammunition for those rifles, and surface-to-air missiles.   In reality, the brokers were undercover agents with the U.S. Customs Service ("Customs") who were operating an undercover business out of an undercover storefront in the Miami area.

In 1992, Cox, who was the original target of the investigation, told the undercover agents that he had a friend "Tom," who was the Minister of Defense with Charles Taylor in Liberia, and who needed arms and ammunition for their rebel group.[6]   In 1993, the defendant participated in three recorded meetings, in which Cox, the defendant and the undercover agents discussed the logistics of shipping large quantities of weapons and ammunition from the U.S. to Liberia. Some of the main issues they discussed included the need for the defendant to pay for the arms and the cost of their transportation up front, and how to evade U.S. arms export laws and avoid interdiction.   In order to conceal the true nature of the lethal aid, they discussed disguising the shipment as medical supplies.   During a meeting in Washington, D.C. on June 18, 1993, the defendant produced a Promissory Note in the amount of $2,350,000 on behalf of the NPRAG (the NPFL government) to the undercover company for the "medical supplies," as well as an eight-page inventory of the fictitious medical supplies.   During an audio and video-recorded

---

[6] It is the government's position that this conversation and others recorded during the undercover Customs investigation constitute co-conspirator statements made during the course and in furtherance of a conspiracy under Federal Rule of Evidence 801(d)(2)(E).   This is so even where, as here, the conspiracy is not charged.   *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir.1998).

meeting on November 29, 1993 inside the undercover business' garage, an undercover agent can be seen removing an M-16 machine gun from the trunk of a vehicle and handing it to the defendant to inspect.   During this meeting, in order to address his purported lack of immediate cash to fund the transportation of the arms, the defendant also produced a proposed Agreement in connection with Promissory Note, in which he proposed that the undercover company pay Cox $200,000 up front in advance of the shipment for the transportation costs; in this way, once the arms successfully reached Liberia, the NPRAG would release the funds to pay for them under the terms of the Promissory Note.   The defendant also produced a draft Certificate of Authenticity in which he certified that the President Taylor and the Ministers of Justice and Finance all affixed their seals to the Promissory Note in his presence on June 1, 1993. However, the deal was never consummated.   Among other charges, Cox pleaded guilty to conspiracy to violate the Arms Export Control Act "in connection with his participation in a conspiracy with Tom Woewiyu and others to export arms unlawfully from the United States to rebel forces in Liberia from approximately January 1992 to approximately September 1993."

Lang and Parks were the primary undercover Customs agents who portrayed principals with the undercover company.   Ostrovsky was an undercover Customs agent who handed an M-16 machine gun to the defendant during the audio and video-recorded meeting on November 29, 1993.   Rich was an undercover Customs agent who posed as the receptionist and secretary of the undercover company.   Verre was the supervising Customs agent of the undercover operation.

The defendant's activities during the course of the undercover Customs operation are consistent with his own accounts of what he did as the NPFL's Minister of Defense to obtain arms for the NPFL fighters.

2. **The Dutch Investigation of Gus Kouwenhoven**

   **Huig "Lewis" Bouter, William "Danny" Tinga, Arien Zuijdwijk**

As noted above in Parts I.C. and I.D., the defendant described for Dutch authorities his founding role in the NPFL and critical work on its behalf.   Lewis Bouter and Danny Tinga are Dutch investigators who received intelligence regarding an association between arms trafficker Gus Kouwenhoven and the defendant.   Kouwenhoven was a Dutch national with business interests in Liberia and was under investigation for, among other things, trafficking arms there. In 2004 Bouter and Tinga conducted a series of interviews for two weeks at the Mamba Point hotel in Monrovia, along with interpreter Arien Zuijdwijk.   They had two laptops and a printer. Bouter or Tinga would ask the question in Dutch, Zuijdwijk would interpret the question in the language of the witness and then interpret the witness' answer back to the investigators in Dutch. Zuijdwijk would review and edit the responses typed in Dutch following each response, and upon completion, the official Dutch statement would be read back to the witness in the witness' language, and if anyone decided it needed to be corrected, the statement would be changed, and once all parties agreed that the statement was accurate, it was printed and the witness and investigators signed it.   The defendant did not want to sign his statement because it was in Dutch.   Bouter, Tinga and Zuijdwijk also participated in the 2006 hearing before the magistrate in which the defendant provided his signed, sworn statement.

