```
                UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,      )   14-CR-00050-1-AB
                               )
      vs.                      )
                               )
JUCONTEE THOMAS WOEWIYU, a/k/a )
JUCONTEE THOMAS SMITH,         )   Philadelphia, PA
                               )   June 12, 2018
              Defendant.       )   11:57 a.m.


          TRANSCRIPT OF DEFENSE'S OPENING STATEMENT
            BEFORE THE HONORABLE ANITA B. BRODY
                UNITED STATES DISTRICT JUDGE



                    APPEARANCES:

For the Government:       LINWOOD C. WRIGHT, JR., ESQUIRE
                          NELSON S.T. THAYER, JR., ESQUIRE
                          ASSISTANT UNITED STATES ATTORNEY
                          UNITED STATES ATTORNEY'S OFFICE
                          615 Chestnut Street, Suite 1250
                          Philadelphia, PA  19106


For the Defendant:        CATHERINE C. HENRY, ESQUIRE
                          FEDERAL COMMUNITY DEFENDER OFFICE,
                          EDPA
                          601 Walnut Street, Suite 540W
                          The Curtis Center
                          Philadelphia, PA  19106


                          MARK T. WILSON, ESQUIRE
                          DEFENDER ASSOCIATION OF PHILADELPHIA
                          601 Walnut Street, Suite 540W
                          The Curtis Center
                          Philadelphia, PA  19106


Audio Operator:           JAMES F.G. SCHEIDT


Transcribed by:           DIANA DOMAN TRANSCRIBING, LLC
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026
                          Office:  (856) 435-7172
                          Fax:     (856) 435-7124
                          Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

1                          <u>I N D E X</u>

2

3        <u>OPENING STATEMENT</u>:                                    <u>PAGE</u>

4          By Ms. Henry                                       3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following was heard at 11:57 a.m.)

2    (Jury present)

3        MS. HENRY:  Five more minutes of good morning.  Good

4 morning, ladies and gentlemen.

5        THE JURY:  Good morning.

6        MS. HENRY:  Good morning, Your Honor, counsel.

7        Ladies and gentlemen, Tom never lied.  Tom Woewiyu

8 had not reason and no motive to lie.  Did you -- the only

9 dispute in this case is about four questions on a citizenship

10 application and questions that were asked during a 15-minute

11 interview.  That's it.  That's the only thing this case is

12 about.

13        Did you get that from the Government's hour-plus

14 opening statement where they're giving you a detailed history

15 lesson on the Liberian Civil War?  Look, we don't disagree

16 about what happened in West Africa 30 years ago during the

17 First Civil War.  It's well documented.

18        You heard them say they're going to have numerous

19 historians come in and tell you about the Liberian Civil War.

20 But all of that has nothing to do with whether Tom Woewiyu

21 lied on his Immigration form or whether he tried to defraud

22 Immigration by hiding who he is, because that's what the crime

23 is in this case.

24        He never tried to hide who he was, he never lied,

25 and because of that your verdict must be not guilty in this

case.  Remember, this case is about four questions and the

testimony in this case should last about three days.  But you

heard from Mr. Thayer that they're talking about bringing

numerous witnesses they plan to call for trial, an extensive

list of witnesses, witnesses that are completely unnecessary

to this case and unnecessary in that they're talking about

what happened 30 years ago on the other side of the globe.

Not only is it irrelevant, but it's largely

undisputed and I want to talk to you about what we're agreeing

on so that you can see what this case is really about.  We

agree -- and I want to say this now right up front, we agree

that Tom is in the NPFL, okay?

He's in the NPFL -- the National Patriotic Front of

Liberia.  He was at some times a spokesperson, some times the

minister of defense, we agree on that, okay?  Everybody knew

that, Tom was in the NPFL.

The NPFL's goal was to oust the evil dictator,

Samuel Doe.  We agree with that, okay?  They want to bring in

journalists and diplomats and witnesses and people from the

Defense Department to say that Tom was in the NPFL.  He was in

the NPFL, okay?

They want to bring all these witnesses to talk about

the history, and in fact what the NPFL was trying to do, they

were trying to get rid of Samuel Doe, the man who usurped the

Government, the dictator.  That was NPFL's plan.  Tom was in

1  the NPFL.  Also, we're agreeing that some NPFL soldiers -- and
2  you're going to see pictures of these soldiers in the bush as
3  he described it and you're going to see what they did and how
4  disorganized it was, but some of those NPFL soldiers committed
5  violent acts and the war was an exceptionally brutal war.
6       And you're also going to hear -- and we agree, that
7  child soldiers were in the NPFL, so we agree on all of those
8  things.  And because they're not in dispute, those issues
9  aren't in dispute, why does the Government need to drag these
10 poor people across the globe and make them come here and
11 testify and re-live some of the most awful things that ever
12 happened to them?
13      What did he say, 24 people, never even been on an
14 airplane, why do they have to bring them here and put those
15 people through this and put you through it too?  I mean, not
16 just the time, I'm not just talking about the time, I'm
17 talking about the emotion of forcing you to listen to these
18 horror stories, and they will be awful, okay?
19      But why make everyone sit through that and make
20 these people go through that?  Because at the end of the day,
21 you're not going to be able to do anything about it.
22      There's nothing that this Court can do to fix what
23 happened to them and there's nobody in this courtroom --
24 nobody in this courtroom who can ever make these people whole,
25 as much as all might want them to be.

1    So then what is it all for?  Come on.  The only

2    reason the Government is calling all these witnesses is to

3    emotionally manipulate you and distract you from the real

4    issue in this case.  It's smoke and mirrors, ladies and

5    gentlemen.