3. **The Defendant's Communications With FBI Special Agent Tylor Hanna**

   **Tylor J. Hanna**

FBI Special Agent Tylor Hanna will testify about his interactions with the defendant, which include his statements during an July 27, 2012 interview conducted by Hanna in connection with an

unrelated matter.   During this interview the defendant provided historical perspective for his close relationship with Charles Taylor, and further revealed that in the late 1980's he arranged for a number of men to receive military training in Libya with the intention of having these men return to Liberia to help train other men to fight against the Doe government.   In securing this arrangement and additional help from Libya, the defendant met with Muammar Gaddafi on several occasions. The defendant told Hanna that he testified for Taylor when Taylor was jailed in Massachusetts in the 1980's for fraud and collected $10,000 bail for Taylor.   He further stated that Taylor called him to tell him to come to Cote d'Ivoire and that Ellen Johnson-Sirleaf and others raised money to send the defendant to Cote d'Ivoire, where they agreed to organize a resistance to the Doe government.   The defendant further stated that he traveled to Burkina Faso and convinced Blaise Compaore and Thomas Sankara to help train the resistance fighters, and that through this relationship, he also secured an agreement with Gaddafi to receive training and supplies.   The defendant said that he met with Gaddafi several times in Libya, and that in 1988 he received permission to begin training in Tripoli, and that 190 men were sent to the Mataba facility there to be trained as trainers, who would return to Liberia and train the resistance soldiers.   Hanna will also introduce into evidence the defendant's resume, which the defendant gave to him, and in which, among other things, the defendant states that he served as the NPFL's spokesperson and Minister of Defense, although he claims that he was more of a defense spokesperson that an actual commander of troops.

### Joseph R. Denahan

FBI Special Agent Joseph Denahan was present during Special Agent Tylor Hanna's interview of the defendant.

33

4. **The Defendant's Immigration-Related Fraud, False Statements And Perjury**

   **Marsilina "Marsha" Eikerenkoetter**

U.S. Customs and Immigration Services Officer Marsha Eikerenkoetter will testify that she is the USCIS officer who conducted the defendant's January 30, 2009 naturalization interview, as described above at Part I.E.   During the interview, the defendant, while under oath, orally confirmed and later subscribed under penalty of perjury to the truthfulness of the contents of his Form N-400. Eikerenkoetter will further testify that, among other things, when she asked the defendant if he ever advocated, either directly or indirectly, the overthrow of any government by force or violence, he responded by "chuck[ling] a little, then answered, 'No.'"

   **Peggy Lin**

USCIS Senior Immigration Services Officer Lin will testify that she authored the USCIS' requests for additional evidence and drafted the denial notice denying the defendant's naturalization application.   Lin will further testify about the grounds of eligibility for naturalization and that the alien bears the burden of proof.   The alien must establish, among other things, that he/she is a person of good moral character.   USCIS found that the defendant lacked good moral character based on his involvement and leadership role in the NPFL, which "has been implicated as a main perpetrator of gross human rights violations during Liberia's infamously violent civil war," as well as his having provided false testimony during his naturalization interview regarding his membership with the NPFL.

   **Sharee A. McCall**

USCIS District #5 Records Manager Sharee McCall will describe the process of certifying the defendant's Alien File.

5.  **Robert Craig**

Department of Homeland Security, Homeland Security Investigations Special Agent Robert Craig will introduce a certified copy of the defendant's 1970 New York State criminal conviction for falsification of business records.

6.  **Jennifer Lohmeier**

FBI Special Agent Jennifer Lohmeier located some of the BBC broadcast recordings and drafted some of the BBC recording transcripts.

G.  **Alphabetical Witness List**

1.  Bishop, James K.
2.  Bouter, Huig "Lewis"
3.  Brown, Brian
4.  Cohen, Herman J.
5.  Craig, Robert
6.  Denahan, Joseph R.
7.  Eikerenkoetter, Marsilina "Marsha"
8.  Fasuekoi, James K.
9.  Hanna, Tylor J.
10. Hatchett, Patrick
11. Huband, Mark
12. Lang, Gary
13. Lidow, Nicholai
14. Lin, Peggy
15. Lohmeier, Jennifer
16. McCall, Sharee
17. Moran, Fr. Michael
18. Rich, Melissa L.
19. Robert, Patrick
20. Ostrovsky, Peter
21. Rose, Gerald S.
22. Savage, John R.
23. Stemn, Gregory
24. Stucke, Mark

25. Tinga, William "Danny"
26. Twaddell, William
27. Verre, Michael
28. White, Tom
29. Zuijdwijk, Arien
30. Witness A
31. Witness B
32. Witness C
33. Witness D
34. Witness E
35. Witness F
36. Witness G
37. Witness H
38. Witness I
39. Witness J
40. Witness K
41. Witness L
42. Witness M
43. Witness N
44. Witness O
45. Witness P
46. Witness Q
47. Witness R
48. Witness S
49. Witness T