6        The issue in this case is the four questions on the

7    citizenship application, questions that Tom Woewiyu answered

8    to the best of his knowledge and belief and that's what's

9    required by law.

10       Now, you heard the Government say he had to take an

11   oath.  Well you know what that oath was?  That oath was that

12   Tom had to answer those questions to the best of his knowledge

13   and belief -- his knowledge and belief, his opinion, okay?

14   And I'm going to show you that in a few minutes.  And he did

15   answer those questions correctly, and we're going to explain

16   to you why.

17       So that's what the case is about.  But if we're

18   going to be forced to talk about this war, let's be real.

19   There was plenty of blame to go around, okay?  There was not

20   one good guy and one bad guy.

21       You know, you only heard like a little bit of it

22   from the Government in the opening, but even the supposed

23   "peacekeeping forces" he was talking about, ECOMOG, you know,

24   they were killing people you're going to find out.

25       So it was a crazy and awful time, it was a mess over

there and that can be hard for us to imagine what that was like because here in the United States we have like the most organized and sophisticated military. Some of you have served in that military and so you know that first-hand.

But this was Africa, okay, this is the bush. This is 30 years ago. More than half of Liberia today doesn't have running water or electricity. Things are really different over there. And you're not here -- you're not here to pass judgment on the way the Liberian Civil War was fought. That's what they're really mad about, right?

I mean, you saw when he comes over to talk to Tom and try to point in Tom's face, it's not about which box did you check on the form. He's talking about what went down in the Liberian Civil War and that's none of our business and that's not what you're here to decide.

You're here to pass judgment on an Immigration case. That's what the Judge told you during voir dire, right? What are the charges? Immigration charges.

But I've got to stop and say for a minute and tell you that what you're telling you about Tom Woewiyu was wrong and you're going to hear he's not the man they're painting him to be and you're going to hear about that during this trial.

But most importantly for you and for the purposes of this trial is that he never intended to mislead Immigration about who he was. That's why he's not guilty. But I'll give

1  you a small abbreviated version of the history as it relates

2  to Tom.  The story starts with Samuel Doe, even before that

3  with the America Liberians like he told you, and then Samuel

4  Doe came.

5       Everyone agrees he was a genuinely bad man.  He

6  killed the president who was this guy James (sic) Tolbert,

7  assassinated 13 of his cabinet members and usurped the office

8  of president.

9       Then as he told you, he went and killed Gio and Mano

10  Tribes after someone tried to -- there was a failed coup on

11  him, and at this time what's going on here with Tom is that

12  Tom joins the majority of Liberians abroad and here, in

13  wanting to get back to a constitutional democratically elected

14  government in Liberia.

15       You're going to hear Tom's own words because he was

16  the spokesperson of the NPFL.  You're go to hear that he and

17  other Liberians viewed Doe as a usurper, not the leader of any

18  legitimate government and that he needed to go.  He told you

19  that in the opening.

20       They agreed Doe needed to go and so Tom, in 1987,

21  was part of a group that formed the NPFL and he began as a

22  spokesperson as I told you and then was defense minister.  And

23  each of these positions, even though that actually -- and

24  you're going to find out that even though they had different

25  titles, he's basically doing the same thing.

1    Like he said, he was -- you saw the picture with 19

2    microphones in front of him, he's the person who's giving

3    speeches, giving testimony talking about the NPFL.  And in his

4    positions for the NPFL, Tom met with United States officials

5    including the United States Ambassador to Liberia.

6    You see, the United States had an interest in this

7    conflict.  There were large scale US industries operating in

8    Liberia at the time -- rubber industries, timber industries,

9    so the US was playing both sides of the fence during this

10   conflict and at times, gave aid to the NPFL, okay?

11   He didn't mention that to you.  So but the point

12   being that things were very complicated.  It was war.  It was

13   war.  And when we're looking back on history when you're

14   studying a revolution or a civil war, you know, people will

15   have different opinions.

16   And this discord, this disagreement about who

17   started it and who's to blame and who did what, it can go on

18   and on and it can never be resolved, and reasonable minds can

19   differ and the debate can go on.  But this isn't history

20   class.  This isn't a debate club, okay?

21   This is Federal Court and Tom is charged with

22   Federal Immigration crimes and not war crimes.  So the

23   indictment basically charges Tom with intentionally trying to

24   hide who he was and what he had done in applying for

25   citizenship.

1        So talk about that a little bit, there's a whole

2   bunch of charges but it's all about the same thing.  It's that

3   -- and the reason that these charges exist, he's right, is

4   that we can't have people hiding who they are coming in.

5        It's a crime to come and try to trick Immigration

6   authorities, pretend to be someone else and slip in and get

7   citizenship.  That's what this crime is about.  Tom never did

8   anything even close to that and the evidence you're going to

9   hear in this case will back that up.

10        So what you have to figure out and what you'll have

11   to decide in this case is what happened during this

12   application process, the application process for citizenship,

13   and you have to decide that what was in Tom's mind during this

14   process, that's what this whole case is about.

15        So let's talk about the steps in the citizenship

16   process because the information the Government gave you was a

17   tiny snippet of it so let's talk about what happens, how you

18   become a citizen.

19        The evidence in this case is going to show you that

20   the citizenship application process which begins with the

21   determination of whether or not you're eligible, so not

22   everyone can apply to be a citizen.

23        You have to have been in residence for a certain

24   amount of time in the United States, you can't have certain

25   kinds of convictions because those things render you

1   ineligible, okay?