### III.      GOVERNMENT'S EXHIBITS[7]

1.  N-400 Application for Naturalization and Supporting Documents, 01/30/09;
2.  Memorandum for File from Marsilina Eikerenkoetter, 02/03/09;
3.  Request for Evidence, 02/03/09;
4.  Request for Evidence Response, 02/20/09;
5.  Request for Evidence, 07/15/09;
6.  Request for Evidence Response, 08/13/09;
7.  USCIS Decision on N-400 Application, 08/12/10;
8.  Woewiyu Cable to John Dobrin, 01/22/90;
9.  J.K. Bishop Cable to Herman Cohen, 06/29/90;
10. Liberia Task Force Memo, 09/16/90;

---

[7] Since for various reasons, the government has not settled on an order of proof, the numbers assigned to the government's exhibits in this memorandum will not match the exhibit numbers assigned to the government's exhibits at time of trial.

11. Cable Re: Murdered Nuns, 11/02/92;
12. Video of recovery of nuns' remains, 11/92;
13. Video, Firestone and the Warlord;
14. Video, Who Killed the Nuns?;
15. Case File of Arms Export Investigation, U.S. Customs Service;
16. Transcripts of meetings in Customs arms export investigation:   01/29/92, 04/29/93; and 11/29/94;
17. BBC Broadcast Recording Transcripts: June 1, 1990; June 21, 1990; June 25, 1990; July 3, 1990; July 12, 1990; July 13, 1990; August 13, 1990; August 14, 1990; August 23, 1990; August 24, 1990; August 27, 1990; August 29, 1990; September 10, 1990; September 10, 1990; September 19, 1990; September 24, 1990; September 27, 1990; March 28, 1991; April 8, 1992; June 3, 1992; October 23, 1992; November 3, 1992; November 28, 1992; May 4, 1993; June 9, 1993; September 7, 1994;
18. Affidavit of Jucontee Thomas Woewiyu, dated 07/19/96, submitted in *Cigna v. Bridgestone/Firestone Inc., et al.*;
19. Statement of Thomas Woewiyu taken on 11/30/04 at the Mamba Point Hotel, Monrovia, Liberia, English translation from Dutch;
20. Witness interview of Jucontee Thomas Woewiyu taken in the presence of investigating magistrate Y.J. Wijnnobel-Van Erp on 03/02/06 in the Hague in the prosecution of Augustinus Petrus Maria Kouwenhoven, English translation from Dutch;
21. Witness interview of Jucontee Thomas Woewiyu taken in the presence of investigating magistrate Y.J. Wijnnobel-Van Erp on 03/02/06 in the Hague in the prosecution of Augustinus Petrus Maria Kouwenhoven, original Dutch with signatures;
22. 302 of Interview of Woewiyu, 07/27/12;
23. Woewiyu E-mail to Agent Hanna, 07/30/12;
24. Woewiyu Resume;
25. 2005 Woewiyu Open Letter to Madam Ellen Johnson-Sirleaf;
26. "Woewiyu Testimony to the Liberian TRC That Was Never Given," African Panorama;
27. 302 of Interview of Woewiyu 302 of Interview, 08/07/12;
28. Woewiyu E-mail to Agent Hanna, 08/23/12;
29. Turning the Tables article, 08/1992;
30. Alien File of Jucontee Thomas Woewiyu;
31. Map of Africa;
32. Map of Liberia Counties;
33. Map of Liberia;
34. Photographs taken by Patrick Robert;
35. Photographs taken by James K. Fasuekoi;
36. Photographs taken by Gregory Stemn.

**IV.     STIPULATIONS BETWEEN THE PARTIES**

To date there are no stipulations between the parties. This may change as the trial date becomes closer.

**V.      ESTIMATED LENGTH OF GOVERNMENT'S CASE**

The government estimates that its case will take approximately six weeks to present.

Respectfully submitted,

LOUIS D. LAPPEN
United States Attorney


*/s/ Linwood C. Wright, Jr.*
LINWOOD C. WRIGHT, JR.
NELSON S.T. THAYER, JR.
Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Government's Trial Memorandum was filed

electronically on the Electronic Case Filing system, is available for viewing and downloading

from the ECF system, and/or was served electronically on the following:

Mark T. Wilson, Esq.
Defender Association of Philadelphia
Federal Court Division
The Curtis Center Building
601 Walnut Street, Suite 540 West
Independence Square West
Philadelphia, PA   19106

/s/*Linwood C. Wright, Jr.*
LINWOOD C. WRIGHT, JR.
NELSON S.T. THAYER
Assistant United States Attorneys

DATED:  January 11, 2018