2        After you have decided if you're eligible or not,
3   the next thing you do is that you fill out what's called the
4   form N-400.  That's the form we've been talking about, the
5   ten-page form.  It's commonly known as the citizenship
6   application.

7        The form was -- back when Tom filled it out, was ten
8   pages.  It's now 20 pages long, okay?  But the N-400 is the
9   citizenship application and a person will fill that out with
10  their lawyer or by themselves.

11       In this case you're going to hear that Tom's lawyer,
12  Attorney Nguyen (phonetic), filed the application on Tom's
13  behalf in 2006 so and you'll see his name is at the back of
14  the document.

15       So Tom's lawyer fills out -- and this is a normal
16  situation, would be the second stage is doing the N-400.  The
17  next thing an applicant has to do is get their fingerprints
18  taken and they do a background check and then you schedule the
19  citizenship interview.

20       Before you have the interview you have to get a test
21  on English language and US civics and you schedule this
22  interview with the Immigration official.  At the interview the
23  person is placed under oath and asked many of the same
24  questions that's in that N-400.  They go over it and try to
25  make corrections.

1          You're going to hear that this interview usually

2    takes about 15 minutes so a person who was an Immigration

3    officer has a whole list of cases for the day, they get their

4    cases, they set up the interviews, it's 15 minutes apiece.

5          After the interview, the Immigration officer sends a

6    written followup question and answer protocol which is called

7    the N-14.  He didn't mention the N-14, but that's part of this

8    Immigration process.  The first thing is you fill out and you

9    check the boxes and send the N-400 in.

10          But then the Immigration officer looks at that and

11    says I have some more -- I want to know more, I have more

12    questions than a yes or no, they ask specific questions, and

13    then the applicant sends those answers in in the long form.

14          In this case, Tom's attorney sent them in because he

15    was represented by counsel, so we'll talk about that.  But the

16    second part is the N-14.  After Immigration -- and listen, I

17    agree with that the Government is saying, the US has a vital

18    interest in this process, okay?

19          It's not just fill out a little form and we'll take

20    it and you're going, that's -- that's all they look at, that's

21    ridiculous.  Of course not.  There's an N-400, there's

22    fingerprints, there's background checks, there's the

23    interview, there's the N-14 where they can ask any questions,

24    the questions are answered.

25          Then Immigration does their own investigation and at

that point when they're done their investigation, the entire

application is submitted for adjudication, meaning it's ready

to be voted on -- is it going to be -- are you going to be

admitted or are you going to be denied, okay?  That's the

application process.

So and all of this is an effort for Immigration to

know as much as they want -- as much as they can, about an

applicant.  The whole point of this is so they have all the

information because it is a very precious commodity to become

a United States citizen.

So they need to know as much as they can and that's

why the process is set up, so that Immigration can gain as

much knowledge about an applicant so they know who they're

dealing with.

What this means is the N-400, what's answered on

that form, is a living and breathing document meaning that

when you fill out the N-14s and you give more information on

questions you answered in the N-400, as long as that's

received before adjudication, before they make a decision,

that's acceptable, okay?

And you're going to hear evidence from experts, from

witnesses, from Immigration people who are going to tell you

that that's the process.

So Tom is only guilty if during this process, this

citizenship application process, he tried to hide who he truly

1    was, if he tried to pull the wool over their eyes and pretend

2    to be somebody else, and he never did.  So who is Tom?  Who is

3    Tom Woewiyu?  Okay, Tom's an open book and he's always been

4    completely open and forthcoming about who he is, his

5    activities and his affiliation since he first arrived in this

6    country 50 years ago.

7         He's been here 50 years.  Tom came to the United

8    States in 1969 on a student visa and he earned a college

9    degree in labor relations.  During that time he obtained

10   lawful permanent resident status which sometimes people refer

11   to as a "green card," so he's been here lawfully that whole

12   time.

13        Since 1967, he's always been here as a lawful

14   permanent resident.  He was later married to a US citizen and

15   he raised children here.  Some of them are in the courtroom

16   today to support their dad.  In fact, Tom has 21 grandkids.

17        So and at various times he worked in the United

18   States selling auto parts, he worked as a shop steward in a

19   manufacturing plant and he's also worked in real estate.

20        And after Tom came here in 1969, you know, he was

21   busy raising his children and working and becoming part of the

22   fabric of the United States and he wasn't involved in Liberian

23   politics at all for all those years.

24        It was only when Doe's reign in Liberia became

25   intolerable to people like him and people in Liberia that he

decided to get involved to try to bring back a constitutional democracy, a democratic -- small "d" -- system of government to Liberia.  So why did Tom care?

Because he still had family -- he's from Liberia, that's his country, he has -- still has family there so it mattered to him when the government was ousted, it mattered to him when Doe, a dictator, took office, when there was no democracy in his country anymore because that affected people he loved, friends and family that he still had over there.

And when he saw what was happening he got involved and he's always been honest about how he got involved, which is by getting involved in the NPFL.

And you're going to hear that not only did he get involved in the NPFL, but everyone knew that he was in the NPFL long before he applied for citizenship, okay?  The Immigration knew that Tom was in the NPFL.

I mean, the Government can't have it both ways. They can't say he was trying to hide who he was, but he was the spokesperson for the NPFL.  He was never trying to hide who he was.

Everyone in the Government, our Government, knew that Tom was in the NPFL.  Let me tell you why.  Tom, as the Government said, gave international press -- he was at a press conference in 1994 saying that he's the president -- he's the spokesperson and minister of defense for the NPFL, so he's on

1   the record saying that.

2         BBC interviews that they want you to listen to,

3   hours and hours of BBC interviews that say -- I'll tell you

4   what he said on those.  I'm the president of the NPFL, I'm the

5   minister of defense of the NPFL and talked about the policies

6   and talked about wanting to bring democracy to Liberia.

7   That's what he says over and over again on those tapes.

8         So our Government knew who he was and not only was

9   he interviewed and not only was he on tape being interviewed,

10   he wrote articles in his name as NPFL's spokesperson.  He gave

11   this Dutch statement, you heard about that and testimony to a

12   Dutch magistrate.

13         What did he say?  I'm in the NPFL, I'm the

14   spokesperson.  He recorded statements with United States

15   Customs officials, you heard that at the platform in Miami.

16   Guess what he said?

17         I'm buying guns, I want to buy guns or get

18   interested in that -- info on that for the NPFL.  So our

19   Government knew.  He also gave that affidavit -- you heard

20   about the affidavit they talked about in Court in the

21   Firestone litigation.

22         He said that, he didn't tell you that it was in the

23   Firestone litigation but remember I said before that there was

24   -- you know, the US had some business interests in Liberia?

25   Well one of those -- the company, the rubber company I talked

1    about is Firestone and Tom filed an affidavit.

2         That's like under oath swearing in Court -- and what

3    did he say?  Of course, I work for the NPFL, I'm the minister

4    of defense.  So not only did Customs know, not only did he

5    file an affidavit in Court, not only did he give a billion

6    interviews, but he met with FBI and Immigration officials

7    twice before he applied.

8         Before his application was adjudicated, okay, before

9    we reached that bottom line, he met with them twice, once in

10   2005 -- he had heard that there had been an assassination

11   attempt on -- or that someone was threatening a member of the

12   government in Liberia.

13        So he reached out, met with representatives from our

14   Government to tell them about that and said as my role as the

15   NPFL spokesperson I heard about this, I think you should know

16   about that, and passed it on to who needs to know.

17        He also met with the FBI agent and before his

18   application was adjudicated, because they were interested in

19   him to give information about another person they were trying

20   to deport, a Liberian national, and they wanted to know from

21   Tom, you're in the NPFL, tell us what you know about this guy

22   named Boley.

23        The guy's name is Boley.  Tell us what you know

24   about Boley.  He went with his lawyer to meet with the FBI and

25   told them all about Boley and said as NPFL, I did this, I did

1   that.  As spokesperson I did this and here's how I know Boley

2   and here's what I can tell you.  You can use this in your

3   deportation against him.  And the Government put him on their

4   witness list to call as a witness.

5          So for them to say that they don't know that he's in

6   the NPFL, that he's hiding that he's in the NPFL, that he's

7   trying to sneak through Customs -- I mean sneak through

8   Immigration and slide by with no one knowing who it is is

9   ridiculous.

10         He met with Immigration, he met with the FBI in his

11  capacity as spokesperson for the NPFL.  So Tom was never

12  trying to hide who he was and they knew it long before he

13  filled out his application.

14         You know, the Government kind of gave this

15  impression like we've got to -- we always have to know -- they

16  have to be honest on this little form we have because if

17  someone's not honest on that, then we would let them in and we

18  wouldn't know.  You know, we could just -- you know, it's the

19  honor system.

20         Okay, first of all, not only did everybody know

21  about Tom being in the NPFL and not only did he meet with

22  authorities, but Immigration knew and they had information

23  about it in their file.

24         So this is a copy of Tom's Immigration file.  It's

25  called thee "A" file.  Everybody who's here as -- as either an

1    alien or a lawful permanent resident gets what's called an

2    "Alien" file and it's started when you first come over.

3          So it goes like in date from the bottom to the most

4    recent, and so this A file is so thick because Tom's been here

5    for 50 years.  So this is what Immigration knew about Tom, the

6    items that are contained in his A file.

7          And there's times that -- not that they were -- this

8    is the usual, that Tom had to come back and report to

9    Immigration, you know, at times to update his information, any

10   kind of problem stuff would be in here -- interviews.

11         In fact, you're going to hear later that he was

12   convicted of some petty offense in the 70s.  That's in here,

13   was reported right -- right away when he came in.  It's in his

14   A file.  So you can't let them try to tell you that they're

15   making a decision on a person applying for citizenship by what

16   they put on the form.

17         This is what they had on Tom before he even went in

18   for the meeting, before he even applied.  So and that's their

19   job, I mean, that's the right thing to do, they should have

20   all that information, okay, because it is a precious

21   commodity, because they are the gatekeepers, they've got to

22   have it to keep this Alien file, this A file up to date with

23   everything about a person who is here not on a citizen status.

24         So you're probably wondering why Tom applied for

25   citizenship after all these years.  I mean, he had been here

1  since 1969 as a lawful permanent resident which, you know, you

2  can just -- he could have stayed in that.

3        But he applied because Tom had heard -- he was under

4  the mistaken impression, someone had told him that if you were

5  an LPR, or a lawful permanent resident, you wouldn't be

6  eligible for Social Security.

7        And Tom was getting to the age where that was

8  something he was thinking about and he was afraid that all the

9  years he had been paying taxes and all the years he had been

10  paying into the Social Security system, that he wouldn't get

11  that benefit.

12        He was wrong about that, that's not the situation.

13  But that's what he thought and that's why he applied for

14  citizenship.  And that's why he hired attorneys -- two

15  different attorneys to help him navigate through the system of

16  applying for citizenship.

17        And the process of applying can take, you know,

18  different lengths of time before it's actually adjudicated,

19  admitted or denied.  In Tom's case he filled out the N-400 in

20  2006 and the denial came in 2010, and that's not unheard of.

21        So the Government cannot say that they didn't know

22  who Tom was before they adjudicated his application.  And it's

23  not a federal crime to make an error on either of the forms or

24  to omit something from the form or to have a different

25  perspective on what something means.

1          It's only criminal, like I said, to try to hide and

2     sneak through and hide who you are and pretend to be somebody

3     that you're not to get citizenship.  So let's go back to the

4     citizenship application process slide again because you see

5     what they're trying to say.

6          What they're trying to say is like -- okay, Tom told

7     everything before it was submitted to adjudication all the way

8     down here on his N-14, you're going to look at it, it's like a

9     20-page document, typed.

10          You're going to see that he told everything about

11     himself in that document and yet they're saying here on the N-

12     400 up at this part, he lied because he didn't fill this part

13     out.

14          But the point is he didn't intend to defraud the

15     Government, he gave them all the information about himself.

16     They had it all before it was submitted for adjudication.

17          But there's even more than a lack of intent in this

18     case, is that Tom didn't even lie.  As I said before, it's

19     their opinion that he answered these four questions wrong,

20     okay, the four questions.

21          But he didn't.  And quite frankly, their opinions

22     don't matter at all in this case.  The only thing that matters

23     is how Tom interpreted these questions and what his -- what

24     Tom's knowledge and intent was when he answered the questions.

25          And I'm going to show you now on the screen if you

take a look, one of the things we talked about is the -- what

that signature line is. Remember, the US Attorney told you

that he met with at the end of the interview after she looks

at it and makes changes to the N-400 -- her name is

Eikerenkoetter.

I've worked really hard on getting that right, her

name is Ms. Eikerenkoetter and she puts her stamp on it and

Tom signs, and what the oath is, what he's swearing to is that

the evidence submitted by me are true and correct to the best

of my knowledge and belief, to the best of Tom's knowledge and

belief, okay?

So let's talk about the two forms that Tom filled

out and let's talk about what happens in that interview in

2009. Well let's talk first about who was at the interview.

So they go to the interview.

It's Tom, his attorney, Ray Basso. Okay, you're

going to meet him, he's going to come to Court and testify --

Tom, Ray Basso, and Ms. Eikerenkoetter who was the Immigration

official.

So they show up for their appointment scheduled at a

certain time in the morning -- it's like 10:00 in the morning

I think. She has her list of cases for the day and Ms.

Eikerenkoetter shows up and she has the N-400, she has Tom's A

file.

And because as they file things when stuff comes in,

the N-400 and the A file, the most recent -- anything --
whatever is most recent is on top.  That's the way it works
with the A file.  So she has the A file, she has Tom's N-400
and she begins to go over it with him, these questions that
Tom has answered to the best of his knowledge and belief.

And he attempted to do that along with his attorney,
okay, and look, when I say "attempt," I mean attempt because
these questions are not -- the questions at issue in this
case, the four questions, are not clearly stated, black and
white questions.

They're not yes and no questions in the traditional
sense because they're not questions like this -- are you
pregnant.  Well, after a blood test you either are pregnant or
you're not pregnant, and that's not the kind of questions that
are being asked here.  The questions are subject to
interpretation and the meaning of certain words are undefined.

For example like you know when you fill out your
income taxes and there's like a whole instruction section that
says, you know, when you're doing the Social Security number
put the dash or don't put the dash, there's all those kinds of
instructions for each question.

It's the same thing with this N-400.  There is an
instruction section and they give you instructions on how to
answer the certain questions.  That's part of the Government
document.  But the questions that are at issue in this are

1  undefined.

2         None of the terms in those questions are defined in

3  the instructions, okay?  So they're vague and Ray Basso is

4  helping Tom fill these out to the best of these knowledge.

5  And look, when I say they're unclear, it's not just me saying

6  they're unclear.

7         The application, as I said before, is now twice as

8  long as it was when Tom filled it out, an acknowledgment by

9  the Government that it was unclear before and they had to make

10 it twice as long to ask more questions.  We're going to go

11 through that later.

12        But the four questions at issue in this case come

13 from the older version of the N-400 so let's go through them

14 one by one, okay?

15        And as we go through each question you're going to

16 see, it's going to be clear to you why Tom answered them the

17 way he did and why his knowledge and belief of those answers

18 was both correct and reasonable under the circumstances.

19        Let's start with Question 8.  Question 8, and when

20 Tom was asked, "Have you ever been a member or associated with

21 any organization, association, fund, foundation, club or any

22 other party or group?"  And the application that Attorney

23 Nguyen had sent in said "no."

24        And when Ms. Eikerenkoetter asked Tom, listen, did

25 you mean answer no to this or do you -- were you part of any

1   other organizations.  At that time -- and you're going to hear

2   testimony about how this went down, Ms. Eikerenkoetter -- Tom

3   at that point starts going through his briefcase trying to

4   pull out his resume with all his information.

5        Ms. Eikerenkoetter says to him, look, I got 15

6   minutes, okay, we can cancel this and reschedule it if you

7   want, but that's all I have.  And Tom said okay, and he gives

8   her the information on the Union of Liberian Associations in

9   the Americas.

10       This is an umbrella group, okay, it's a union of

11  different Liberian associations, it encompasses associations

12  in Liberia and associations in the United States.  Encompassed

13  within its umbrella is the NPFL, and that's the evidence

14  you're going to hear in this case.

15       And the reason that he wrote one organization, the

16  umbrella organization instead of listing all the detailed

17  organizations, is because of the fact that Ms. Eiherenkoetter

18  gave him 15 minutes and told him otherwise we're going to have

19  to cancel this, and that's the advice that he received from

20  his attorney, Anthony Basso who was also there -- I mean,

21  sorry, Raymond Basso who was also there, who told him that's

22  fine, we can give them more details later in the N-14.

23       Now, so you're going to see on the N-14, the next

24  screen, you'll see and hear is where Tom is explaining in

25  writing how that situation went down where she said she had 15

1 minutes and then he said look, because of the time

2 constraints, I gave you the umbrella organization.

3 He explains that it is an umbrella organization,

4 okay? That's in his N-14. What's also in his N-14 that's

5 filed by Attorney Basso under oath, under -- it was a

6 notarized document, and in there Tom lists in two full pages

7 -- and you're going to get this so you can look through it

8 later, I know it's hard to see on the screen, he gives two

9 pages of every single group he's been a member of.

10 He starts with back in the 70s -- remember I told

11 you he worked in the automotive industry and that he was in

12 the AFL-CIO, that he was a Teamster. Talks about his church,

13 Christian Fellowship.

14 Then he starts to talk about he's in the NPFL, CRC,

15 he's in the NPFL and he talks about exactly what he does. It

16 gives details about what they're trying to do. Then he talks

17 about being a chairman of the ULAA, the umbrella group.

18 He talks about in 1995 that he's a member of a

19 church and he also then later talks about how he's currently

20 in the ULAA. NPFL is in here twice. Everything is in here.

21 He's given full disclosure on the N-14, he's followed the

22 advice of his counsel and he's answered the questions

23 completely well before his application is adjudicated, okay?

24 So they knew who he was and at worst, the worst the

25 Government can say about Question 8 is that his initial answer

was incomplete.  But that's not criminal, okay, because he gives full disclosure, no crime was committed in regards to Question 8.

Let's talk about Question 10 and Tom's answer. Question 10 asks, "Have you ever advocated either directly or indirectly the overthrow of any Government by force or violence?"  And Tom said "no."

Remember when I told you that Tom had to answer these questions to the best of his knowledge and belief, and let me tell you, Tom certainly has genuine -- and you're going to hear the -- if you're forced to listen to all these tapes and all these witnesses, you're going to know one thing, is that Tom had genuine and deeply rooted beliefs about the country he was born and raised in.

And he, along with the other members of the NPFL, were trying to unseat a tyrannical dictator.  There was no Government in place.  Once Doe took office they were -- that was that they were trying to do, they were trying to overthrow a dictator, a usurper is what the language that Tom says in a lot of his interviews, not a -- a usurper of the government, okay?

So Tom said this in his filings that they talked about in the Firestone case.  Tom said the NPFL never intended at any time from January, 1987 through the present to overthrow the constituted government of Liberia forcibly or

1  otherwise, okay?

2          There was no government.  There was no congress

3  under Doe, there was no senate, there was no democratic

4  government.  Tom's efforts were to rid Liberia of a dictator

5  and a despot, not a government.

6          And Tom also in the same memorandum they were

7  talking about to the State Department, Tom said the military

8  has as its objective the overthrow -- of what?  The Doe

9  dictatorship and in its replacement, a democratically elected

10 government.

11         See, that's why Tom answered that question the way

12 he did.  He wasn't trying to overthrow the government, he was

13 trying to overthrow a dictator and install a democratic

14 government and that's the reason he answered that.

15         In fact, you're going to hear from Ms.

16 Eiherenkoetter that during the interview she asks him about

17 this question and that when she called what was happening in

18 Liberia "government," Tom laughed a little.

19         He laughed at that because there was no government.

20 There was no congress, there was no senate, there was no

21 government.  Now look, a political science professor might say

22 oh, a dictatorship could be a kind of government.

23         But it wasn't in Tom's mind.  In Tom's mind when he

24 answered that question to the best of his knowledge and

25 belief, that's what he was talking about.

1          And that's why him and his attorney answered that

2    question the way they did and that's why in the N-14

3    subsequent filings you'll see a lot of information that they

4    provided about Tom's efforts to bring a democratic government

5    to Liberia, so Tom wasn't lying when he said he didn't try to

6    overthrow the government.

7          Let's talk about Question 11.  Question 11, "Have

8    you ever persecuted, either directly or indirectly, any person

9    because of race, religion, national origin, membership in a

10   particular social group or political opinion?"

11         As I said earlier, and listen, I'm sure you've caught

12   the vibe by now that this was a brutal civil war.  There's no

13   question that NPFL soldiers did awful things and we don't

14   dispute that.

15         But at a lot of the times that these things were

16   happening, Tom was either traveling abroad or in the United

17   States.  I mean, he maintained his residence in the United

18   States during this entire civil war.

19         He didn't live over there, he lived here.  And

20   you'll see like a lot of the interviews -- his BBC interviews,

21   he's like where are you calling from?  He's in the United

22   States, that's where he is.  He's the spokesperson, but he's

23   here, so he wasn't the one laying hands on people in Liberia.

24         So Tom -- now the Government wants to paint him as a

25   policymaker in that because he made the policy or he espoused

the policy in the 15 microphones in front of him, that he's
responsible for everything NPFL soldiers did in the bush,
okay?  But that's not at all who he was.  He was a statesman
and more of a press secretary.

And the question on the form doesn't define the term
"persecute" or what they mean by "indirectly."  They don't say
anywhere in there what they mean by persecute and what they
mean by indirectly.

And Tom never believed that the NPFL was persecuting
people because of their race, religion, national origin,
membership in a particular social group or political opinion.
He firmly believed that the NPFL was trying to help Liberians
by ridding the country of a vicious dictator.  His aim was not
to persecute people because of their beliefs.

Now, there is issue with Doe supporters were
Mandingo and Krahn Tribespeople, but they were singled out
because of their national origin or membership in a group.
They were simply the other side in the war.

In Tom's mind, the NPFL was never persecuting anyone
but rather fighting a war and trying to defeat the enemy and
to him, this wasn't persecution, it was war.

And he genuinely wanted to help Liberians and that's
why he answered Question 11 the best he could to the best of
his knowledge and belief.

That's what his opinion was and that question asked

1   and to the best of your knowledge and beliefs, means to your

2   opinion that, you know, his reason for anything that the NPFL

3   did wasn't about ethnicity, it was about a quest to bring

4   democracy to Liberia.

5           So reasonable minds can differ, okay, on what this

6   question means and how a person is supposed to answer it if

7   they were involved in a war.

8           And the US Government has acknowledged that, has

9   acknowledged that this answer -- that this question is

10  insufficient, that Question 11, the question I'm talking

11  about, is vague.

12          And I'll tell you why they've acknowledged that.

13  Because as I told you earlier, and you're going to see this in

14  the evidence in this case, this is going to be in your hands,

15  is that the new form for N-400 -- not the one that he signed,

16  but the new one, has expanded, okay?

17          Some of -- these are some of the questions that have

18  been added to the new form because the old Question 11

19  standing alone is based on the applicant's opinion, so now

20  they've added this whole big section with these questions.

21          And this new line of questions aren't based on your

22  opinion, they're factual questions, okay, and they're not

23  subject to interpretation, but they help Immigration learn a

24  lot more, so let's go over a couple of them.

25          "Were you ever involved in any of the following:

genocide, torture, killing or trying to kill someone?"  "Were

you ever a member, did you serve in, help or otherwise

participate in any of the following:  a military group, a

paramilitary unit, vigilante group, rebel group, guerrilla

group?"

They go on to ask -- the next slide -- "Were you

ever part of any group or did you ever help any group or

organization that used a weapon against any person or

threatened to do so?"

"If you answered yes, when you were part of this

group, did you ever use a weapon?"  They ask if you've ever

sold or given weapons to another person.  You have to answer

yes or no to that.  This is all new.

They ask if you've ever received any military

training, weapons training.  They even ask if you've ever

recruited or enlisted or conscripted child soldiers -- like

the Government's talking about, child soldiers.  Did you ever

use any person under 15 to do anything.

You see, if Tom were asked these new questions

today, if Tom were asked these new questions today he would

probably have to answer yes to many of them because those are

the facts about what happened in Liberia, not his opinion

about why it happened or his opinion about whether it

constituted persecution.

And the facts about what happened in Liberia is

1  what's -- on any form is what's important to Immigration, so

2  even if Tom had been asked and answered yes to these

3  questions, I mean here's the point, even if Tom had been given

4  this new form and answered yes to those questions -- answered

5  yes, let's just say he answered yes to all of those questions,

6  he would still answer no to Question 11.

7       He would have still answered no, that in his opinion

8  based on his knowledge and belief, he persecuted anyone

9  because he just doesn't see it that way. And that's the only

10  thing that matters in this case.

11       That's what the Judge is going to tell you, that's

12  what the law is, is how he sees it. Remember, take a look at

13  that again. Tom signs that to the best of his knowledge and

14  belief and that's why he answered that question, Question 11,

15  the way he did.

16       Here's the last question. Question 18, let's take a

17  look at that. They asked Tom has he ever been convicted of a

18  crime or offense. And his attorney, Attorney Nguyen, checked

19  the box -- you can see it's computer -- it's checked on the

20  computer, and then when Ms. Eikerenkoetter asked questions she

21  does a little manual check next to it.

22       So it said have you ever been convicted of a crime

23  and the form is checked "no." Now look, Tom has never tried

24  to hide the fact that he had contact with the police when he

25  was a young man. It was a couple of petty misdemeanors.

1          He gave the -- it's all in his A file, so when I say

2     "petty" I mean like one of the things in his A file talks

3     about he had a job working for a parking garage and he

4     pocketed a $1 bill, that was the charge.  So when we're

5     talking patty, we're talking petty, okay?

6          Tom submitted, through counsel, his record, his

7     criminal record and the documentation that he could obtain to

8     outline it.  So the Government wants to say he's lying, he's

9     trying to hide who he is.

10          First of all, he did check the box "no," but then if

11    you go to the next screen he says further down on that same

12    page they said, "Have you ever been convicted of a crime?"

13    "No."  He writes -- it said if you answered "yes" to any of

14    them, which he answered "no," complete the following.

15          And he writes, "receiving stolen property, 1982 in

16    New York, pled guilty to a misdemeanor," okay?  So he's

17    telling them yes I've been convicted, I pled guilty to a

18    misdemeanor, notwithstanding that there was an error in the

19    checked box.

20          And he -- not only did he explain in detail that and

21    another contact that he had that nothing happened with, not

22    only did he give the details on that in the box, he submitted

23    documentation with the N-400, certified copies of these

24    convictions.

25          So if you look the N-400 supporting documents, the

1 first is the criminal record from New York with that case

2 where he got probation, the receiving stolen property, and

3 then he tried to get a record of his conviction from Queens

4 but they sent back the letter saying it was too old and they

5 had destroyed the file.

6 So but he gave both of those documents to

7 Immigration, and so it's abundantly clear that he wasn't

8 trying to hide his criminal record, he was actively disclosing

9 it. And, you know, as far as those petty cases go, one was a

10 conditional discharge and one was a non-conditional discharge.

11 It's unclear what that means other than the fact

12 that it's some sort of probation or unsupervised probation and

13 no fine and no jail time, so it's hard to know how those

14 particular things are classified because they're not -- they

15 don't say it's a conviction, they say it's a discharge --

16 unconditional, conditional.

17 So that's -- you know, that's why he checked the

18 box, but he gave all the documentation. He clearly wasn't

19 trying to hide anything about that to Immigration. So those

20 are the four questions. That's it. That's it.

21 And that's how that 15-minute interview went down

22 and that's what this case is about. And this case is about

23 the time it took Attorney Nguyen to check those boxes on the

24 computer and a 15-minute interview with Ms. Eikerenkoetter and

25 Attorney Basso and Tom.

So that's the -- that's the period of time where you guys have to figure out if there was criminal activity in there, in that time with the form and in that time, that 15 minutes with the interview.

At best, the Government could say that Tom and his lawyer's initial responses were imprecise I guess or incomplete, which is explained by the time period and the time constraints and how the questions were asked, the vagueness of Questions 10 and 11.

But that's certainly not criminal, okay? Let's not forget that by the time the N-14 is filed, all that information is correct, true and correct. And they're not disputing that. Believe me, there would be charges if he made false statements in the N-14, right? Or if he held something back.

You would hear about those charges. There's no charges for that. That's true and correct. So after all this investigation, two interviews with Tom and his lawyer -- one with the Immigration woman and one with the FBI and Immigration on this other guy's case where he made himself available to answer any questions that they had, anything they want, he's there with his lawyer and he's an open book.

After all that, after looking at the N-14, after doing their investigation, they decide to finally adjudicate the application and they denied Tom citizenship, and nobody's

1    here to secondguess that, okay?

2           It was in their discretion, as it always is, and

3    it's a vital gate-keeping process and they can decide who can

4    and can't be here as citizens and Tom can go back to Liberia

5    when this is over, but that should have been the end of the

6    story, okay?

7           This -- the Government has an interest, it is vital

8    gate-keeping.  Okay, then it's done.  Then why isn't it done

9    then?  If that's what this is really about, if it's really

10   about protecting the citizenship process and it's really about

11   Immigration making sure people -- who gets -- who gets

12   admitted, if that's what it's really about, why wasn't it over

13   when his application was denied?

14          Because that should have been the end of the story

15   but it wasn't.  Five years later they decided to bring charges

16   here in Federal Court.  Why is that?  What's really going on

17   here?  I mean, why is a case that should take like three days

18   becoming a case where the Government's calling like 60

19   witnesses?

20          Listen, I want to be clear to you that we have no

21   control over what witnesses they decide to call.  I mean, or

22   what witnesses they decide to bring here on the taxpayer's

23   dime, we don't have any control over that.  That's up to them.

24   That's their call, it's their choice, it's within their

25   prosecutorial discretion.

1          And in creating this lengthy witness list he

2     described, I mean, that did allow them to travel to London, to

3     Paris, to the Netherlands, to Africa, to Australia.  Calling

4     just some Immigration witnesses takes some four blocks away at

5     2nd and Chestnut because that's where their offices are.

6          But, you know, I'm sure it's not just that they

7     wanted to travel the world, right?  I mean, perhaps they

8     genuinely want to hold someone accountable for the trauma that

9     Liberian civilians were forced to endure during the civil war

10    decades ago.

11         You know, the US Government doesn't have the

12    jurisdiction, it doesn't have the authority to prosecute war

13    crimes that happened in Africa.  It doesn't.  The Liberian

14    Government took the action that it felt was appropriate.  They

15    had a Truth and Reconciliation Commission.  You're going to

16    hear about that.

17         They investigated both of their civil wars.  They

18    heard from over 5,000 witnesses, issued a comprehensive

19    report, and the former President of Liberia, Ellen Johnson

20    Sirleaf, a Nobel Peace Prize winner, made the decision that

21    the country was going to go forward without prosecuting

22    anyone.

23         So there's nothing that can happen in this courtroom

24    that they can do, and there's nothing you can do that can

25    change that.  I mean, convicting Tom of crimes he didn't

1  commit isn't going to rewrite history, it's not going to write

2  any wrongs that may have been committed during the war, and

3  it's absolutely precluded by law.

4       You've sworn an oath as jurors -- you're going to

5  hear about it again when the Judge gives you the instruction

6  -- you've sworn an oath to apply the rule of law to the facts

7  as you find them.  So even if you want to in your heart of

8  hearts hold someone accountable for what happened in the civil

9  war, you can't do it in this courtroom.  It can't happen here.

10      And it certainly can't be Tom because Tom never

11 intended to deceive Immigration during the citizenship

12 application process, and so when this case is over I'm going

13 to ask you to find him not guilty.

14      (Defense opening statement concludes at 12:46 p.m.)

15                          * * *

16                   **C E R T I F I C A T I O N**

17

18      I, Diane Gallagher, court approved transcriber,

19 certify that the foregoing is a correct transcript from the

20 official electronic sound recording of the proceedings in the

21 above-entitled matter.

22

23 _____        _____

24 DIANE GALLAGHER                         DATE

25 DIANA DOMAN TRANSCRIBING, LLC