UNITED STATES OF AMERICA,  )  14-CR-00050-1-AB
                           )
     vs.                   )
                           )
JUCONTEE THOMAS WOEWIYU,   )
a/k/a JUCONTEE THOMAS SMITH, )  Philadelphia, PA
                           )  June 25, 2018
               Defendant.  )  9:39 a.m.


                  TRANSCRIPT OF TRIAL
     BEFORE THE HONORABLE ANITA B. BRODY AND JURY
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        LINWOOD C. WRIGHT, JR., ESQUIRE
                           NELSON S.T. THAYER, JR., ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           UNITED STATES ATTORNEY'S OFFICE
                           615 Chestnut Street, Suite 1250
                           Philadelphia, PA 19106

For the Defendant:         CATHERINE C. HENRY, ESQUIRE
                           FEDERAL COMMUNITY DEFENDER OFFICE,
                           EASTERN DISTRICT OF PENNSYLVANIA
                           601 Walnut Street, Suite 540W
                           The Curtis Center
                           Philadelphia, PA 19106

                           MARK T. WILSON, ESQUIRE
                           DEFENDER ASSOCIATION OF
                           PHILADELPHIA
                           601 Walnut Street, Suite 540W
                           The Curtis Center
                           Philadelphia, PA 19106

Audio Operator:            MICHAEL COSGROVE

Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                           P.O. Box 129
                           Gibbsboro, NJ 08026
                           Office: (856) 435-7172
                           Fax:    (856) 435-7124
                           Email:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1                          I N D E X

2    PROCEEDINGS:                                    PAGE

3    Colloquy                                        4

4    Special Agent Jennifer Lohmeier and Mr. Wright

5    read Government Exhibit I-8 into the record     16

6    Special Agent Jennifer Lohmeier and Mr. Wright

7    read Government Exhibit I-9 into the record     20

8    Special Agent Jennifer Lohmeier and Mr. Wright

9    read Government Exhibit I-16 into the record    24

10   Special Agent Jennifer Lohmeier and Mr. Wright

11   read Government Exhibit I-21 into the record    29

12   Special Agent Jennifer Lohmeier and Mr. Wright

13   read Government Exhibit I-29 into the record    33

14   Special Agent Jennifer Lohmeier reads Government

15   Exhibit I-2 into the record                     37

16   Special Agent Jennifer Lohmeier reads Government

17   Exhibit I-1 into the record                     40

18   Special Agent Jennifer Lohmeier reads excerpts from

19   Government Exhibit I-3 into the record          54

20   Special Agent Jennifer Lohmeier reads excerpts from

21   Government Exhibit I-34 into the record         59

22   Special Agent Jennifer Lohmeier reads Government

23   Exhibit I-35 into the record                    63

24   Special Agent Jennifer Lohmeier reads Government

25   Exhibit KK-4 into the record                    78

1                          I N D E X

2

3    WITNESSES:              DIRECT    CROSS   REDIRECT   RECROSS

4    Jennifer Lohmeier          *        98

5    Gary Lang                 106

6

7    *Reading of Government Exhibits into evidence

8

9    EXHIBITS:                                  I.D.   EVID.

10   Government Exhibits I-1, I-2, I-3, I-4,

11   I-8, I-9, I-16, I-21, I-29, KK-4, I-35, I-36          14

12   Government Exhibit HH-1, Video            120    120

13   HH-2 Videotape                           136    136

14   H-2-1 Videotape                          144    144

15

16

17

18

19

20

21

22

23

24

25

1          (The following was heard in open court at 9:39 a.m.)

2               MR. WILSON:  (audio begins) -- it was indicated there

3     was advance notice that we were going to be objecting to the

4     entry of JJ-7 into evidence.  We would agree that the

5     Government can present --

6               THE COURT:  You never sent him a copy?

7               MR. WILSON:  Yes, we did.

8               MR. WRIGHT:  It came to me as a motion?

9               MR. WILSON:  It doesn't say motion.  It was an email.

10    I copied you and --

11              MR. WRIGHT:  And Nelson?

12              MR. WILSON:  -- Nelson on the email.

13              THE COURT:  Where's Mr. -- where's Nelson?

14              MR. WRIGHT:  He's out talking to a witness.  He

15    should be in.  Here he is, Your Honor.

16              THE COURT:  Welcome.

17              MR. WRIGHT:  JJ-7.

18              MR. THAYER:  Good morning, Your Honor.  I apologize.

19              MR. WILSON:  JJ-7 is the decision of the USCIS.

20              MR. WRIGHT:  Oh, right, no, no, no.  He did send --

21              THE COURT:  And you know about that.

22              MR. WRIGHT:  Yeah.  He did send us a -- he did send

23    us an email, that's correct.  My apologies.  I thought --

24              MR. WILSON:  I think the only reason I sent it, Your

25    Honor, --

1          THE COURT:  I'm sure that, you know, I -- you know,

2     the two of you are very grown up.

3          (Laughter)

4          MR. WILSON:  The -- I just sent it, Your Honor,

5     because it is 11 pages long and I wanted Your Honor to have a

6     chance to review it before today.

7          THE COURT:  No, I did read it.

8          MR. WILSON:  Yeah.

9          THE COURT:  Okay.  You're fortunate that I read

10    papers.  But anyway -- so what's your position on that?

11         MR. THAYER:  Your Honor, the Government's position is

12    that this is evidence that goes directly to the materiality

13    element.

14         THE COURT:  Well, it's not expert testimony.  This is

15    testimony of what she did, isn't it?

16         MR. THAYER:  Exactly, Your Honor.  There's almost no

17    more probative evidence of -- of how material this information

18    is, that the defendant sought to conceal from the Immigration

19    authorities and that which it based its decision-making on.

20         THE COURT:  I don't see any problem with that,

21    frankly.  I agree with --

22         MR. WILSON:  Well, Your Honor, 704(b) specifically in

23    criminal cases specifically includes the opinion of others on

24    the ultimate issue of -- that the jury has to --

25         THE COURT:  But this is not on the ultimate -- this

1    isn't the ultimate issue.

2            MR. WILSON:  Well, it is the ultimate issue.  It's --

3            THE COURT:  It's the materiality of what they did and

4    why they did it.  Now, I don't know whether -- when is she

5    going to testify?

6            MR. THAYER:  Probably tomorrow, Your Honor.

7            THE COURT:  Okay.  So we have some time to -- I'm not

8    sure I'm going to let everything in.  So the question is what

9    I'm going --

10           MR. WILSON:  Your Honor, may I propose what we would

11   agree to?

12           THE COURT:  Well, --

13           MR. WILSON:  And that's that they -- they reviewed

14   everything and they determined -- they made a decision that he

15   was not morally fit to obtain citizenship and they issued that

16   determination on August 10th of -- August 12th of 2010.  And --

17           THE COURT:  That's reasonable.  What's --

18           MR. THAYER:  Your Honor, that --

19           THE COURT:  That's --

20           MR. THAYER:  That, of course, cuts out all of the

21   actual probative evidence that would be important for the jury

22   to understand in the specific context of, for example, use of

23   child soldiers, which USCIS found important to know in terms of

24   making their decision.

25           Now, at the end of the day, Your Honor, whatever

1    concern the defense has about Ms. Lin's decision can be cured

2    with a simple instruction from the Court that simply because

3    USCIS made a determination, that doesn't bind the jury one whit

4    in terms of making its determination, which is a completely

5    separate one in a separate criminal context than from one in

6    the Immigration context.  And that -- that I think can take

7    care of --

8            THE COURT:  Well, I -- I think -- basically I agree

9    with you, it goes to materiality.  There's no question about

10   that.  And the question becomes whether or not the information

11   that was withheld is -- was material and why they found it

12   material.

13           Some of this stuff is -- I think is overly -- what

14   would you call it -- overly prejudicial.  So I think the two of

15   you ought to get together.  You're not going to have this until

16   tomorrow.  I just got this this morning.

17           MR. WILSON:  Right.

18           THE COURT:  I -- I want to see whether -- I want to

19   see whether I can tailor it myself, and I'm asking the two of

20   you to think about whether you can tailor it.

21           MR. WILSON:  Your Honor --

22           THE COURT:  Okay?  That's where we are.

23           MR. WRIGHT:  Your Honor, in light of that, we do have

24   the witness that precedes Ms. Lin, who is almost our last

25   witness.  Our last witness may be Ms. -- Special Agent Lohmeier

1    on just an issue relating to maps, that sort of thing.  But --

2             THE COURT:  You're not really relying on that, are

3    you?

4             MR. WRIGHT:  We'll see.  But if we don't put on

5    Special Agent Lohmeier, Ms. Lin will be our last witness.  And

6    if we end early today, because we have the witness who preceded

7    her today, who was another Immigration officer --

8             THE COURT:  I'll try and do this over lunch, if

9    that's helpful.

10            MR. WRIGHT:  Well, we could end with her today and

11   then we'll just pick up tomorrow with our last witness and rest

12   tomorrow.

13            THE COURT:  Well, why don't you rest today?

14            MR. WRIGHT:  Well, it depends on whether Ms. Lin is

15   -- we have Ms. Lin coming in tomorrow morning, and so we're

16   hopeful that we can put her on tomorrow morning and then we'll

17   be finished tomorrow.

18            THE COURT:  Okay.  That's certainly within my

19   constraints on you.

20            MR. WRIGHT:  Yes, Your Honor.

21            THE COURT:  Although I think that my constraints

22   maybe taste better to you now (inaudible).

23            MR. WRIGHT:  I gotcha, Your Honor.

24            THE COURT:  Right?

25            MR. WRIGHT:  Yes, Your Honor.  If Your Honor pleases,

1    I just want to let the Court know the procedure that we've

2    agreed upon.

3             Counsel has advised me that the next series of

4    documents that we plan on introducing, which include ancient

5    documents, --

6             THE COURT:  All right.

7             MR. WRIGHT:  -- and they are transcripts from -- from

8    broadcasts --

9             THE COURT:  Yeah, I've ruled on that.

10            MR. WRIGHT:  Right.  And then some other documents

11   that concern Mr. Woewiyu, that they are admissible.  They're

12   authenticate and they are admissible.  And what we'll do is,

13   we'll just have not a dramatic reading, but a reading from

14   Special Agent Lohmeier.  It could take an hour, hour and a half

15   to read them all.  And then -- probably an hour and a half to

16   read them all.

17            THE COURT:  This morning?

18            MR. WRIGHT:  This morning.  And so we'll swear --

19   we'll put her on the stand and then we'll move all those

20   documents in and then she'll start --

21            THE COURT:  And then you're finished for today?

22            MR. WRIGHT:  No, no, no, no, no, no, no.  Then we

23   have some more evidence.  This -- we have some more evidence,

24   Your Honor.  We're not finished for the day, no, Your Honor.

25            THE COURT:  Okay.  Because I mean that's much.

1          MR. WRIGHT:  No, we have -- we have -- we have more

2     evidence, Your Honor.

3          THE COURT:  Oh, okay.  Because if you don't have a

4     witness --

5          MR. WRIGHT:  No, we have witnesses.

6          THE COURT:  Okay.

7          MR. WRIGHT:  We have witnesses, Your Honor.  And --

8     and some audiovisual, Your Honor.

9          THE COURT:  Okay.

10         MR. WRIGHT:  That counsel's aware of --

11         THE COURT:  All right.  We'll do that.  All right.

12         MR. WRIGHT:  -- aware of and familiar with.

13         THE COURT:  All right.  Okay.  So -- did you want to

14    speak with me about something?

15         MR. WRIGHT:  No, just that, Your Honor.  Just to

16    advise the Court, with the Court's permission, we're going to

17    proceed this morning.

18         THE COURT:  And then do you think tomorrow morning --

19    tomorrow afternoon, if there is a defense, then you're going to

20    have to think about --

21         MR. WILSON:  Yes, Your Honor.

22         THE COURT:  -- about whether or not there's going to

23    be any defense tomorrow.

24         MR. WILSON:  I'm going to start emailing people right

25    now.

1           THE COURT:  What?

2           MR. WILSON:  I'm going to start emailing people right

3    now because we had told them probably Wednesday.

4           THE COURT:  Okay.  All right.  Or Thursday.

5           MR. WRIGHT:  Your Honor, we will be making a motion

6    tonight -- we will be making a motion tonight in relationship

7    to one of their witnesses.  We got notification of this

8    witness' -- of this witness at 6:09 p.m. yesterday, which is

9    fine, but we think for various reasons --

10           THE COURT:  Are we going to use the --

11           MR. WRIGHT:  -- this witness should -- should be

12    precluded.  And this is one of the defense witnesses.  And so

13    we won't be able to file the motion till tonight because we

14    just got it last night.

15           THE COURT:  Well, you can tell it to me orally.

16           MR. WRIGHT:  Well, no, we'd rather put something in

17    writing, Your Honor.

18           MR. WILSON:  Your Honor, it's the expert, Steve

19    Brittan (phonetic), --

20           MR. WRIGHT:  We'd rather put something in writing.

21           MR. WILSON:  -- who we intend to call as an expert on

22    the citizenship application process.  And Steve Brittan's

23    familiar to everybody here.  It's --

24           THE COURT:  Not me.

25           MR. WILSON:  Your Honor, he was a --

1        THE COURT:  I'm sometimes important.

2        MR. WILSON:  He was a U.S. Attorney -- or Assistant

3   U.S. Attorney in this district for a while, and he's been in

4   private practice for several years now and he does criminal

5   work, federal criminal work, but he -- but he also does -- a

6   significant part of his practice is immigration practice.  And

7   he's been involved with the -- with clients who have applied

8   for citizenship.

9        THE COURT:  And does he have -- does he have an

10  expert report?

11       MR. WILSON:  There is no report, Your Honor.

12       THE COURT:  Well, how can you call --

13       MR. WILSON:  His testimony will be relatively brief.

14  I sent a summary --

15       THE COURT:  Well, that's not relevant.  The question

16  is whether or not he has a report.  How can you present an

17  expert witness without a report?  I mean I don't know.

18  Nobody's ever done that.

19       MR. WILSON:  Well, Your Honor, the --

20       MR. WRIGHT:  We object, Your Honor, and we -- we are

21  writing it up.  We are writing it up this morning and --

22       THE COURT:  Well, you better think about whether you

23  want to get yourself an expert witness.

24       MR. WRIGHT:  We'll -- we'll write it up.

25       THE COURT:  Okay.  All right.  Okay.  Then I have a

1   few legal things to decide, so he may not start until Wednesday

2   afternoon or Thursday morning.

3            Okay.  That sounds good.  All right.  The jury will

4   be very happy to hear that.  Okay.  I'll -- I'll come back in

5   and you'll -- you'll begin again.

6            MR. WRIGHT:  Yes, Your Honor.

7            THE COURT:  All right.

8            MR. WRIGHT:  We'll move these documents into evidence

9   and then we'll call Special Agent Lohmeier.

10           THE COURT:  Thank you.  We'll have somebody new.

11      (Off the record)

12           COURTROOM DEPUTY:  All rise.  This court is now in

13   session.  The Honorable Anita B. Brody residing.  Good morning,

14   Your Honor.

15           THE COURT:  Good morning, members of the jury.  Good

16   morning, counsel, parties.  Please be seated.

17           Okay.  All right.  Mr. Wright?

18           MR. WRIGHT:  If I may, Your Honor.  Your Honor, the

19   parties have conferred and agreed that certain documents are

20   admissible.  What we'd like to do, with the Court's permission,

21   is move these documents into admission and then have a reading

22   of them, which will take roughly not longer than two hours, so

23   I think an hour to an hour and a half.

24           THE COURT:  Okay.  You have no problem, do you?

25           MR. WILSON:  No, Your Honor.

1              THE COURT:  Okay.  Special Agent Lohmeier will read

2    them.

3              The Government moves to have admitted into evidence

4    Government Exhibits I-8, I-9, I-16 --

5              THE COURT:  One second.  I-8, I --

6              MR. WRIGHT:  Nine.

7              THE COURT:  -- nine, yes.

8              MR. WRIGHT:  I-16.

9              THE COURT:  Mm-hmm.

10             MR. WRIGHT:  I-21, I-29, KK-4, I-35, I-36.  And now

11   we're going to go backwards a little bit in order, Your Honor.

12             I-1, I-2, I-3, I-4 -- and I-4, Your Honor.

13             THE COURT:  And I-4.

14             MR. WRIGHT:  Yes, Your Honor.

15             THE COURT:  All right.  One, two, three and four.

16             MR. WRIGHT:  Yes, Your Honor.

17             THE COURT:  Okay.  Well, it's KK -- it's 1, 2, 3 --

18   it's I-1, 2 and 3, and then it's KK-4, Your Honor.

19             THE COURT:  Oh, KK-4.

20             MR. WRIGHT:  Yes, Your Honor.

21             THE COURT:  All right.

22             MR. WRIGHT:  The Government calls Special Agent

23   Jennifer Lohmeier.

24             THE COURT:  She's just going to help you read it, is

25   that --

1           MR. WRIGHT:  She's just going to read, Your Honor.

2           THE COURT:  Okay.

3           MR. WRIGHT:  And she can do it from the witness

4    stand, I guess, with the microphone?

5           THE COURT:  Yes, of course.

6           MR. WRIGHT:  Thank you, Your Honor.

7           THE COURT:  You understand that she's just reading as

8    a help to the Government, that's all.  Will they have the

9    books?

10          MR. WRIGHT:  They don't have books, Your Honor, but

11   each document should be on the computer and should appear on

12   their screens --

13          THE COURT:  Okay.

14          MR. WRIGHT:  -- while she's in fact reading.

15          THE COURT:  All right.  Okay?

16          MR. WRIGHT:  Special Agent Lohmeier, will you begin

17   with Government Exhibit I -- I-8.

18          SPECIAL AGENT LOHMEIER:  Yes, sir.

19          MR. WRIGHT:  And hold on just one moment.  We want to

20   make sure that it's up on the screen.

21          THE COURT:  Is this the same I-8 as we had in the

22   book yesterday?

23          MR. WRIGHT:  It may well be in there, Your Honor,

24   yes, but we did not play it because there was no tape related

25   to it.  It's a --

1     THE COURT:  Okay.  Well, then they can have the books

2  and they can --

3     MR. WRIGHT:  They can have the book, but not all --

4  not everything is in the book, so --

5     THE COURT:  All right.  So --

6     MR. WRIGHT:  Some of them are in the book.  These may

7  be --

8     THE COURT:  Is it all right if we give out the books?

9  It's easier, I think.

10     MR. WRIGHT:  Certainly, Your Honor.  That's fine.

11     THE COURT:  That will be easier to read than on the

12  screen.

13     MR. WRIGHT:  Certainly, Your Honor.

14     (Pause)

15     THE COURT:  Jim will do it.  Thank you very much.

16     (Pause)

17     THE COURT:  She does not have to be sworn in.

18     MR. WRIGHT:  With the Court's permission, if Special

19  Agent Lohmeier may begin.

20     (Pause)

21     THE COURT:  Okay.  Which -- it's I -- I-8 first,

22  right, Mr. Wright?

23     MR. WRIGHT:  Yes, Your Honor, I-8.

24     THE COURT:  Okay.  You may read.

25     SPECIAL AGENT LOHMEIER:  Thank you, ma'am.

1    "Woewiyu discusses interim government, Taylor.   From

2    the London BBC World Service in English, 17:09 GMT, 5 July

3    1990.

4         Text:   "ECOWAS, Economic Community of West African

5    States ministers have been gathering in Sierra Leone today to

6    begin their mediation efforts in the Liberian Civil War between

7    Samuel Doe's government and Charles Taylor's Patriotic Front

8    rebels.   But the Patriotic Front is anxious to refute

9    suggestions from diplomatic sources that Charles Taylor was

10   prepared to accept Doe's condition to resign if there was an

11   interim government not headed by Taylor.

12        "Patriotic Front spokesman, Tom Woewiyu, called us up

13   to talk about it and Robin White asked him if he could say

14   exactly what Charles Taylor's position was.

15        "Begin recording.   Woewiyu:   Yes, I know in fact that

16   Mr. Taylor did not tell any diplomatic source that he would

17   allow the formation of an interim government without his

18   leadership.

19        It is clear, and all the Liberian people know, that

20   at this particular time any interim government without Mr.

21   Taylor's leadership, Mr. Taylor, who is in control of the more

22   than 15,000 fighting people now in Liberia, without his control

23   will see nobody.   No group of Liberians that will be able to

24   lead an interim government without further interruption of

25   Liberian lives.   And so it is unrealistic and it is very

1   conniving and shameful for those diplomatic sources that are

2   trying to get Mr. Taylor out of control of this situation.

3           "Mr. White:  But why?  Does he not accept that it is

4   a responsible thing to do temporarily?

5           "Mr. Woewiyu:  It is not a reasonable thing to do

6   because if Mr. Taylor is not in control of the situation in

7   Liberia, if he is not in control of the forces that have come

8   together to push this military machine into the ocean, we would

9   just be plunged into another chaos.

10          "Mr. White:  As I understand it, this proposal has

11  come not just from Doe, but from the Americans and also from

12  ECOWAS.

13          "Mr. Woewiyu:  Well, I think it comes more from the

14  Americans because we have seen a whole lot of resistence from

15  the American State Department, who have their own agenda.

16  Maybe they have somebody in mind that they should run the

17  country.  The Liberians will have to do their own thing.

18          "It is sad, though, that ECOWAS and all African

19  leaderships had to wait till this time when Doe has killed all

20  of our people and he continues to be killing people.  His

21  killer team is still on the streets of Monrovia beheading

22  people, and they are now sitting in Freetown with a proposal

23  that says an interim government should be formed without Mr.

24  Taylor.  And there's only Mr. Taylor who has done something to

25  bring the cause of the Liberian people to this point, that we

1  will have a chance to reorganize our lives."

2          "Mr. White" --

3          MR. WRIGHT:  If I may interrupt, Your Honor.  I'll

4  just ask Special Agent Lohmeier not to put in the misters and

5  just to read it precisely as it is on the sheet, Your Honor.

6          THE COURT:  Okay.  Well, why don't you read White and

7  let her read --

8          MR. WRIGHT:  I thought everyone would be tired of my

9  voice by now, Your Honor, but I --

10          THE COURT:  Well, okay.

11          MR. WRIGHT:  I will -- I will read Mr. White.

12          THE COURT:  Maybe that would be easier than --

13          MR. WRIGHT:  Yes, Your Honor.  I will do that.

14          THE COURT:  So you, Mr. -- Mr. Wright are White,

15  right?

16          MR. WRIGHT:  I will be -- yes, Your Honor.

17          THE COURT:  All right.

18          MR. WRIGHT:  "White:  Will it not be bad tactics on

19  your behalf, though, to confront not only the Americans, but

20  all of West Africa?"

21          SPECIAL AGENT LOHMEIER:  "Well, it is not bad

22  tactics.  It is just telling people the truth and telling them

23  exactly how you feel."

24          MR. WRIGHT:  "And there are also -- and there are

25  also the talks in Freetown.  I understand the representatives

1   of your movement will be going.  Do you hold out any hopes that
2   anything is going to come out of this meeting then?"
3          SPECIAL AGENT LOHMEIER:  "Well, I am told, and
4   obviously I hope that when there is a precondition that we
5   understand, that the ECOWAS propose and is behind the idea that
6   an interim government will be formed without the leadership of
7   Mr. Taylor, that is a very bad way to approach a negotiating
8   table with the mediators having a predetermined position.  So I
9   hope they can get out of this predetermined position and we
10  approach the table with an openness, that all of us can discuss
11  which direction we want to go."
12         MR. WRIGHT:  "Will these talks in Freetown go on?
13  Will you hold your fire?"
14         SPECIAL AGENT LOHMEIER:  "No, absolutely not."
15         MR. WRIGHT:  "That's Patriotic Front spokesman Tom
16  Woewiyu.  And according to our correspondent in Freetown, the
17  ECOWAS meeting, they're still not underway.  A number of ECOWAS
18  ministers have not turned up; neither has the delegation from
19  the Patriotic Front."
20         MR. WRIGHT:  If we may go, Your Honor, to Government
21  Exhibit I-9.
22         THE COURT:  You can start reading.
23         SPECIAL AGENT LOHMEIER:  Okay.
24         "Woewiyu urges more U.S. pressure on Doe.  London BBC
25  World Service in English, 22 GMT, 5 July 1990.

1        "From the News Hour Program:  Things have been very

2   unstable and very tense in the West African State of Liberia

3   for many months now.  There has been more fighting today, as

4   you have heard, and government soldiers have been looting shops

5   and businesses in the beleaguered capital of Monrovia.

6        "Twilight is gathering around the regime led by

7   President Samuel Doe.  Most of his senior advisors have fled

8   the country, though the president it seems will not follow

9   them.  Meanwhile, the rebels inch forward.

10       "Journalists trapped in the capital report lack of

11  food, lack of water, with only one Telex a day getting out of

12  Monrovia.  But contact with Mr. Charles Taylor's headquarters,

13  the rebel headquarters, is even more sporadic.  So we called

14  Mr. Tom Woewiyu, who has known Mr. Taylor for more than 20

15  years and acts as spokesman for him in Washington.  Mr. Woewiyu

16  has spoken a few hours ago with rebel commanders in the field.

17  So I asked him what the news was from Liberia.

18       "I get the report that we are closing in on the

19  pressure point of the last enclave of the regime where Mr. Doe

20  is holed up in the mansion, and the few troops that he has with

21  him from what I understand are loose.  Some of them have put

22  down their weapons and are busy looting."

23       MR. WRIGHT:  "So you think it pretty well is near the

24  end now?"

25       SPECIAL AGENT LOHMEIER:  "Yes, it is.  And we can see

1    the sign of disorganization, even though we have always known

2    that there was not really an organized and civilized army; it

3    was just a group of people that Doe got together and he called

4    the Liberian Army.

5          "We hope to get hold of Doe himself because it is the

6    wish of all the Liberians that he can stand trial and answer

7    for the thousands that he killed, and also maybe give back all

8    the money that he has in all the foreign banks and which he

9    stole from our people."

10   MR. WRIGHT:  "Do you expect that he will do some deal

11   with you now?  Because we were surprised he did not accept

12   earlier offers of safe passage out of the country to bring the

13   war to an end sooner."

14   SPECIAL AGENT LOHMEIER:  "The deal we are making with

15   him is that we will spare his life.  We will see to it that no

16   harm comes to his life and that he stands trial.  Let God be

17   the judge for what happens to his life."

18   MR. WRIGHT:  "What sort of state do you expect to

19   capture Monrovia in when all this is over?"

20   SPECIAL AGENT LOHMEIER:  "From the description I'm

21   getting, it is going to be in a very, very bad shape.  I'm not

22   too sure where these soldiers, his people that are looting,

23   where they expect to carry this loot.

24         "I do now know, or maybe some of them have homes and

25   they are stacking them up with the stuff that they are looting,

1    and sooner or later they are going to pretend they were never

2    part of this thing and trying to sit on those loots.  But there

3    is no way to get out of the city, so if people know what we

4    know, they should stop the looting, turn their guns down and

5    let us all join hands, forget about what has gone down and we

6    will build our country."

7           MR. WRIGHT:  "Is there anybody helping

8    diplomatically?  Is anyone in touch with President Doe?  I

9    think obviously if the United States tried to persuade him to

10   call it a day."

11          SPECIAL AGENT LOHMEIER:  "Yeah.  The United States

12   tells us that they are in touch with him.  I've expressed the

13   feeling that maybe the United States was not putting enough

14   pressure, if indeed they were.  I think they are building a

15   position for a while to let Doe know the reality of the

16   situation and have him leave, but I understand that he seemed

17   not to have any idea of what the reality is and he seems to be

18   holding on.  And the thing that bothers some of us is how some

19   of our fellow citizens are sacrificing their lives and fighting

20   on behalf of Doe, who is not worth fighting on behalf because

21   he is only thinking about himself."

22          MR. WRIGHT:  "Does President Doe got a way out,

23   either helicopter or a plane or a speed boat?  Do you think he

24   could get away if he wanted to?"

25          SPECIAL AGENT LOHMEIER:  "I do not know.  Maybe he

1    can.  I see no way that he is going to get out of there.  That

2    is why I'm suspecting he may already be in one of those

3    embassies that have the facilities to take him out without our

4    interference.  But if he is still in the mansion, then you know

5    God will be the referee between him and us."

6              MR. WRIGHT:  With the Court's permission, we'd like

7    to read Government Exhibit I-16.

8              SPECIAL AGENT LOHMEIER:  "Woewiyu says U.S. supports

9    ECOWAS force.  London BBC World Service in English, 7:30 GMT,

10   27 August 1990.

11             "From the Network Africa Program hosted by Jihanna

12   Allahli (phonetic).  The peace-keeping troops of the Economic

13   Community of West African States (ECOWAS) have been

14   encountering some resistance in their attempt to consolidate

15   their hold on the area around the port of Monrovia where they

16   landed earlier.  Meanwhile, as part of the ECOWAS peace package

17   agreed earlier this month, a meeting representing a broad

18   spectrum of Liberian interested parties will be held later

19   today in Bonjon.  On the line from Bonjon, I asked our

20   correspondent Peter DaCosta about the purpose of today's

21   gathering."

22             MR. WRIGHT:  "The idea is to get together all

23   interest groups, concerned citizens of Liberia, as well as a

24   broad spectrum of political parties to discuss the future of

25   the first interim government in Liberia.  The idea is for

1    Liberian groups to sit down and come up with someone who they

2    consider impartial enough to head such an interim government,

3    and also to ponder over the constitution of a broad-based

4    administration that would run Liberia until such time as free

5    and fair elections will be held."

6              SPECIAL AGENT LOHMEIER:  "But is it not a little bit

7    early for such a meeting" --

8              THE COURT:  One second.  Who is this that's speaking

9    now?

10             MR. WRIGHT:  This is the -- this is DaCosta and

11   Allahli, and in fact this leads into what we will later on --

12             THE COURT:  Well, we don't know who these -- I mean

13   who are these people?  I mean we're having a lot of talk, but

14   we have no idea who's saying anything.

15             MR. WRIGHT:  Well, if I may, Your Honor, I think that

16   they are -- that they're identified in the actual -- in the

17   actual document itself, Your Honor.

18             THE COURT:  No, they're not.  I don't see any.  Do

19   you know who they are?

20             MR. WRIGHT:  It's the correspondent -- it's --

21             THE COURT:  But does the defense know who they are?

22             MR. WRIGHT:  It's correspondent Peter DaCosta, who is

23   talking about the circumstances and puts into context Mr.

24   Woewiyu, who's coming up shortly in this recording.

25             THE COURT:  Oh, I see.  Mr. Allahli, I know who he

 1    is.  Okay.

 2              MR. WRIGHT:  Yes, Your Honor.

 3              THE COURT:  Okay.  They're all reporters.

 4              MR. WRIGHT:  Yes, Your Honor.

 5              THE COURT:  All right.  They're reporters.  These

 6    people are reporters.  Okay.

 7              MR. WRIGHT:  And then it goes into Mr. Woewiyu --

 8              THE COURT:  Okay.

 9              MR. WRIGHT:  -- in a page or so.

10              THE COURT:  That's Allahli.  Oh, okay.  I didn't know

11    who Mr. DaCosta was, but that's okay.  A correspondent, Mr.

12    DaCosta.  Okay.  They're all correspondents.  Okay.  So that's

13    just their -- what they're -- this is --

14              MR. WRIGHT:  Yes, Your Honor.

15              THE COURT:  This is --

16              MR. WRIGHT:  It puts this into context.

17              THE COURT:  All right.  Okay.

18              MR. WRIGHT:  And I believe we're at, "But it is not a

19    little" --

20              THE COURT:  Yes.

21              SPECIAL AGENT LOHMEIER:  "But it is not a little bit

22    early for such a meeting when already there has been a report

23    of some differences between Prince Johnson and the ECOWAS

24    forces that have landed in Monrovia in a complete opposition

25    from Charles Taylor's movement on the presence of ECOWAS forces

1    in Monrovia."

2              THE COURT:  One second.  I think it would be easier

3    if you just read Mr. Woewiyu, --

4              SPECIAL AGENT LOHMEIER:  Sure.

5              THE COURT:  -- and you read all the correspondents.

6              MR. WRIGHT:  Certainly, Your Honor.

7              THE COURT:  And that was a correspondent, --

8              MR. WRIGHT:  Okay.

9              THE COURT:  -- but you can go on to DaCosta.

10             MR. WRIGHT:  Okay.

11             "DaCosta:  Well, the idea that seems to be very much

12   in people's minds at the moment is that Charles Taylor is being

13   overtaken by the peace process and he has sent some

14   representatives here earlier on last week to discuss with

15   ECOWAS -- with the ECOWAS diplomatic grouping the chance of

16   agreeing to a cease fire.

17             "Now, the other two parties in the conflict, Prince

18   Johnson and Samuel Doe, had already indicated that they would

19   be willing to sign a cease fire agreement and it was up to

20   Charles Taylor and the National Patriotic Front of Liberia to

21   endorse that cease fire.

22             Having all agreed in principle to a cease fire, the

23   National Patriotic Front then relied on the agreement and

24   decided that they wanted no part of anything that involved

25   ECOWAS and ECOWAS peace-keeping force.  So ineffectively the

1   Patriotic Front is being marginalized in terms of the peace

2   process.  That ends the recording."

3           And then it begins:  "According to reports from

4   Banjul, Prince Johnson is expected to attend the meeting

5   despite the report of friction between himself and the ECOWAS

6   force.  Problems arose when the ECOWAS force arrested on

7   Saturday, that's 25 August, 35 suspected individuals around the

8   Port of Monrovia whom Prince Johnson later identified as his

9   own men.

10          "He later had to bow to the force commander General

11  Kanu's (phonetic) request to reduce his presence around the

12  port to a token force of only 20 men.  But the main resistance

13  to the ECOWAS force came from the rebel group willed to Charles

14  Taylor, whose National Patriotic Front of Liberia, the NPFL,

15  controls most of the country.

16          "The movement, which is vehemently opposed to the

17  ECOWAS intervention in the eight-month-old civil war, has

18  succeeded in infiltrating suburbs around the port and mounting

19  attacks against the ECOWAS troops.  They claim to have killed

20  12 and wounded 50 soldiers.

21          "On the line to Amazon Ivory Coast, the NPFL's

22  defense spokesman Tom Woewiyu denied that the ECOWAS force was

23  in Liberia on a peace-keeping mission."

24          SPECIAL AGENT LOHMEIER:  "What we have is not a

25  peace-keeping force.  It was a group that was already committed

 1   to getting into Liberia, getting into this war, and I believe

 2   that they have the support of the United States.

 3            "As you can see, all the logistical information

 4   concerning what was happening inside Liberia was given to them

 5   by the United States, and they are still being helped by the

 6   United States to carry out this particular offensive against

 7   our country."

 8            MR. WRIGHT:  "Meanwhile, the arrival of the" --

 9            THE COURT:  No, this -- is this --

10            MR. WRIGHT:  Keeping --

11            THE COURT:  Oh, that's -- that's Woewiyu, isn't it?

12            MR. WRIGHT:  No.

13            MR. WILSON:  It is not, Your Honor.

14            MR. WRIGHT:  This is the last paragraph, Your Honor.

15            THE COURT:  What?  Okay.

16            MR. WRIGHT:  "Meanwhile, the arrival of the peace-

17   keeping force has not only been welcome, but sought after by

18   civilians.  Scared and hungry civilians, mostly women and

19   children, were reported to have received foods -- food from the

20   peace-keeping force."

21            THE COURT:  Okay.

22            MR. WRIGHT:  With the Court's permission, we would

23   like to read Government Exhibit I-21.

24            SPECIAL AGENT LOHMEIER:  "Woewiyu views election.

25   London BBC World Service in English, 17:09 GMT, 24 September

1    1990."

2          MR. WRIGHT:  "In Liberia it seems some kind of cease

3    fire is in operation and Charles Taylor, the Patriotic Front

4    leader, is busy laying down his plans for the country.  He has

5    persistently rejected the ECOWAS, Economic Community of West

6    African States plan and the interim government set up at the

7    recent talks in Banjul.

8          "Taylor is again calling himself president of Liberia

9    and is now talking of holding elections as soon as 10 October.

10   Well, Patriotic Front spokesman Tom Woewiyu called us up again

11   to tell us about his plans, and Elizabeth O'Heaney (phonetic)

12   asked him if holding an election so early was not a mad

13   scheme."

14         SPECIAL AGENT LOHMEIER:  "Well, Elizabeth, it is not

15   a mad scheme."

16         MR. WRIGHT:  "London BBC World Service, 6:15 on 24

17   September in an otherwise abbreviated transmission of the

18   Woewiyu interview asked the following."

19         SPECIAL AGENT LOHMEIER:  "What Mr. Taylor is talking

20   about is, as you recall Mr. Taylor declared an interim

21   government about two months ago, which is called the National

22   Patriotic Reconstruction Assembly.  That government consists of

23   six individuals from the cabinet, five from the National

24   Patriotic Front itself, and 13 members, one from each of the

25   political regions of Liberia.  And of course he has appointed

1    some of those cabinet members, one of which I am, and we have

2    been running the country since then.

3              "What he is saying now is that on 10 October the

4    people of Liberia, there are more than two million Liberians

5    living in Liberia and besides those who fought in Monrovia,

6    which is about two square miles or even less, besides that

7    area, every other part of Liberia I won't say is running

8    smoothly to what it used to be, but people are trying to

9    normalize their lives.  And so he is asking the consensus of

10   that population to appoint one person or elect one person from

11   each of the political regions to come and represent them on

12   that assembly.

13             "The assembly is an interim assembly; the life of it

14   is only six months, and it will set all of the stages for

15   general elections for normalizing the situation in the country.

16   And that is what he is talking about."

17             THE COURT:  I'm just -- I'm just -- you pronounce

18   interim --

19             SPECIAL AGENT LOHMEIER:  Interim.

20             THE COURT:  -- inteerim (sic)?  It's the same word as

21   interim, isn't that correct?

22             SPECIAL AGENT LOHMEIER:  Yes, ma'am.

23             THE COURT:  Yeah, interim.  Okay.

24             MR. WRIGHT:  "You know there is a war on in Liberia

25   currently.  You say this is only in Monrovia.  Now, what state

1   is the rest of the country in to be able to mount an election?"

2          SPECIAL AGENT LOHMEIER:  "Well, believe me,

3   Elizabeth, we have enough food in the rest of the country.  We

4   have transportation running from Monrovia to Nimba, from

5   Monrovia to the Ivorian border.  People are coming back in.

6   People who want to go out are going.  And food prices have

7   dropped dramatically.  The stores are open in Buchanan, open in

8   all of the towns in those areas.

9          "We have opened the Port of Buchanan and merchants

10  are now bringing in goods.  The Red Cross is working out of the

11  Port of Buchanan, the Catholic Relief, everybody is working

12  there.  And I won't say that everything is normal in those

13  areas, but I tell you, the war itself for us is over.  And as

14  long as Doe is dead, Prince Johnson's people know that was the

15  prime objective.

16         "The only problem we have now is this ECOMOG,

17  Economic Community of West African States Cease Fire Monitoring

18  Group, which is determined to install a government that they

19  formed in Banjul, a government that has no basis at all.  And

20  of course they're the ones now that are carrying out bombing

21  raids throughout the country."

22         MR. WRIGHT:  "What will this assembly do?"

23         SPECIAL AGENT LOHMEIER:  "It will be the task of the

24  assembly to somehow create an environment in which all

25  Liberians will have a free hand in putting their political

1   parties back on track.

2           "It will be the responsibility of the assembly to

3   establish an election commission to see to it that elections

4   are held.  It will be the responsibility of the assembly to see

5   to it that all the security mechanisms, police, immigration,

6   and all of the normal apparatus of our society are put back on

7   track to make sure that Liberia returns to a normal situation."

8           MR. WRIGHT:  "Can I ask you what kind of

9   administration you think you have in other parts of the

10  country, especially Grand Gedeh County?  Do you have an

11  administration there?"

12          SPECIAL AGENT LOHMEIER:  "At this particular time,

13  Grand Gedeh is a very volatile area.  Mr. Taylor has issued

14  orders to have our men not to enter Grand Gedeh.  There are

15  Liberian citizens in Grand Gedeh who have absolutely nothing to

16  do with what Mr. Doe and his henchmen did.

17          "Of course, there are still armed remnants of the Doe

18  troops in there, but what we have done is seal off Grand Gedeh

19  so that no violence come out of there into other areas.  And

20  I'm sure at this particular time there are negotiations going

21  on with some of the major leaders inside of Grand Gedeh with

22  our people so that we can normalize the situation in there.

23  But I can assure you that there is no intention on the part of

24  the Grand Gedehans and of course on the part of the National

25  Patriotic Front people to have another war started over there."

1          MR. WRIGHT:  With the Court's permission, the

2    Government would like to read Government Exhibit I-29.

3          SPECIAL AGENT LOHMEIER:  "NPFL defense minister

4    comment.  London BBC World Service in English, 18:30 GMT, 10

5    November 1992."

6          MR. WRIGHT:  "The NPFL, National Patriotic Front of

7    Liberia, defense spokesman Tom Woewiyu called us up from

8    Liberia to give his version of what is happening about their

9    self-proclaimed cease fire.  On the line" --

10          THE COURT:  Well, let's start with the date, if you

11    don't mind, as we did before.

12          MR. WRIGHT:  Certainly, Your Honor.  I believe that

13    Special Agent Lohmeier read GMT 10 November '92, which would be

14    November 10, 1992, of course Your Honor.

15          THE COURT:  '92.  Okay.

16          MR. WRIGHT:  Yes, Your Honor.

17          THE COURT:  All right.

18          MR. WRIGHT:  With the Court's permission, I'll start

19    from the beginning.

20          THE COURT:  I didn't know whether you read -- had you

21    read that?

22          SPECIAL AGENT LOHMEIER:  I have, Your Honor.

23          THE COURT:  You didn't read it?

24          SPECIAL AGENT LOHMEIER:  I did, ma'am.

25          THE COURT:  Did you read it?  Oh, I'm sorry.

1        SPECIAL AGENT LOHMEIER:  That's all right.

2        THE COURT:  Okay.

3        MR. WRIGHT:  If I may start from the beginning, Your

4   Honor?

5        THE COURT:  Yes, start from the -- from the -- from

6   the text, yeah.

7        MR. WRIGHT:  Certainly.

8        "The NPFL, National Patriotic Front of Liberia,

9   defense spokesman Tom Woewiyu called us up from Liberia to give

10  his version of what is happening about their self-proclaimed

11  cease fire.  On the line Elizabeth O'Heaney asked Mr. Woewiyu

12  whether they have in fact stopped fighting."

13       SPECIAL AGENT LOHMEIER:  "Well, as of midday today,

14  we ordered our forces to stop fighting, and of course as your

15  own reporter in Monrovia is saying, ECOMOG, Economic Community

16  of West African States (ECOWAS) Cease Fire Monitoring Group,

17  continues to bombard our position by air and by sea."

18       MR. WRIGHT:  "And have you stopped fighting?  Has the

19  NPFL stopped fighting?"

20       SPECIAL AGENT LOHMEIER:  "We have ordered our forces

21  to stop fighting.  Of course, if we are being shot at, we are

22  not going to turn our backs."

23       MR. WRIGHT:  "Why could you not just have a cease

24  fire that was ordered by ECOWAS?  Why did you have to announce

25  your own?"

1    SPECIAL AGENT LOHMEIER:  "The reasons why we had to
2    do that are several.

3        "First of all, we were not invited to the meeting in
4    Bussa.  We were not part of the discussions.  So the term of
5    reference of the cease fire ordered by ECOWAS was not discussed
6    with us.  But to make sure that ECOMOG did not lie that they
7    had tried to abide orders from ECOWAS and we did not, we made
8    sure we gave our people 12 hours to stop in order for a cease
9    fire to be put in place.  But it is clear now that they do not
10   even want to observe any form of cease fire."

11   MR. WRIGHT:  "So when the ECOWAS ordered cease fire
12   starts at midnight, are you going to observe it?"

13   SPECIAL AGENT LOHMEIER:  "If ECOMOG observes a cease
14   fire, we will observe a cease fire.  You see the problem with
15   the whole cease fire and the reason we had to call it in
16   advance is, because in all the world around you do not call a
17   cease fire just by sitting in a buja and say cease fire.  You
18   have to sit the parties to a table and get a term of reference.
19   You just cannot call a cease fire, because everybody has to
20   know where they are and what they should be doing in the course
21   of that cease fire.

22       "If by midnight they cease fire and they let us know
23   that they want a cease fire, we will do our best to honor that.
24   And if they do not, then we will all know who is prolonging the
25   pains of the Liberian people."

1          MR. WRIGHT:  With the Court's permission, Special

2    Agent Lohmeier will read Government Exhibit I-2.

3          THE COURT:  I-2.

4          MR. WRIGHT:  Yes, Your Honor.  It's not a transcript.

5          THE COURT:  You don't have a transcript?

6          MR. WRIGHT:  No, it's not -- it is not a -- it's not

7    a recording from the BBC.  It is in fact a letter that was --

8    that was written from -- from Firestone, Your Honor.

9          THE COURT:  I don't have it, do I?

10          MR. WRIGHT:  It should -- no, it would not be in that

11    book.  It would be in your big binder, Your Honor.  It is not a

12    -- it's not a -- it's not a BBC recording.  It's just a regular

13    exhibit.

14          THE COURT:  And it's I -- oh, KK-4, is that it?

15          MR. WRIGHT:  No, it's I-2.

16          THE COURT:  I-2.

17          MR. WRIGHT:  Yes, Your Honor.

18          THE COURT:  Oh.

19          MR. WRIGHT:  And as a matter of fact, it appears on

20    the screen, Your Honor.

21          THE COURT:  Oh, yeah, one second, one second.  Let me

22    -- let me get it so that I know what it is.  So it's not --

23    it's only going to be on the screen?

24          MR. WRIGHT:  It is on the screen, Your Honor.

25          THE COURT:  Oh, okay.  All right.  I'll read it from

1    the screen.  Okay.

2         SPECIAL AGENT LOHMEIER:  "Firestone Plantations

3    Company, Harvey S. Firestone, founder, Harbel, Liberia, West

4    Africa.  October 3rd, 1990.

5         "To Commander-in-Chief Charles Taylor, National

6    Patriotic Front of Liberia, Republic of Liberia, care of Mr.

7    Tom Woewiyu.

8         "Dear Sir:  Pursuant to our recent discussion with

9    Mr. Tom Woewiyu and his request that we write this letter, we

10   hereby confirm the representatives of Firestone Plantations

11   Company and its parent corporation, collectively the

12   concessionaires, desire to meet with you or your duly

13   authorized representatives at the earliest mutually convenient

14   date in Abidjan, Cote d'Ivoire or in another country

15   neighboring Liberia.

16        "The purpose of this meeting would be to discuss a

17   visit to the Firestone Plantation in Liberia by representatives

18   of the concessionaires.  The proposed visit would allow

19   representatives of the concessionaires to assess the state of

20   their assets in Liberia and of the plantation itself,

21   preparatory to any resumption of operations in Liberia upon the

22   cessation of the state of force majors which presently exist

23   under the concession agreement with the government.

24        "We are specifically concerned about the safety and

25   security of our representatives during any such visit and their

1    safe passage into and out of Liberia and we seek your

2    assurances in those respects.  In addition, we also wish to

3    discuss certain matters relating to any future operations in

4    Liberia of Firestone Plantations Company and its affiliates,

5    United States Training Company, including those identified on

6    the attached list.

7              "We await your early reply to this letter and your

8    advice as to a convenient time and location for our meeting.

9    Please address any response to this letter directly to Mr. D.A.

10   Ensminger, President and Managing Director, Firestone

11   Plantations Company, care of Bridgestone Firestone, Inc., 1200

12   Firestone Parkway, Akron, Ohio, 44317, USA.

13             "Thank you for your prompt attention in response to

14   this correspondence.  Very truly yours, Firestone Plantations

15   Company.  Signed by D.A. Ensminger, President and Managing

16   Director.

17             "Attached is a discussion agenda.

18             "1) Protection and safety of personnel.  a) Personnel

19   and personal safety; b) Harassment.

20             "2) Protection of property and equipment.

21   a) Protection against further damage or losses; b) Recovery of

22   confiscated or stolen properties; c) Vacate occupied facilities

23   and living quarters.

24             "3) Recovery of losses; physical property and lost

25   revenue.  a) Return of property; b) Monetary restitution;

1  c) Tax relief abatement.

2             "4) Resumption of operations.  a) Availability of

3  Freeport, Monrovia latex export; b) Importation of replacements

4  of confiscated destroyed equipment, vehicles, supplies free of

5  duty; c) Functional banking system, internal and external.

6             "5) Employment/re-employment of personnel.

7             "6) Other matters concerning the future of FPCO,

8  USTC."

9             MR. WRIGHT:  With the Court's permission, the

10 Government would seek permission to have Special Agent Lohmeier

11 read Government Exhibit I-1, which should come up on the screen

12 momentarily, Your Honor.

13            THE COURT:  Okay.

14            SPECIAL AGENT LOHMEIER:  "In the Court of Common

15 Pleas of Summit County, Ohio.  Cigna Worldwide Insurance

16 Company and Cigna Property and Casualty Company, Plaintiff v.

17 Bridgestone Firestone, Inc., Firestone Plantations Company,

18 Lonestar Transport Lines, Inc., United States Trading

19 Company --

20            THE COURT:  One second.  This is I -- oh, okay, I'm

21 sorry.

22            MR. WRIGHT:  I-1, Your Honor.

23            THE COURT:  All right, good.

24            SPECIAL AGENT LOHMEIER:  "United States Trading

25 Company and United States Liberia Radio Corporation,

1    Defendants.  Case No. CV-94-061878, declaratory judgment, Judge

2    Williams.

3         "Affidavit of Jucontee Thomas Woewiyu.  I, Jucontee

4    Thomas Woewiyu, being first duly sworn under oath, depose and

5    state as follows:

6         "1) I am personally familiar with the matters

7    described in this affidavit.

8         "2) My knowledge is based upon my experiences as the

9    president of the Union of Liberian Associations of America

10   (ULAA) from 1980 through 1987; the chairman of the board of

11   ULAA from 1987 through 1990; a founder of the National

12   Patriotic Front of Liberia (NPFL) in January 1987; a member of

13   the NPFL from 1987 to the present; a member of the Executive

14   Council of the NPFL from 1990 through 1994; an official

15   spokesman for the NPFL from 1989 through 1994; the chief

16   negotiator for the NPFL from 1990 through 1994; the Minister of

17   Defense for the National Reconstruction Assembly Government

18   (NRAG) from 1990 through 1994; the Minister of Liberia for the

19   Liberian National Transitional Government from March 1994

20   through August 1995, LNTG I, and the Minister of Labor for the

21   LNTG from August 1995 to the present, LNTG II.

22        "3) An election for the president of the Republic of

23   Liberia was held in October 1985 which ultimately resulted in a

24   declaration that Samuel Kanyon Doe had received 50.9 percent of

25   the popular vote.

1          "4) A majority of Liberians believe that Samuel

2    Kanyon Doe engaged in and was directly responsible for unlawful

3    conduct, which included but was not limited to improper

4    persecution and coercion of political opponents during the

5    presidential election campaign, gross voting irregularities on

6    election day, and the infamous slow count of ballots that

7    followed.

8          "5) A majority of Liberians believe that this

9    unlawful conduct by and on behalf of Samuel Kanyon Doe resulted

10   in the declaration that he had won the presidential election.

11   This unlawful conduct by and on behalf of Samuel Kanyon Doe

12   violated both the letter and the spirit of the constitution of

13   the Republic of Liberia, and that Samuel Kanyon Doe was not the

14   true victor in the presidential elections.  The majority of

15   Liberians therefore believe that Samuel Kanyon Doe was not the

16   constitutional president of Liberia.

17         "6) The majority of Liberians believe that they were

18   entitled to be governed by a president elected under the

19   democratic processes guaranteed by the constitution of the

20   Republic of Liberia.

21         "7) In the years following the declaration that

22   Samuel Kanyon Doe had won the 1985 presidential election, a

23   majority of Liberians believed that he engaged in and was

24   directly responsible for unlawful conduct that violated the

25   rights, freedoms, and democratic system of government

 1    guaranteed by the constitution of the Republic of Liberia.

 2    That unlawful conduct included but was not limited to gross

 3    human right violations, tribal reprisals, and flagrant

 4    corruption.

 5            "8) The NPFL was formed in the Ivory Coast in January

 6    1987 at a two-day meeting attended by myself, Charles Taylor,

 7    Moses Duopu, Harry Yuan, and Yeagbe Debgon.

 8            "9) At this meeting it was agreed that the specific

 9    intent and objective of the NPFL would be to preserve and

10    protect the rights, freedoms, and democratic system of

11    government guaranteed under the constitution of the Republic of

12    Liberia.

13            "It was also agreed that the NPFL would pursue with

14    specific intent to preserve and protect the rights, freedoms,

15    and democratic system of government guaranteed under the

16    constitution of the Republic of Liberia by attempting to

17    pressure the unlawful usurper of the presidency, Samuel Kanyon

18    Doe, into resigning.

19            "It was further agreed that after his resignation,

20    the NPFL would ensure that free and fair democratic elections

21    would be held under the auspices of either the existing

22    government administration or an interim government

23    administration in which all political parties would be invited

24    to participate.

25            "The specific intent and objective of the NPFL has

1    been the same from its date of creation through the present.

2              "10) The NPFL believe that the vast majority of

3    Liberians supported its objective to protect and preserve the

4    rights, freedoms, and a democratic system of government

5    guaranteed by the constitution of Republic of Liberia.

6              "11) That belief by the NPFL was based partly on the

7    fact that many individuals and groups inside and outside of

8    Liberia attempted to pressure the unlawful usurper of the

9    presidency, Samuel Kanyon Doe, into resigning through the use

10   of political pressure in and outside of Liberia in the years

11   following the 1985 elections.

12             "12) Samuel Kanyon Doe resisted that pressure and

13   continued to engage in conduct that violated the letter and

14   spirit of the constitution of the Republic of Liberia with

15   increasing impunity.

16             "13) Beginning with an incursion into Nimba County on

17   December 24, 1989 by approximately 12 of its members, the NPFL

18   attempted to apply additional pressure to persuade the unlawful

19   usurper of the presidency, Samuel Kanyon Doe, to resign.

20             "14) The incursion into Nimba County by the NPFL

21   sparked a popular uprising against the unlawful usurper of the

22   presidency, Samuel Kanyon Doe, by a substantial portion of the

23   civilian population and enumerable defectors from the Armed

24   Forces of Liberia (AFL).

25             "15) The NPFL was a very small group in 1989 and

early 1990 in which the number of actual members never exceeded

200 people.  However, due to the popularity of its intentions,

namely to preserve and protect the rights, freedoms, and

democratic system of government guaranteed by the constitution

by the Republic of Liberia, many civilians joined in the

fighting from time to time to help achieve that goal.

"16) Unfortunately, many of the civilians who joined

the noble effort of the NPFL to preserve and protect the

rights, freedoms, and democratic system of government

guaranteed under the constitution of the Republic of Liberia

also pursued their own personal objectives.

"Their pursuit of these personal objectives resulted

in looting, vandalism, theft, tribal reprisals, revenge for

past insults and injuries, and factional turf battles.  The

personal objectives of the people or groups who engaged in that

conduct were not the objectives of the NPFL.

"In fact, the NPFL formulated a standing policy which

strictly prohibited, among other unlawful conduct, looting,

theft, and vandalism.  Thus, the personal objectives of those

people or groups which engaged in that type of prohibited

conduct were at odds and direct conflict with the intentions of

the NPFL.  Whenever it was possible to do so, the NPFL punished

those responsible for that unlawful conduct.

"17) The NPFL never intended at any time from January

1987 through the present to overthrow the constituted

1     government of Liberia forcibly or otherwise.

2          "18) The NPFL never intended at any time from January

3     1987 through the present to change or alter in any way the

4     democratic system of government in Liberia forcibly or

5     otherwise.

6          "19) The NPFL never intended at any time from January

7     1987 through the present to change or alter in any way the

8     tripartite organizational system of government in Liberia

9     forcibly or otherwise.

10          "20) The NPFL never intended at any time from January

11     1987 through the present to change or alter in any way the

12     organizational structure of any branch of the government of

13     Liberia forcibly or otherwise.

14          "21) The NPFL never intended at any time from January

15     1987 through the present to seize control of any office or

16     branch of the government of Liberia forcibly or otherwise.

17          "22) The NPFL never intended at any time from January

18     1987 through the present to exercise the powers of any office

19     or branch of the government of Liberia forcibly or otherwise.

20          "23) The NPFL never intended at any time from January

21     1987 through the present to influence how the powers of any

22     office or branch of the government of Liberia were exercised.

23          "24) The NPFL never intended at any time from January

24     1987 through the present to seize control of the presidency of

25     the government of Liberia forcibly or otherwise.

1          "25) The NPFL never intended at any time from January

2     1987 through the present to exercise the powers of the

3     presidency or the government of Liberia forcibly or otherwise.

4          "26) The NPFL never intended at any time from January

5     1987 through the present to influence how the powers of the

6     presidency were exercised.

7          "27) The NPFL never intended at any time from January

8     1987 through the present to install any of its members in any

9     governmental office or post forcibly or otherwise.

10          "28) The NPFL never intended at any time from January

11     1987 through the present to install Charles Taylor or any other

12     members of the NPFL as president of the government of Liberia

13     forcibly or otherwise.

14          "29) The NPFL never intended at any time from January

15     1987 through the present to seize control or exercise the

16     powers delegated by the government of Liberia to another entity

17     or body, such as the AFL, forcibly or otherwise.

18          "30) Any conflicting statements or declarations that

19     may have been made by any individual purporting to represent

20     the NPFL, and any conflicting statements or declarations that

21     may have been reported in the media, did not and do not reflect

22     the specific intentions or objectives of the NPFL.

23          "To the extent such statements or declarations were

24     made, they were either a) an inaccurate reflection of the

25     intentions and objectives of the NPFL; b) not authorized by the

1   NPFL; c) reflected the personal motives of the individual

2   making the declaration; or, d) if made by an unauthorized

3   spokesman for the NPFL or made for political or propaganda

4   purposes.

5          "31) I am also personally familiar with the

6   intentions and objectives of the Independent National Patriotic

7   Front of Liberia (INPFL), based on conversations I had with its

8   leader, Prince Yormie Johnson, at meetings in Banjul, Gambia in

9   July 1990.

10          "32) Mr. Johnson and his followers had previously

11  been associated with the NPFL.  Mr. Johnson and his followers

12  were aware of and at all times shared the objectives of the

13  NPFL outlined above.

14          "33) Mr. Johnson instituted the formation of the

15  INPFL in June or July 1990 because he objected to the

16  leadership of the NPFL by Charles Taylor.  Mr. Johnson believed

17  incorrectly that Mr. Taylor wanted to install himself as the

18  president of the government of Liberia through the use of

19  force.

20          "Mr. Taylor personally assured me and the Council of

21  the NPFL on numerous occasions that he had no secret intention

22  to forcibly install himself as president of the Republic of

23  Liberia.  Moreover, as outlined above, the NPFL never intended

24  to install Charles Taylor or any of its members as president of

25  the government of Liberia forcibly or otherwise.

"To the extent Mr. Taylor desired to become president of the government of Liberia, the NPFL would have required him to run as a candidate in the free and fair democratic presidential elections that were to have been conducted following the resignation of Samuel Kanyon Doe.  Additionally, even if Mr. Taylor had harbored a desire to install himself as the president of Liberia with force, that was a personal objective that was not shared by the NPFL.

"34) The INPFL at all times shared the specific objective of the NPFL to preserve and protect the freedoms, rights, and democratic system of government guaranteed by the constitution of the Republic of Liberia.

"35) Like the NPFL, the INPFL sought to pressure the unlawful usurper of the presidency into resigning and to ensure that free and fair democratic presidential elections would be held as soon as practical following his resignation, under the auspices of the existing government administration or an interim government administration in which all political parties would have been invited to participate.

"36) Like the NPFL, the INPFL never intended at any time to overthrow the constituted government of Liberia forcibly or otherwise.

"37) Like the NPFL, the INPFL never intended at any time to seize control of or exercise any of the powers of the government of Liberia forcibly or otherwise.

1    "37) The NPRAG was created by civilians with the

2   support of the Executive Council of the NPFL as an interim

3   caretaker administration to temporarily perform basic

4   governmental functions of Liberia.  The intention to form the

5   NPRAG was declared in approximately July 1990 and Charles

6   Taylor was nominated as the interim president.

7        "The NPRAG was subsequently formed in approximately

8   November 1990 and Charles Taylor was confirmed as the interim

9   president, pursuant to election conducted by representatives of

10  the 13 counties in Greater Liberia.

11       "The NPRAG was an interim administration that was

12  designed and intended to function pursuant to the constitution

13  of the Republic of Liberia as closely as possible under the

14  circumstances that existed at the time.

15       "One of the primary functions of the NPRAG was to

16  negotiate an agreement with the Interim Government of National

17  Unity (IGNU).  The interim governmental administration that had

18  been installed in Monrovia would result in the creation of a

19  unified interim government responsible for holding free and

20  fair elections for the formation of a lawfully constituted

21  democratic civilian government, as required under the

22  constitution of the Republic of Liberia.

23       "The NPRAG and IGNU eventually reached such an

24  agreement resulting in the formation of the LNTG.  The LNTG has

25  subsequently engaged in efforts to hold the free and fair

democratic elections that were envisioned by the NPRAG and
IGNU, desired by the Liberian people, and required under the
constitution of the Republic of Liberia.

"The NPFL, the NPRAG, and the INPFL never intended to
declare and did not declare at any time their independence or
liberty from either the Republic of Liberia or as a constituted
system of government.

"40)  The NPFL, the NPRAG, and the INPFL never
intended to and did not at any time cast off their allegiance
to either the Republic of Liberia or its constituted system of
government.

"41) The NPFL, the NPRAG, and the INPFL never
intended to and did not commence hostilities against either the
Republic of Liberia or its constituted system of government to
establish their independence or liberty.

"42) The NPFL, the NPRAG, and the INPFL never
intended to and did not commence hostilities against either the
Republic of Liberia or its constituted system of government for
the purpose of creating a sovereign state with a new system of
government.

"43) The NPFL, the NPRAG, and the INPFL never
intended to and did not occupy or hold in a hostile manner any
territory under a claim of independence or liberty from either
the Republic of Liberia or its constituted system of
government.

1          "44) The NPFL, the NPRAG, and the INPFL never

2     intended to and did not proclaim that they had been created to

3     supplant either the Republic of Liberia or its constituted

4     system of government.

5          "45) The fighting that occurred in Liberia through

6     September 1990 was a reflection of the desire by Samuel Kanyon

7     Doe and a small number of pawns who had been members of the AFL

8     to preserve his unlawful status as president.  On the one hand

9     and on the other, a desire by the NPFL, the INPFL, and the

10    majority of Liberian citizens to preserve and protect the

11    independence, liberty, and the democratic system of government

12    guaranteed to them under the constitution of the Republic of

13    Liberia.

14         "46) Neither the NPFL nor the INPFL sought to impose

15    their views on the whole of Liberia, forcibly or otherwise, by

16    attempting to change or seize control of the Republic of

17    Liberia or its democratic system of government.

18         "47) The events in Liberia constituted a popular

19    uprising because the majority of Liberians supported the

20    objective of the NPFL to preserve and protect the rights,

21    freedoms, and democratic system of government guaranteed to all

22    Liberians by the constitution of the Republic of Liberia.

23         "Further your affiant sayeth naught.  Signed by

24    Jucontee Thomas Woewiyu.  Subscribed and sworn to me before me

25    this 19th day of July, 1996.  Sandra K. Haughton (phonetic),

1   notary public."

2               MR. WRIGHT:  Your Honor, with the Court's permission,

3   may we have just a very, very short adjournment so -- she's

4   going to continue to read, but she has quite a bit more to

5   read, Your Honor.

6               THE COURT:  Okay.  That sounds reasonable.  She has

7   to get her voice back.  Okay.

8               Members of the jury, remember your recess

9   instructions.  We'll be back right away.  We'll be back in

10  about five minutes.  Okay?

11              MR. WRIGHT:  Thank you, Your Honor.

12      (Jury out)

13      (Recess at 11:02 a.m. to 11:20 a.m.)

14      (Jury in at 11:21 a.m.)

15              THE COURT:  Okay.

16              MR. WRIGHT:  With the Court's permission, we'd like

17  Special Agent Lohmeier to read a portion of excerpts from I-34,

18  Your Honor.

19              UNIDENTIFIED SPEAKER:  I-34?

20              MR. WRIGHT:  I-34.

21              UNIDENTIFIED SPEAKER:  Oh, it's not in this grouping

22  that you mentioned?

23              MR. WRIGHT:  I believe that I did, but if I didn't,

24  I --

25              THE COURT:  No, you never -- I never got I-34.

1          MR. WRIGHT:  If that's the case, Your Honor, the

2     Government moves that I-34 be admitted into evidence.  It's one

3     of the documents that we discussed with counsel.

4          THE COURT:  I have -- I-34 is not on there.

5          MR. WILSON:  It wasn't on the list that he gave, but

6     -- but we don't have any objection to it.

7          THE COURT:  Oh, okay.  All right.  I don't have a

8     copy, but it doesn't matter.

9          MR. WRIGHT:  Your Honor, it would be in your -- it

10    would be in your -- in your large book.

11         THE COURT:  Okay.

12         MR. WRIGHT:  Under I -- under I-34, Your Honor.

13         THE COURT:  Okay.  That's no problem.

14    (Pause)

15         THE COURT:  Okay.  All right.  You may begin.

16         MR. WRIGHT:  And with the Court's permission, I'll

17    ask Special Agent Lohmeier to advise us, since she's reading

18    excerpts, as to where those excerpts are located on the

19    document, Your Honor.

20    (Pause)

21         MR. WRIGHT:  Your Honor, rather than starting with

22    I-34, we'll start with I-3, which is -- also should be in your

23    book.  My apologies to the Court.  She'll read excerpts.

24    (Pause)

25         THE COURT:  Okay.  All right.

1          SPECIAL AGENT LOHMEIER:  "2005 Jucontee Thomas

2    Woewiyu open letter to Madam Ellen Johnson Sirleaf.  Thursday,

3    September 15, 2005 by Jucontee Thomas Woewiyu.

4          "Dear Madam Ellen Johnson Sirleaf:  The Rest of Your

5    Apologies.  I write this letter to first compliment you for

6    finally mustering the courage to apologize to the Liberian

7    people for the callous and deadly statement you made on the BBC

8    in 1990 while prosecuting the second and Taylor led version of

9    NPFL wars.

10          "You said 'Level Monrovia, we will rebuild it,' and

11   not 'Level the Executive Mansion,' as contained in your

12   statement of apology.  As you said, you regret making what you

13   now term as a 'stupid comment.'  If you truly regret making a

14   statement that resulted in the death of thousands of your

15   fellow countrymen and women, why replace it now with a false

16   one?

17          "I am also writing this letter to refresh your memory

18   about other reckless and deadly statements you made in the past

19   that must be included in your apology if you are honest in

20   seeking forgiveness from the Liberian People whom you are also

21   seeking to rule.

22          "Your Level of Involvement.  First, let us clarify

23   the matter of what level of involvement and part you played in

24   the founding of the National Patriotic Front of Liberia (NPFL)

25   and the prosecution of its wars:  The Quinwonkpa failed coupe

1    in 1985 and the version led by Charles Taylor which started in

2    December of 1989.  As you know, the NPFL organization was the

3    same but operated with different foot soldiers in each version

4    under your stewardship as we will see later on in this letter.

5          "Your position in that organization, especially the

6    Taylor version, was not as petit and as limited as you continue

7    to describe it to have been.  'Level Monrovia, we will rebuild

8    it,' could have only come from the real Head of State and

9    Commander-in-Chief whose army was the NPFL as you saw yourself.

10   You issued the order and it was executed.  It included the

11   notorious Octopus, which finally wrecked Monrovia.

12         "Fifteen years have gone by and Monrovia is still

13   without water and electricity. During the course of this

14   period, you were the second most powerful person in the United

15   Nations Development Program (UNDP), but zero came to Liberia by

16   way of your influence.  You even undermined the promotion and

17   employment of qualified Liberians in that UN organization

18   during your tenure. For now, I will leave your UN record to

19   speak for itself.

20         "Preparation for Invasion.  My first trip to the

21   Ivory Coast to meet with Charles Taylor, Harry Yuan, Moses

22   Duopu and others to assess the level of military plan of action

23   for the purpose of removing Doe was sponsored by you and others

24   in the wake of the failed Quinwonkpa coupe in which you played

25   a major role.  At the time, you were personally supporting

Harry Yuan in the rapid re-recruitment of his fellow Nimbaians and Clarence Simpson was supporting Moses Duopu, the late Counselor Gbaydiah and others in the Ivory Coast to launch another arm attack on the Doe regime following the botched Quinwonkpa coupe.

"If you can recall, after my visit, to the Ivory Coast, the three men split up in search of a possible training base and support. Duopu went to Nigeria, Harry Yuan went to Senegal and Taylor went to Burkina Faso. It was Taylor who first found the possible avenue to accomplish the mission.

"With your knowledge and support, I again went to Burkina Faso to ascertain the truth to Taylor's claim that he had found the ultimate opportunity to train men for another attempt to remove the Doe regime by force of arm.  The sponsors, especially Thomas Sankara, wanted to know that there was a political support for an arm rebellion by civilians to remove the Samuel Doe's military junta.  With your knowledge and consent, I gave the sponsors the assurance they needed to kick off the process of recruitment and training.

"Upon my arrival back in the United States, I went straight to your sister's house on Long Island where you were living.  While we were discussing the issue of Taylor leading this round of armed rebellion, Byron Tarr arrived.  When you told him what you were putting Taylor up to, he was totally opposed on the ground that Taylor was corrupt.  He gave in only

1    when you asked him if he had any other viable alternative,

2    given that your people had tried more than 10 times to get rid

3    of Doe, but failed.

4            "The Libyan Connection.  You accepted and agreed to

5    create a political alliance to replace the junta. Since you

6    could not go to Tripoli, Libya, during the training of the men

7    and the planning stage, you appointed a special envoy, Mr.

8    Harry A. Greaves Jr.  For reasons not necessary to be stated

9    here, neither you nor Mr. Greaves ever went to Tripoli but you

10   stayed abreast of the progress of the training until it was

11   completed.

12           "Following the training of the men, and while they

13   were waiting in the Diaspora, you and I met with Taylor in

14   Paris where you promised to arranged for a ship to drop the men

15   in Liberian waters from the Sierra Leone side.  There was also

16   talk about you arranging with President Momo of Sierra Leone

17   for the offensive to be launched from Sherbro Island.  I

18   believe, relying on that, Taylor went to Sierra Leone to follow

19   up and he wound up in jail.  What a way to treat your general."

20           SPECIAL AGENT LOHMEIER:  I'll be skipping to, "A

21   Secret Meeting with Charles Taylor and Jackson F. Doe's

22   Disappearance.

23           "A few months after the meeting in Virginia, in my

24   absence you went to the war front at Gborplay, Nimba County,

25   where the NPFL still had its headquarters, and told Charles

1    Taylor and other leaders of the organization that you and I had

2    agreed that the government would be given to Liberian Action

3    Party once the Doe regime was deposed.  Upon my arrival at that

4    forest headquarters, I was confronted with a court marshall of

5    a life-threatening nature for supposedly selling out the

6    revolution in advance while others were still fighting and

7    dying.  Only God and my friendship with Taylor saved me.  I was

8    able to walk away with my life."

9         SPECIAL AGENT LOHMEIER:  Skipping ahead to, "Your

10   Financial Contributions to the War Effort.

11        "Let me refresh your memory on the financial

12   contributions to the Taylor war efforts from you and your

13   sources.  $25,000 was the initial amount by your consortium,

14   Clarence Simpson and Taylor Major, when the war started.  I am

15   the founding Chairman of the Association for Constitutional

16   Democracy of Liberia (ACDL)."

17        SPECIAL AGENT LOHMEIER:  And towards the end:

18        "I truly hope that the factual and historical events

19   I have outlined in this letter will help to jar your memory so

20   that you can do the right thing, tell the truth.  Sincerely,

21   Jucontee Thomas Woewiyu, August 30, 2005."

22        MR. WRIGHT:  With the Court's permission, Special

23   Agent Lohmeier will read just a short portion of I-34.

24        THE COURT:  Do you want anything counter read?

25        MR. WILSON:  We may, Your Honor.

1          THE COURT:  Oh, later.  Okay.  That's fine.

2          SPECIAL AGENT LOHMEIER:  "African Panorama, watching

3    through the bird's eyes, the Woewiyu testimony to the Liberian

4    TRC that was never given."

5          From page 2, halfway down:

6          "As I speak to you now, my heart goes down for an

7    innocent group of Fante people,  Ghanaian immigrants in Grand

8    Bassa County."

9          THE COURT:  One second.  We have to get this --

10          SPECIAL AGENT LOHMEIER:  I'm sorry

11          THE COURT:  -- blown up a little.

12      (Pause)

13          THE COURT:  Okay.  Thank you.

14          SPECIAL AGENT LOHMEIER:  Yes, ma'am.

15          "As I speak to you now, my heart goes down for an

16    innocent group of Fante people, Ghanaian immigrants in Grand

17    Bassa County who, as the uprising turned into anarchy, were

18    rounded up by the NPFL forces and put in what amounted to a

19    concentration camp called Flamingo Camp, a logging village in

20    Nimba County.

21          "By the time I came to know of the camp, some heinous

22    acts including rape and murder had been committed there.

23    However, with my ardent urging Mr. Taylor saw to it that the

24    camp was broken up.  Some of the victims fled to Ghana, while

25    others returned to Buchanan.  I deeply apologize to these

1    outstanding Ghanaian immigrants in Liberia.

2              "My heart also goes out to the ethnic Krahns of Grand

3    Gedeh County who may have suffered as a result of a statement

4    attributed to me during the war.  Immediately following my

5    breakup with Taylor, NPFL Radio maliciously aired an utterance

6    in my voice saying, 'A good Krahn man is a dead Krahn man."

7              MR. WILSON:  Your Honor, I'm going to ask at this

8    point that the next paragraph be read also.

9              THE COURT:  Okay.

10             MR. WILSON:  For completeness.

11             SPECIAL AGENT LOHMEIER:  "The truth is, the utterance

12   was a distorted version of a sentence in which I told Enoch

13   Dogolea that Taylor was fooling himself if he thought he could

14   buy the Krahn people with any amount of money.  In actual fact,

15   I said to Dogolea, 'Didn't Taylor say the only good Krahn man

16   was a dead Krahn man, and that the only good Doe was a dead

17   Doe?"

18             THE COURT:  Okay.

19             MR. WILSON:  Thank you.

20             THE COURT:  Is that what you want read?

21             MR. WILSON:  Yes, Your Honor.  We may come back to it

22   at a later --

23             THE COURT:  Okay.  All right.  Anything else?

24             SPECIAL AGENT LOHMEIER:  Skipping to page 6.

25             THE COURT:  Page 6?

1          MR. WRIGHT:  Your Honor, if she could read -- she was

2     supposed to read the entire portion.  If she could read the

3     next paragraph also.

4          THE COURT:  Okay.

5          MR. WRIGHT:  At the end after -- at page 2.

6          SPECIAL AGENT LOHMEIER:  Mm-hmm.

7          "At one point, Taylor was bankrolling Roosevelt

8     Johnson and his Ulli Mojay (phonetic) against Alhaji Kromas

9     (phonetic) Ulli Mokay (phonetic).  Some outstanding

10    personalities in the Krahn community at the time were actually

11    flocking to Banga and collecting large sums of money under the

12    guise of peace building.  Thank God some Krahns had heard the

13    statement from Taylor directly before it was attributed to me.

14    In any case, I must register my sincerest apology to the Krahn

15    people who in fact are cousins to my Bassa ethnic group."

16         SPECIAL AGENT LOHMEIER:  To page 6?

17       (Pause)

18         SPECIAL AGENT LOHMEIER:  "Condemnation.  I must also

19    use this opportunity to condemn in the strongest terms those

20    men and women who use the shadow of this legitimate uprising of

21    the people to commit mass murders and destroy our scarce

22    infrastructure.

23         "I was mortified when I read the testimony of a so-

24    called former warlord who said that his faction's involvement

25    in this civil war was motivated by greed; that he and his

1    comrades had been fighting for the government of Sierra Leone

2    as mercenaries; that apparently they were paid with weapons to

3    launch a counter-offensive in Liberia.

4            "The truth of the statement is that these fighters

5    took over the diamond region of Liberia.  In the fight over

6    diamonds, the band metamorphized into two groups.  The second

7    group moved into Lofa and connected its new empire to the

8    Republic of Guinea where they had natural ethnic affinities.

9            "Liberia has jurisdiction to punish or forgive those

10   who committed crimes under the guise of fighting a liberation

11   war."

12           MR. WRIGHT:  There is one line in the heading on page

13   14, Your Honor.

14           THE COURT:  All right.

15      (Pause)

16           SPECIAL AGENT LOHMEIER:  "The Assassination of

17   President Doe by ECOMOG."

18           MR. WRIGHT:  With the Court's permission, the

19   Government requests that Special Agent Lohmeier read all of

20   I-35.

21           THE COURT:  Oh, they're not going to -- she's not

22   going to read this?

23           MR. WRIGHT:  No.

24           THE COURT:  Oh.  Okay.  She's going to read all of

25   I-35?

1          MR. WRIGHT:  Yes, Your Honor.

2          THE COURT:  Okay.

3          SPECIAL AGENT LOHMEIER:  "Turning the Tables.  Last

4    week Tom Woewiyu called a press conference in which he reversed

5    the NPFL's long-held view of the West African Peace Initiative,

6    and especially Nigeria's involvement, saying that he and his

7    colleagues want a disarmament to be accelerated so that the

8    NPFL can metamorphized itself into a political party rather

9    than an insurgent army.

10          "Woewiyu, Minister of Labor of the Liberia National

11   Transitional Government (LNTG), who is also a former defense

12   spokesman for the National Patriotic Front of Liberia (NPFL),

13   was among the first four NPFL nominees to eventually agree to

14   be sworn in as members of the LNTG earlier this year.  The

15   others were Samuel Dokie, Minister of Internal Affairs, Zaed

16   Dachey (phonetic), Minister of Lands and Mines, and Lavella

17   Supowood, Minister of Justice.

18          "It was discovered almost as soon as they took their

19   seats that Charles Taylor had not intended them to take their

20   seats until all the cabinet posts, which he wanted allocated to

21   the NPFL and major dictatorships and headships of vital public

22   corporations, had been granted to the organization.  This was

23   immediately perceived as the beginning of a major split in the

24   ranks of the NPFL because Woewiyu, Dokie, and Supowood were

25   largely considered the intellectual and ideological backbone of

1    the organization's hierarchy.

2          "Below are excerpts from the main statement made by

3    Woewiyu by Lindsay Barrett in Monrovia Reports."

4          THE COURT:  All right.  Is this in evidence?

5          MR. WRIGHT:  Yes, Your Honor.

6          THE COURT:  Okay.  All right.

7          SPECIAL AGENT LOHMEIER:  "Gentlemen of the press, I'm

8    a founding member of the NPFL.  I was there when there was no

9    NPFL and we put down PFL together along with others.  Even if I

10   wanted to, I don't think I could get out of the NPFL, so the

11   notion that I'm not with the NPFL anymore, Samuel Dokie is not,

12   Supowood is not, is a fallacy and is merely a divisive scheme

13   by those who have actually used the NPFL as noble goals to

14   frustrate the Liberian people.

15         "Yes, there's a problem in the NPFL and in this

16   country.  The NPFL itself is a very, very good organization.

17   It is an organization made up of men and women dedicated to a

18   cause.

19         "Most of you can recall that when the NPFL launched

20   this revolution, almost everybody in this country supported it.

21   There were very few that did not support the idea that a

22   people's force had to be used to remove the dictatorship of

23   Samuel Doe.  It was not the fighting men or the method of

24   fighting that frustrated and derailed this noble goal, it was

25   the leadership of the NPFL that led to all of these problems.

1            "The NPFL, of course, as you know, is being headed by

2    Charles Taylor, who as a matter of fact was a made leader of

3    the NPFL as a result of a series of coincidences.  Charles

4    Taylor is not the founder of the NPFL.

5            "The NPFL was founded by the late Thomas Quinwonkpa,

6    and after the failure of his attempt it was continued by those

7    of us who felt that we had to continue the struggle until

8    things changed.  It could have been led by several other

9    prominent Liberians.  It could have been led by myself, Tom

10   Woewiyu.  It could have been led by Moses Duopu.  It could have

11   been led by Harry Yuan.  These are people who were actually

12   there at the resuscitation of the NPFL.  Taylor was a part of

13   that, and by a series of coincidences we agreed for him to lead

14   the organization.

15           "Over the years, he has abused that agreement.  He

16   has abused the trust of a group of noble men, and of course we

17   have worked along with the organization to see if we could

18   solve the problem and maintain the goal of the organization,

19   which was to change things in this country for the betterment

20   of all.

21           "Therefore, over the years we went from one thing to

22   another and everybody seemed to have been given the NPFL all

23   the opportunities to accomplish its goal through politics.  Mr.

24   Taylor has consistently obstructed that, insisting that he must

25   be president of this country by force, not even by election, or

1    else the war will not stop.

2              "Those of us who took the decision to join the LNTG

3    recently thought that this was the best opportunity in the

4    history of the struggle for us to put an end to this charade on

5    the part of Taylor.  Taylor knows that in no way could he be

6    elected in this country.  He has done things in the name of

7    NPFL that he has to answer for and he knows that, so he

8    continues to dwell on armed struggle as a way of trying to

9    bring himself to power.  And of course we have to try to find a

10   way to end this.

11             "Over the years those of us who led the NPFL had

12   known that Taylor and a handful of men, of people, have turned

13   the noble goal of the NPFL into a revenge adventure.  America

14   Liberians versus country people, that type of revenge.  What we

15   started off doing, we did with everybody.  All of the tribes in

16   this country, America Liberians, Gbandi, Gisi, everyone joined

17   hands to solve the problem, including the Krahns, who are

18   members of Doe's tribe," --

19             THE COURT:  I don't see where you're reading.  Oh,

20   okay.  Did you -- did you leave anything out?

21             SPECIAL AGENT LOHMEIER:  No, ma'am.

22             THE COURT:  Okay.

23             SPECIAL AGENT LOHMEIER:  "-- all came along to join

24   the NPFL to change the situation for the betterment of the

25   Liberian people.  But Taylor and a handful of people decided

1    that this was an opportunity to avenge the 1980 coup which led

2    to the killing of 13 leaders of this country who are from the

3    America Liberian Tribe.

4                "Taylor himself took part in that decision to" --

5                THE COURT:  Wait a second.  On the screen is -- all

6    right, now it is.  Okay.  It wasn't before.  Okay.  All right.

7    It wasn't on the screen.  Okay, you can go on.

8                SPECIAL AGENT LOHMEIER:  All right.  Thank you,

9    ma'am.

10               "Taylor himself took part in that decision to execute

11   them, but in his quest for power, he has turned around, trying

12   to convince others that he is the messiah for them, the so-

13   called America Liberian.  All of these things Taylor is doing

14   because now he and others have decided that they are going to

15   use the so-called country people against themselves.

16               "Those children who fought in the NPFL and died were

17   not related to Taylor and did not come from his background.

18   While his children, even in the midst of war, are in private

19   schools in Geneva and other parts of the world, he takes pride

20   in walking around with other people's 8-year-olds, dragging AK-

21   47s behind them.  But he knows that those children belong to a

22   group of people that he has no regard for.

23               "This has been the nature of this war.  This has been

24   the nature of how the NPFL with its noble goals has almost lost

25   those goals by following Charles Taylor.

1      "Other warring factions have come about because they

2  have to resist this particular move by Taylor.  Some of them

3  may not be aware that most of us in the NPFL were aware of this

4  problem.  If they knew it, they probably would not have mounted

5  more warfare in order to get rid of Taylor.

6      "You take the situation with the ULIMO.  It got

7  strengthened very much with Taylor's brother in Lofa Bridge,

8  Nelson Taylor.  He killed, killed, killed until the ULIMO

9  people had to launch resistance on that side with the help of

10  indigenous people in that area.  He moved on to Bong Mines, did

11  the same thing, and ULIMO got the support of the environment.

12  He moved on to Bassa and the same thing happened.  He moved on

13  to Sinu; he harassed and killed the people until LPC came

14  along.

15      "LPC and ULIMO are mostly NPFL fighters who had to

16  run for their lives.  LPC in particular, most of those fighters

17  who started the war in Sinu and Bassa, are NPFL fighters whose

18  ears were cut off by John Richardson, Charles Bright and Cuckoo

19  Dennis in their revenge against the so-called native people.

20  They know it; LPC knows it.  LPC knows and we know what Nelson

21  Taylor did in Sinu which gave rise to the creation of the LPC.

22      "So what the NPFL has had to do is admit that we have

23  a problem.  Today I want the public to know that the NPFL, the

24  organization, is not the problem.  We the people in the NPFL

25  are not the problem.  We recognize that we have a problem.

That problem is our leader, Mr. Charles Taylor.  He is opposed

to any peace in this country.  He is opposed to the LNTG.  You

can see now he is no longer talking about the ceding of the

rest of the NPFL representatives to the LNTG.  He is now on to

the formation of a new army by the factions.

          "Obviously, the Liberian people will not tolerate the

formation of a prominent army by a bunch of gun-holding

factions.  This is a country with a constitution.  The army is

based on that.  Taylor is not in any position to demand an army

based on sovereignty because he is only sitting in one house in

Banga that does not form the sovereignty or the territorial

jurisdiction of the Republic of Liberia.

          "Others involved in the conflict do not feel that the

issue of sovereignty is any longer an issue that should stop

the peace process, but he is still using that as an obstacle.

And therefore we want to say here today that the NPFL

leadership will deal with the issue of the problem within it.

We will avoid violence.  And this is what Taylor doesn't want.

He wants us to reduce ourselves, our noble goal, to the

situation that happened within ULIMO wherein it reduced the

people's movement, a movement for justice, a movement for

democracy to tribal conflict.

          "Two tribes of this country, the Mandigos and the

Krahns, most of whose members are not involved in this warfare,

their names are now used to fight a war.  We are not going to

1   bring the NPFL down to that.

2          "We believe that by publically acknowledging within

3   the NPFL that our leadership is a problem, we will solve the

4   problem.  We believe in calling on the NPFL fighters to stop

5   fighting anybody, ULIMO, AFL, LPC, Lofa Defense Force.  They

6   are not the enemies of the NPFL; Taylor is the enemy of the

7   NPFL.  This they must know.

8          "We call upon all the other factions to recognize our

9   admission of this problem and our desire to correct the problem

10  without resorting to further destruction of lives and property.

11  We believe that the NPFL is capable of handling its own

12  leadership problem without any further bloodshed, and therefore

13  we call on the LPC, LDF, ULIMO, LNTG, and the international

14  community to urge all to stop the violence and pause while the

15  NPFL tries to resolve this problem of leadership internally.

16         "Mr. Taylor is an enemy to this society.  He is an

17  enemy to the NPFL.  He has distorted our ideals and wasted

18  blood on the noble goals of the people of this country.

19         "It is not an accident that several people that

20  showed up behind the lines disappeared.  Jackson Doe was not

21  captured in combat.  He walked over to our side, led by some of

22  our fighters, joyously to Kakata.  There was a very, very big

23  festival in the middle of the war to celebrate that a leader of

24  our people had been saved.  A leader who Doe wanted dead was

25  saved.

1    "He was escorted to Harbel, to Mr. Taylor.  He was

2   received.  At the time, I was in Sierra Leone.  Taylor informed

3   me that Jackson Doe was with him and that I should inform

4   Sawyer, Ellen Sirleaf, and all the politicians that Jackson Doe

5   was safe, only for me to arrive in Harbel one week later and he

6   could not tell me where Jackson Doe was.  He could not tell me

7   where Alfred Fuomo (phonetic) was; where Steven Daniels was;

8   where David Toa (phonetic) was; Professor Yakisin (phonetic).

9   All these people were taken to Buchanan and given housing, then

10   they disappeared.

11    "Then there was Cooper Taya (phonetic).  I went

12   personally to Freetown and urged him not to mount another

13   insurrection, another warfare on our people, he being a Nimba

14   citizen.  Nimba had already suffered so much and we felt that

15   there was no reason to double the jeopardy by him launching

16   another war under the leadership of my dear brother Binwall

17   Funbulla (phonetic), and Cooper Taya agreed and came along.

18   Funbulla thought that this was a mistake and we tried to get

19   him to understand that we were all one and that there was

20   nothing that was going to happen to these people.

21    "Cooper Taya came out and sat in a Harbel club.  He

22   never got out of the clubhouse.  I went away to the United

23   States and came back and I could not find Cooper Taya.  Taylor

24   could not tell me what happened to Cooper Taya.  About a year

25   ago, I took 18 of the 43 men out of jail in Banga.  He had

1   hailed these Cooper Taya men and they stayed in jail for almost

2   two years.  I felt responsible for whatever happened to the

3   rest of them and I felt I had to do something to save some of

4   them, and they were saved.

5           "If you look at the background of all of these

6   people, Gabriel Cappolla (phonetic) and others, you will see

7   that they all came from a common background of the so-called

8   country people, are indigenous people.  It agrees that this was

9   not an error.  This was a calculated decision on the part of

10  Taylor.

11          "Quite recently, this decision has been very, very

12  prominent in public knowledge, that the revenge against the so-

13  called country people has been the backdrop of the actions of

14  Mr. Taylor and a handful of people.  Mrs. Grace Minor, Charles

15  Bright, Cuckoo Dennis, and others are in the background of

16  these.

17          "I must be very clear that those of us in the

18  leadership of the NPFL are very, very much aware that these

19  people in no way represent the aspirations of the America

20  Liberian Tribe in this country.  They are a bunch of confused

21  people, including Mr. Taylor, who wants to use any kind of

22  excuse.  And I'm sure that Mr. Taylor in the beginning tried to

23  show that he was fighting a countryman's war against others

24  when he took part in the decision to execute the 13 America

25  Liberian leaders of this country.  I am sure that he was trying

1    to convince the country boys and the PRC that a group of

2    prominent citizens of this country should be wiped out to

3    satisfy his personal issues.

4        "This clarification is not intended to put any shadow

5    of doubt on the America Liberian Tribe as being part of Mr.

6    Taylor's conspiracy.  It is only intended to try to show to our

7    people that we must not fight for any reason at all on behalf

8    of people that tend to divide this country along certain ethnic

9    and tribal lines.  It is our intention that the NPFL fighters

10   know that Taylor does not see their struggle as a political

11   struggle for a change in this country, but rather as a struggle

12   to bring him to power, whatever his motive his.

13       "We know for sure that if Taylor had come to power,

14   most people, including America Liberians and natives, and

15   anybody that he saw as an obstacle to his desire for power,

16   would have been erased.  And we know for sure that Taylor has

17   committed more atrocities, probably more than we are aware of,

18   from the Doe regime.

19       "And therefore I make this plea today to all of the

20   fighters from all of the fighting forces to all of the leaders

21   of all the different forces, some of the organizations, the

22   LPC, ULIMO, who may have their own problems and their own

23   Charles Taylors, too, and the nation.  And all of us are poised

24   to help them to get rid of these problems without any further

25   bloodshed.

1     "We must all realize that we are all one.  This

2     nation belongs to all of us, all Liberians born in this land,

3     and the fourth and fifth generations of Liberians should not be

4     identified by tribe, but identified internationally by their

5     country of origin, even though we must respect each other as a

6     diverse group of people and try to capitalize on the

7     opportunity and the unity that diversity brings with it.

8          "Therefore, I call upon all the fighters of the NPF

9     to stop fighting the LPC, stop fighting ULIMO.  ULIMO, stop

10    fighting NPFL.  ULIMO, stop fighting ULIMO because those that

11    you are fighting for, they are the problem.  The problem that

12    you're fighting against are not the problem.

13         "We hope, we pray that the LNTG government will be

14    sustained.  The LNTG government must not fail.  The LNTG

15    government must lead us to free, fair, and democratic

16    elections.

17         "We are aware that the international community can no

18    longer tolerate the selfish aims and objectives of a handful of

19    people who just continue to create a nightmare for our nation.

20    They will not tolerate this.

21         "The United Nations and the world have expended a

22    whole lot of money in this country to solve our problem, and

23    through the LNTG the solution to this problem must come.  The

24    elections must come.  And those of us that are in the

25    leadership of NPFL are committed to the LNTG.

1        "Mr. Taylor and Mr. John T. Richardson are not the

2        NPFL.  John Richardson was a displaced person who we picked up

3        from Dupolk Road (phonetic).  He does not know where the NPFL

4        is coming from.  He is only looking at the NPFL from a racist

5        point of view.  Mr. Charles Bright was a businessman fighter

6        with Prince Johnson and any other group that he can take

7        advantage of.  So these are not the representatives of our

8        people across the nation for this noble goal.

9        "The NPFL is the same as LPC; it is the same as

10        ULIMO; it is the same as AFL.  We are all one and the same

11        people trying to bring a better Liberia for all of us.  It is

12        unfortunate that we had to use weapons.  But those of us that

13        were involved in the fight are prepared to put the weapons down

14        and let politics prevail.

15        "So therefore we call on the state council to

16        maintain its vigilance.  We call on the TLA to maintain their

17        vigilance.  We call on ECOWAS to maintain their vigilance.  We

18        call on Nigeria in particular and thank them and the people of

19        Nigeria, the citizens of Nigeria, the leaders of the Republic

20        of Nigeria for their endurance, for their perseverance, for

21        their dedication to Africanism, to the survival of this nation

22        as a nation, and we call upon them to maintain their vigilance

23        and we see this conflict to end as a regional power.

24        "I look forward to the day when this conflict comes

25        to an end with all the ECOWAS flags, Nigeria's flags leading in

a parade in the City of Monrovia, and around this country in

celebration of the victory of the people of Liberia and the

sustenance of their sovereignty.  If Mr. Taylor cannot see

that, then he will just have to get out of our way, and we must

not continue to kill  each other for this purpose.

        "We would like to call upon the international

community, the UN, OAU, ECOWAS, and all the regional leaders,

Ghana, Guinea, Sierra Leone, the Ivory Coast, the entire ECOWAS

countries, especially the regional countries that have

contributed troops here, to maintain their vigilance in the

name of the Liberian people, in the name of Africa, and not to

dwell on the failures, but on the successes and the relative

peace that is coming.  And I pledge, and the people in the NPFL

pledge that they will do their best to bring this situation to

an end through politics, through democratic means, as quicky as

possible."

        MR. WRIGHT:  With the Court's permission, we ask that

Special Agent Lohmeier, before -- well, before we go to that,

Your Honor, if we may have Government Exhibit I-36 published.

        That is the -- an enlargement of a photograph that's

part of this ancient document and that's already been admitted

into evidence.

        THE COURT:  Any -- any --

        MR. WILSON:  None, Your Honor.

        THE COURT:  Is it all right?

1          MR. WILSON:  Yes, Your Honor.

2          MR. WRIGHT:  Now, with the Court's permission, --

3          THE COURT:  Okay.

4          MR. WRIGHT:  -- we'd like to have Government Exhibit

5    KK-4 read.

6          THE COURT:  Okay.

7          MR. WRIGHT:  It's been admitted into evidence.

8      (Pause)

9          MR. WRIGHT:  With the Court's indulgence, if we can

10   have just one moment.

11         THE COURT:  Sure.

12     (Pause)

13         THE COURT:  Okay.

14         MR. WRIGHT:  With the Court's permission.

15         THE COURT:  Certainly.

16         SPECIAL AGENT LOHMEIER:  "Horrors of War.  After a

17   lull of about two years in the Civil War in Liberia, Charles

18   Taylor's National Patriotic Front of Liberia (NPFL) launched

19   attacks on ECOMOG positions and the people of Monrovia on

20   October 15, 1992.

21         "The NPFL fighters abducted thousands of civilians in

22   and around Monrovia and made them walk for miles to areas under

23   their control.  Many died from hunger and exhaustion.  In the

24   following narrative, a Liberian journalist, Robert Sonnie

25   Morris, who managed to return to Monrovia recently, tells of

1    his abduction and ordeal behind NPFL lines.

2              "Friday night, October 23, 1992 will remain etched in

3    my memory.  It was when forces of the NPFL entered Cadwell and

4    parts of New Crewe Town, all suburbs of Monrovia.

5              "Around 8:00 that night, I heard sporadic shooting

6    in Duwalla" --

7              MR. WILSON:  Your Honor, --

8              SPECIAL AGENT LOHMEIER:  -- my area --

9              MR. WILSON:  Your Honor, may we see you at sidebar?

10             THE COURT:  Sure.  Let me just get the document up.

11        (Sidebar begins)

12             THE COURT:  I don't know what it is.

13             MR. WILSON:  It's 34.

14             THE COURT:  No, I know that.

15             MR. WILSON:  Okay.

16             THE COURT:  KK --

17             MR. WRIGHT:  KK-4, Your Honor.

18             THE COURT:  KK-4.  There it is.  I'm getting to it.

19   I'm getting to it.

20             MR. WILSON:  It's going to be very hard to read that.

21             THE COURT:  Yeah, it sure is.

22             MR. WILSON:  It's better to have you watch on the

23   screen.

24             THE COURT:  All right.  Tell me what -- what is --

25             MR. WILSON:  So basically, Your Honor, we agreed that

1    this was -- that this qualifies as an ancient document for

2    purposes of the rules, but it's an ancient document that

3    contains hearsay.  It's not the words of Tom Woewiyu.  It's not

4    the words of anybody else.  It's the words of a -- of a person

5    who is not -- is not present and has not given testimony, and

6    we do not have a chance to cross-examine him on what he's going

7    to write in here.

8                   THE COURT:  That's true for all of these.

9                   MR. WILSON:  Well, no, most of these are our -- our

10   client's statements, so --

11                  THE COURT:  Some are some aren't.

12                  MR. WILSON:  There was some -- some of the BBC

13   recorded --

14                  THE COURT:  You're telling me that the only -- you're

15   arguing that the only -- that the ancient documents were --

16   just has to deal with -- with -- with authenticity and nothing

17   else?

18                  MR. WILSON:  It -- it has to -- the ancient document,

19   the purpose of the rule was that it give some authenticity to

20   an old -- older document.  However, it has to be -- it contains

21   within that ancient document hearsay that we can't confront,

22   that we can't cross-examine.  And for that reason, it should

23   not be admissible because of our right to confront -- you know,

24   the right of Mr. Woewiyu to confront people whose testimony is

25   being presented.  In this case, the testimony is being

1    presented by somebody that we can't confront.

2            THE COURT:  That's always true with the ancient

3    document rule.  But that's what the ancient document rule is.

4            MR. WILSON:  But --

5            THE COURT:  I wish you had brought this up pretrial.

6            MR. WRIGHT:  Your Honor, he did bring it up pretrial,

7    but the problem -- but the argument is that the law is on the

8    other side under Langdor (phonetic).

9            Langdor facts says that as long as it's the firsthand

10   observation of the author, that there's not an issue.  And

11   that's what the law is.  And this is -- this individual who was

12   there.  The only issue that ever exists is if this ancient

13   document, is if it's being reported to someone.  And the Third

14   Circuit said, well, there may be a problem there because there

15   could be a mistake in the transmissions.  But that's not the --

16           THE COURT:  Not this.

17           MR. WRIGHT:  It's not this.  It's not this issue.

18   This is his firsthand account.  And so under Langdor, on the

19   ancient document, this is admissible.  Those are the rules of

20   evidence in this circuit, respectfully.

21           THE COURT:  Well, I -- I don't have a problem with

22   what you're saying at all.  The only thing is, do you think

23   that the jury should know that?

24           MR. WRIGHT:  Should know that this --

25           THE COURT:  That this is -- this is being admitted

1  because it's an ancient document and that's the law, and that

2  under those circumstances you are not given a right to cross-

3  examination, but that's what it's supposed to be.

4          MR. WILSON:  Your Honor, I'm just here to note that

5  we are objecting on confrontation clause grounds.  Regardless

6  of what the hearsay rules say, this is testimony that's being

7  given --

8          THE COURT:  I understand.

9          MR. WILSON:  -- without an opportunity to cross-

10  examine, --

11          THE COURT:  I understand that.

12          MR. WILSON:  -- without an opportunity to --

13          THE COURT:  I understand the ancient documents rule.

14  That's okay.  So if it isn't, you can -- you certainly can

15  reexamine it.  Your objection is certainly preserved.

16          MR. WILSON:  Thank you, Your Honor.

17          THE COURT:  Okay.

18      (Sidebar ends)

19          THE COURT:  Okay.

20          SPECIAL AGENT LOHMEIER:  I can continue?

21          THE COURT:  Yes, you can continue.

22          SPECIAL AGENT LOHMEIER:  "Around 8:00 that night, I

23  heard sporadic shooting in Duwalla, my area.  I heard sounds of

24  different types of weapons.  It was a serious exchange of fire

25  between ECOMOG and the rebels.  This lasted for three hours.

1      "By 11 p.m., the rebels had captured the areas

2   mentioned above after the ECOMOG soldiers had withdrawn their

3   base in the compound of the Liberia Free Zone Authority (LFZA)

4   on Bushrod Island.  Heavy shooting ensued the entire night.

5   Window glasses were broken and bullets penetrated some houses.

6   Shops, stores, and cars were looted.  I prayed for the ground

7   to open, but it did not.

8      "Later I heard abusive and obscene language being

9   used against ECOMOG, the interim government, the AFL, Armed

10   Forces of Liberia, as well as against people of the Krahn and

11   Mandingo ethnic groups.  I knew then that it was the rebels,

12   who are notorious for their vulgarity and vandalism.

13      "The majority of the NPFL fighters belonged to the

14   Gio and Mano ethnic groups.  I then said to myself, Lord, these

15   people are around, save me.

16      "By 6:30 the following morning, Saturday, October 24,

17   the rebels, looking fearful by their dressing, began calling

18   residents of the areas to come out of their houses for

19   interrogation and to be taken to Gonjaland, Taylor's territory.

20      "I came out with my nephew Kingsley and we joined

21   other residents who had emerged from their houses.  The rebels

22   began asking for people who were working for the interim

23   government, people of the Mandingo and Krahn tribes and for AFL

24   soldiers.

25      "Adjacent to my house, the rebels instantly killed a

1    man because of his Mandingo accent.  They asked us not to take

2    along any Liberty, a $5 banknote issued by the interim

3    government.  They warned strongly that if anybody was caught

4    with Liberty, he would be killed.  I saw people throwing

5    thousands of Liberty notes into the bushes.

6              "The rebels intensified their atrocities by beating

7    people and killing others because of their tribes in connection

8    with the interim government.  Their personal belongings were

9    taken away from them.

10             "It was a crime to carry gold chains, rings, watches,

11   shoes, coins, money, and other valuables to Taylor's territory.

12   All these items were taken from us.  Women were stripped naked

13   and their vaginas opened to see whether they had jewelry hidden

14   in there.  My gold ring, sneakers, and watch were taken away

15   from me.

16             "I walked barefoot for miles before reaching our

17   destination.  Along the way, the rebels were raping women and

18   young girls between the ages of 12 and 15.  It was a crime for

19   one to work for his government.  Because of my connection with

20   the past government as assistant minister and now with interim

21   government, I had to hide my identity.  But this survival

22   strategy did not work throughout the journey.

23             "At one point, the rebels ordered me to sit on the

24   ground for almost two hours, asking me all kinds of unnecessary

25   questions.  I answered their silly questions with extreme

caution.  I was released, but it did not take long before I was
grabbed and asked what I was doing in Monrovia, after Taylor
had ordered people to leave the city and go to his territory
for their safety.

"In order to save my life, I told them that I had
undergone an operation and I was taking treatment at a
hospital.  Luckily, I had an old operation mark on my stomach.
I showed it to them.  Suddenly, one of them kicked me and I
dropped.  'Don't you know that the President Taylor has good
hospitals in this area?', he asked me.  They then let me alone.
Since then, the part of my body where the rebels kicked me has
been bothering me.  I have been taking treatments since I came
back to Monrovia in March of this year.

"We reached Johnsonville, outside Monrovia, around
2 p.m. that Saturday, October 24, 1992.  There the rebels
showed us some bodies of ECOMOG soldiers they had slaughtered.
Some of the soldiers' throats were cut, while others were shot.
The rebels were wearing some of the uniforms and boots they had
taken off the dead soldiers.

"Tears had begun in our eyes, but we could not cry as
we were afraid of being shot on the spot if we did.  They
boastfully told us, look at the gods, ECOMOG soldiers, you all
and Amos Sawyer were worshiping in Monrovia.  They then
shouted, 'Get your asses from here.  We're sending 20,000 men
to take the executive mansion today.'

1           "Immediately we began walking fast in order to leave

2      the area.  It was raining that day and we had to walk in the

3      rain, crossing the mud and creeks.  As we walked in the creeks,

4      we'd drink the water in them because we were extremely thirsty.

5           "Before we reached Fandell, one of the rebels who

6      knew a man who was with us secretly told him that they, the

7      NPFL fighters, had decided to kill all residents from Duwalla,

8      Monrovia that night because the Duwalla residents were the ones

9      who were pointing out the rebels to ECOMOG soldiers whenever

10     the rebels came to Monrovia to purchase goods or just spy on

11     ECOMOG.

12          "The rebel advised the man not to tell the fighters

13     that he was from Duwalla.  When the rebel left, the man

14     revealed the information to us, and so all of us from Duwalla

15     decided to give the rebels wrong addresses in order to save our

16     lives.

17          "Around 3:30 that afternoon, we reached the Fandell

18     Campus of the University of Liberia.  The rebels began asking

19     for all of those from Duwalla.  They mounted a checkpoint and

20     started asking men, women, children whether they were from

21     Duwalla.  They became furious when everyone gave a wrong

22     address.  They insisted that they wanted to see the people from

23     Duwalla because they themselves had been to Duwalla and taken

24     people from there.

25          "They began asking each of us to point out people

1    whom we knew were from Duwalla.  Some people were detained at

2    that checkpoint for further interrogation.  I don't know what

3    happened to them later.

4          "We were very, very hungry when we left the Fandell

5    Campus.  We had not eaten anything that whole day.  We went to

6    a farm to dig some cassava to eat.  Unfortunately, the farm was

7    virtually empty, as abductees from Gardnersville, another

8    suburb of the capital and other areas, had gone before us and

9    eaten all the cassava while on their way to Taylor's territory.

10         "We, however, picked up the cassava buds, which had

11   been thrown on the ground, and ate them like groundhogs would.

12   We peeled the cassava buds with our fingernails and teeth.  We

13   became hogs overnight.

14         "We did not know exactly which part of Taylor's

15   territory we were heading for.  When we asked the fighters,

16   they told us to keep going and we just kept going.  When we

17   were approaching a checkpoint around 15 Gate near Harbel, I saw

18   many rebels, including G2 officers, security officers, and

19   police officers.  I observed that one of the rebel officers was

20   staring at me.

21         "Before we reached the checkpoint, he pointed me out

22   to his colleagues and called my full name.  He said, 'I know

23   that man.  He served in Doe's government and he is now with

24   Sawyer's radio station, the Liberia Broadcasting System (LBS).'

25   My spirit left me at once as I walked up to them for

1    interrogation.

2          "Later, heavy shooting started and bullets started

3    flying around.  Fighters did not know who was doing the

4    shooting.  Everyone, including the fighters, took cover.  I

5    used this God-given opportunity to slip away from the area.

6          "About 6:30 that evening, I reached 15 Gate, the

7    gateway to Taylor's territory where wanton killing of civilians

8    took place.  Taylor's television crew were there recording

9    displaced people entering that territory.  About 5,000 people

10   were lined up and interrogated.  Some who did not pass the test

11   were detained.  I began praying for it to get dark before my

12   turn so as not to be pointed out again.

13         "As fate would have it, it got dark when I reached

14   near the T.V. crew.  They could not televise the scene as there

15   was no electricity.  The rebels then asked me some questions,

16   which seemed foolish to me.  The most annoying part was that

17   abductees were not asked questions by just one rebel.  While

18   one rebel was asking questions, his colleagues would join in

19   all kinds of other questions.  However, after answering them, I

20   was allowed to pass.

21         "I arrived in Kingsville No. 7 around 10:30 that

22   night.  It took me 15 hours that Saturday to walk from Duwalla

23   to Kingsville, which is adjacent to the Firestone Plantation

24   Company and about two miles from Kakata.

25         "Thousands of displaced people, hungry and exhausted,

were on the streets.  Some were in churches and abandoned houses, while others went elsewhere.  I went to Eldora (phonetic) Church in that area and stayed there for almost five months.

"During my stay in Kingsville, I had some terrible experiences; harassment, intimidation, killing, vulgarity, rape, intoxication, drugs and alcohol, stealing, detention, looting, vandalism, random shooting in the air, and other vices were the order of the day in Taylor's territory.  Civilians could not travel freely in the villages without being harassed or harmed.

"Food and medicines were difficult to find.  Charles Taylor provided rice for his fighters only at the front; civilians had to hustle on their own for food.

"When the war got hot against the rebels, Taylor stopped providing them with rice.  They therefore went on the rampage, taking food and other things.  They already used to take things from people, but this time it was worse.

"Because of ECOMOG's air raids against the NPFL, we could not stay in town.  We had to run into the forest by 5 a.m. every day and return by 7 p.m.  We did this for three months.

"It came to the point where the rebels told us not to go into the forest, as ULIMO soldiers had infiltrated the area and were hiding in the forest and bushes.  It became extremely

1  risky for civilians.

2          "A civilian could not walk alone to look for food or

3  sell palm nuts or other foodstuffs to survive.  The rebels

4  would arrest and interrogate him, and if they were not

5  satisfied, would execute him for being on a reconnaissance for

6  ULIMO.  People were killed, their bodies thrown into the bushes

7  for allegedly being ULIMO spies.  It put great fear into all

8  civilians.

9          "I was constantly sick with malaria and fever.  I

10 used herbs, but they were not effective.  My constant illness

11 reduced my weight.  I was like a skeleton.  My feet were

12 covered with sores for two and a half months.  I could hardly

13 sit without drawing flies.

14         "This embarrassed me and caused me to stay away from

15 gatherings on some occasions until my sores healed.  The family

16 I was living with became scared for me, said, 'Young man, the

17 bullets have not killed you; will you die on our hands?'  I

18 could not answer their questions.  Many sick, displaced

19 persons, including children, died daily as a result of the lack

20 of medication.

21         "Some of the fighters, in order to demonstrate how

22 wicked they were, killed innocent civilians and drank their

23 blood.  I recall that while we were in Kingsville around

24 November, a fighter ran to the African Methodist Episcopal

25 Church where about 1500 displaced people were lodging and asked

1  some prophets to pray for him.  He appeared to be going out of
2  his mind.

3          "Seeing the fighter armed with an AK-47 automatic
4  rifle and a cartridge belt around his neck, the frightened
5  prophets said that they should all go outside and pray.
6  Outside the prophets asked him to confess his sins before
7  prayers could be said.

8          "Confessing, he said he had just wickedly killed a
9  displaced man from Monrovia.  He had butchered the man and
10 drunk his blood, and after a few minutes felt as if he were
11 going crazy.  That is why he had gone to the church for prayers
12 to be said for God's forgiveness.  Prophets hurriedly prayed
13 for him in order to get him to leave the area.  I observed that
14 the prophets wanted to safeguard their own lives by praying for
15 him.  He appeared desperate.

16         "The rebels did not like to hear people saying
17 positive things about ECOMOG.  They had been brainwashed by
18 Taylor against ECOMOG to the point where it could be seen as
19 treason for civilians to talk about peacemakers in Gonjaland.

20         "I recall that in February, when ECOMOG captured
21 certain parts of Bensenville and Careysburg, people in
22 Division 7 and other surrounding towns and villages were happy
23 that the ECOMOG soldiers were on their way to rescue us.  We
24 were all delighted because the regional force was on its way to
25 free us from bondage and bring us back to Monrovia.  But we

could not allow our delight to show, knowing the kind of people who were around us.

"However, one displaced fellow called Roosevelt who was living in Jimmy Katatown (phonetic) near Division 7 became overjoyed and told a displaced lady the news, not knowing that she was having secret love affairs with some of the rebels. She went and reported him to the commander of the Cobra Unit.

"Early the next morning, the commander sent his man to go and arrest Roosevelt. After interrogating him at their headquarters, he was stripped naked, tied and beaten severely for spreading news about ECOMOG. After the flogging, he was released with his mouth bleeding and his back looking like someone who had had leprosy for 10 years.

"When I arrived in Kingsville, I had one pair of trousers, a brief, and a T-shirt to my name. The family that put me up felt sorry for me and gave me a pair of trousers, a shirt, and an old pair of slippers, which got cut every two or three days. I patched those slippers so often that they could not be patched anymore.

"In fact, thousands of displaced people had nothing to wear, as the rebels had taken almost all their clothes off them. We were looking like prisoners. There came a time when it was difficult to find soap to purchase, and if one was fortunate enough to find it, it was costly.

"As a displaced person, I had no money and so did not

bathe with soap for almost three months.  As a result, I got

eczema on my skin.  This disease is commonly known in Liberia

as dishcloth.  I used some herbs to treat it.  The disease

caused by lack of soap affected most of the displaced people.

"Another commodity that was hard to find was salt.

Whenever it was available, it was sold in small quantities for

an exorbitant price.  A small bag was sold for $50.  Thousands

of displaced people could not afford to buy food and so had to

go for days without.

"The only thing we could get for nothing was palm

nuts, which were abundant in the villages.  One only needed to

climb the palm trees and cut as many bunches as one wanted

without paying a cent.  We used the palm nuts to prepare palm

butter, a popular Liberian dish.  However, certain basic

ingredients, like fish, meat and salt, to give it the right

flavor, were not available.

"Saturday, February 28, 1993 is a day I will never

forget.  It was the day I thought I was going to die because of

heavy bombardment in the town in which I was seeking refuge.

This was the date that ECOMOG began its rescue operation to

free us from the hands of the rebels.

"It all started at 7:30 that Saturday morning.  After

morning prayers, I decided to take a walk around the town,

think about when I would get my freedom.  Suddenly, I heard the

sound of a very powerful rocket that dropped in the nearby

1    bush.  The sound frightened everyone.

2              "About 20 minutes later, another powerful rocket

3    landed.  People panicked and starting running everywhere,

4    including the rebels.  Around 10 a.m., there was complete

5    silence in all the town and villages as everyone listened for

6    another rocket to drop.

7              "At 11 a.m. the rebels began retreating by the

8    hundreds; old men, young men, women and children from their

9    positions at 15 Gate and other areas.  It was then that it

10   became clear that the peacemakers, ECOMOG, were on their way.

11             "At noon approximately 700 rebels were in Bonga town,

12   a town near Iron Village in Careysburg District, which is one

13   and a half miles from No. 7, took to their heels and assembled

14   in the churchyard where I was staying.

15             "All the civilians in the yard were gripped with fear

16   as the rebels were usually in the habit of taking civilians

17   along with them whenever they retreated.  No civilian wanted to

18   go with them.  Everyone was praying for ECOMOG to show up as

19   soon as possible.  We closed our windows and peeped through

20   them.

21             "The rebels had a limited supply of weapons, a few

22   RPGs, hand grenades, and a pillowcase full of ammunition.  With

23   regard to food, they had less than 30 cupfuls of rice in a bag.

24   They became confused.  They did not know where to run or what

25   to do.

1      "While they were discussing the matter, they realized
2   that they were surrounded on all sides, on land, by sea, and in
3   the air.  ULIMO was around Kakata; ECOMOG was in Harbel and
4   around Bensenveille.  From the ocean, around Marshall City,
5   ECOMOG warships kept firing warning shots.  And in the air, an
6   ECOMOG jet, which Liberians had dubbed the doodoo bird, was
7   looking for them, largely scarring them away.

8      "The rebels then realized they were in danger.  At
9   this point, they decided to disarm the children known as small
10  soldiers.  The way we see this thing, they said, the children
11  cannot fight it; we have to take the guns from them.

12     "At this time, the civilians are praying for the
13  rebels to leave the area.  And as God would have it, another
14  rocket dropped and the ground shook as if an earthquake had
15  occurred.  The roofs of houses shook.  Dishes on tables fell to
16  the ground.  Some civilians ran out of their houses while
17  others hid under their beds.  I stayed under my bed until the
18  next morning, which was Sunday.

19     "The rebels left the yard during this pandemonium.
20  For most of the night, bombardments and shooting continued from
21  the direction of ECOMOG troops.  Trees were feeling, but either
22  by design or miracle, the bombs avoided population centers.
23  There was a torrential downpour all that night.

24     "No one could sleep, as all were praying for survival
25  and anxiously awaiting the arrival of the peacemakers.  The

1    rebels fired no shots at ECOMOG because they had all fled.

2            "Around 6:45 a.m. on Sunday, February 29, we heard

3    shouts of jubilation as people took to the streets with their

4    belongings.  When we opened our door and came outside, we were

5    told that ECOMOG had taken over the area and were calling on

6    all civilians to go to a safety zone.  'All civilians come out;

7    we are here to save you,' an ECOMOG officer shouted.  I jumped

8    for joy.  I took my few belongings, one T-shirt, a pair of

9    trousers, and a Bible, and joined the crowd.

10           "We were directed to go to a town adjacent to 15 Gate

11   for debriefing and registration.  I was not well and so could

12   not run.  Rockets were still flying, but were dropping further

13   away.  I managed to reach the safety zone.

14           "After the debriefing and registration -- name,

15   nationality, sex -- we were put on several trucks and taken to

16   the Careysburg Police Station that afternoon.  The rebels had

17   been using that building for their security operation, but had

18   fled before ECOMOG captured the area.  We slept there on Sunday

19   night and by 11:30 a.m. Monday morning, March 1st, 1993, were

20   taken to Monrovia.

21           "On our way, we sang and praised ECOMOG for saving

22   our lives and freeing us from the hands of the so-called

23   freedom fighters who continued to terrorize and kill their

24   fellow Liberians.  When we entered Monrovia around the red

25   light in Paynesville, hundreds of citizens were shouting and

1    dancing for joy to see us return.  'Thank God our people are

2    coming back from rebel territory,' they said.  It took us two

3    hours to get to Monrovia.

4            "Upon our arrival, ECOMOG took us to the Sims

5    Community School in Caldwell for another debriefing session and

6    registration.  When I disembarked from the truck, I could

7    hardly stand on my feet.  My eyes could not see clearly and I

8    was extremely weak.  I fell to the ground.  Two ECOMOG soldiers

9    lifted me up and carried me inside the school building for

10   emergency treatment.  I was given something to eat.

11           "While eating, I saw some security officers from the

12   Executive Mansion, the presidential palace, whom I have known

13   for many years.  They saw me, but were not sure who I was

14   because news had circulated in Monrovia that I had been killed

15   by the rebels.  Moreover, I had become so slim that I could not

16   be easily identified.  However, they came closer and said,

17   'Morris, are you the one?'  Then they shook my hand and

18   introduced me to the ECOMOG officers after I answered yes.

19           "The security officers proceeded to the Liberia

20   Broadcasting System (LBS) and informed the director general of

21   my return to Monrovia.  Hearing this good news, he drove to

22   where I was with a note from the ECOMOG field commander, handed

23   it to the ECOMOG officer in charge of the school building and I

24   was released.

25           "I got into her car and she drove me to my residence

1    in Duwalla.  My family and friends were delighted to see me.

2    Many of them cried for joy.  However, I received distressing

3    news.  My fiancé told me that my five-month-old child had died

4    during the height of the October 15 attack on Monrovia and had

5    some burns.  I felt bad and began to weep.  Later I discovered

6    that my house was looted and I would have to start from

7    scratch."

8              MR. WRIGHT:  Your Honor, I don't have any further

9    questions of Special Agent Lohmeier --

10             THE COURT:  Okay.

11             MR. WRIGHT:  -- at this time.

12             THE COURT:  Okay.  Is there going to be some --

13        (Transcriber change)

14             MR. WILSON:  Your Honor, may I just have a couple

15   moments?

16             THE COURT:  Sure.

17        (Pause)

18                      CROSS-EXAMINATION

19   BY MR. WILSON:

20   Q    Ms. Lohmeier, you read from  just a couple of portions

21   from Government's Exhibit number 30 -- I-34.  Correct?

22   A    Yes, sir.

23             THE COURT:  I-34?  I didn't have that down as one.  I

24   have 35 and 36.  You read from 34?  Okay.

25   Q    And that is -- what you read from is the -- titled "The

1    Woewiyu testimony to the Liberian TRC that was never given,"
2    correct?
3    A    Correct.
4    Q    Okay.  And it's addressed to Mr. Chairman and Members of
5    the Truth and Reconciliation Commission, government officials
6    present, members of the clergy, chiefs, elders, fellow
7    Liberians, ladies and gentlemen, correct?
8    A    Correct.
9    Q    Okay.  And the copy we have is as reported in African
10   Panorama, correct?
11   A    Yes, sir.
12   Q    Which is a periodical focused on Africa, correct?
13   A    To my understanding, yes.
14   Q    And there's nothing on I34 that indicates when this was
15   published, is that right?
16   A    Not to my knowledge, sir.
17   Q    Now you initially read from page 2 beginning with that
18   one, two, three, four -- the fifth paragraph under "Apology?"
19   A    Yes, sir.
20   Q    At the top of page 3 there's a heading "Key Contributors
21   to the Cause of the Liberian People," correct?
22   A    Yes.
23   Q    And you did not read that part, you skipped to page 7,
24   correct?
25   A    Yes, sir.

1    Q    Now this whole statement, "The Woewiyu testimony to the

2    Liberian TRC that was never given," that was -- it goes to page

3    17, correct?

4    A    Yes, sir.

5    Q    And this was while the TRC, this was published while the

6    TRC was still in effect, correct?

7    A    I'm not exactly sure when this was published, sir.

8    Q    Okay.  Well, the TRC, the Truth and Reconciliation

9    Commission, you know what that is, correct?

10   A    Correct.

11   Q    Okay.  And just briefly, this is a commission that filed a

12   final report in the year 2009, isn't that right?

13           MR. WRIGHT:  Objection.  That assumes facts not in

14   evidence, Your Honor.

15           THE COURT:  Sustained.  She may not know that.

16           MR. WILSON:  Well, I'm --

17   BY MR. WILSON:

18   Q    Did you know whether the TRC ultimately filed a final

19   report?

20   A    Yes, sir.

21   Q    Okay.  And during your course -- you were assigned to an

22   investigation that involves Mr. Woewiyu, correct?

23   A    Correct.

24   Q    Okay.  And you investigated him up to a point at which you

25   were transferred to other duties, correct?

1    A    Yes, sir.

2    Q    Okay.  And when was that that you were transferred?

3    A    I was transferred last April.

4    Q    Okay.  So during the investigation of Mr. Woewiyu, you

5    became familiar with the final report of the TRC, correct?

6    A    I became familiar with it.

7    Q    Okay.  And you looked in that final report to see what it

8    said about Mr. Woewiyu, correct?

9    A    Correct.

10   Q    Okay.  And you -- the report's quite long, isn't that fair

11   to say, 300, about 300 pages, or a little over 300 pages?

12   A    Yes, sir.

13   Q    Including the appendices that are at the end, correct?

14   A    Correct.

15   Q    You -- at the beginning of the report, it describes the

16   methodology that was used, does it not?

17   A    I would have to look at the report.

18   Q    Okay.  Well, were you familiar with the fact that the

19   commission essentially did investigation for about three years?

20   A    I'm not sure --

21            MR. WRIGHT:  Object--

22   A    -- how long the commission --

23            THE COURT:  Sustained.

24   Q    Were you familiar with who the commissioners were for the

25   Truth and Reconciliation Commission?

1    A    I know there were commissioners for it, yes, sir.

2    Q    Okay.  Do you know whether they were Liberians or whether

3    they were individuals from other countries?

4    A    I'm not sure to what extent.

5    Q    Did you ever talk to any of the commissioners as part of

6    the investigation of Mr. Woewiyu?

7    A    Yes, sir.

8    Q    In the report, or --

9            THE COURT:  Let me see you at sidebar a second.  I

10   want to make sure that I understand this.

11       (Sidebar begins at 12:27 p.m.)

12           THE COURT:  Had you objected to this line of

13   questioning before --

14           MR. WRIGHT:  We did object to it but if they're gonna

15   open the door to this where it talks about him ordering the

16   murder of six civic --

17           THE COURT:  Oh, but --

18           MR. WRIGHT:  -- police peacekeepers, he's gonna open

19   the door to that, Your Honor --

20           THE COURT:  Well, okay, because you have no problem

21   with testifying about --

22           MR. WRIGHT:  Oh, let him open it.  And as long

23   as --

24           THE COURT:  There's no objection to this line?

25           MR. WRIGHT:  No, let him go ahead.

1    THE COURT:  Okay, I thought maybe that there was an

2    objection --

3         MR. WRIGHT:  No --

4         MS. HENRY:  It would be one question if she did

5    interview, we didn't receive any 302 of any interviews with

6    commissioners, that would be helpful.

7         MR. WRIGHT:  That wasn't part of -- we don't have a

8    commissioner who is a witness in this case.

9         THE COURT:  Yes, but they can call them if they want

10   to.

11        MR. WRIGHT:  Well, if they want to, but we don't have

12   a commissioner who's a witness, there's no witness who's a

13   commissioner --

14        THE COURT:  Well, then it isn't cross-examination

15   because you certainly can --

16        MS. HENRY:  We'll find out more than -- this is the

17   first we're hearing about it, so.

18        MR. WRIGHT:  But Your Honor, if they go down this

19   path, I'm gonna go down this path about what the TRC found

20   about him, about him ordering the murders of six civic police

21   peacekeepers.

22        THE COURT:  Well, they can do whatever they want.

23        MR. WRIGHT:  Very well.

24        THE COURT:  I'm not gonna stop them.  I just wanted

25   to know whether or not -- for some reason I thought I missed an

1    objection by you but there was not.

2              MR. WRIGHT:  No, I did object earlier, Your Honor.

3              THE COURT:  What did you object on?

4              MR. WRIGHT:  There were a couple of things.  Number

5    one, she's not competent to talk about the TRC.  It's all

6    hearsay --

7              THE COURT:  That's all she was doing is reading.

8              MR. WRIGHT:  Right.  I mean, it has nothing to do

9    with --

10             THE COURT:  I thought that was the basis and you may

11   have misunderstood my ruling.  Okay.  All right.  Well, if

12   that's the basis of your objection, and you're not -- she's

13   not, as far as I'm concerned, she was there as a reader.  It

14   could have been anyone else in this courtroom.

15             MR. WRIGHT:  That's true, Your Honor.

16             THE COURT:  You didn't question him, you didn't

17   question anyone else.  I'm not gonna let you go forward with

18   it.

19             MS. HENRY:  With this line of questioning.

20             THE COURT:  You can take it in your own case.  I have

21   no problem with that.

22        (Sidebar ends, 12:29 p.m.)

23             THE COURT:  Okay.  That's just my ruling.  If you

24   wish to present this -- and you can certainly call her in your

25   own case --

1              MR. WILSON:  Thank you, Your Honor.

2              THE COURT:  -- if you wish.

3              MR. WILSON:  Your Honor, if I may just consult with

4    my colleague.

5              THE COURT:  Sure.

6         (Pause)

7              MR. WILSON:  I have no further questions.  Thank you,

8    Your Honor.

9              THE COURT:  Okay.

10             MR. WRIGHT:  Nothing from the Government, Your Honor.

11             THE COURT:  You may step down.

12             THE WITNESS:  Thank you.

13             THE COURT:  Your next witness, if any.  Your next

14   reading, or what have you.

15             MR. THAYER:  No reading, Your Honor, but a little bit

16   of watching and listening.

17             THE COURT:  Okay.

18             MR. THAYER:  Next witness is Gary Lang.

19        (Pause)

20             GARY LANG, GOVERNMENT'S WITNESS, SWORN

21             THE CLERK:  Sir, would you state and spell your name

22   for the record, please.

23             THE WITNESS:  My name is Gary J. Lang.

24             THE CLERK:  Spell your last name, please.  Spell your

25   last name, please.

1           THE WITNESS:  L-A-N-G.

2           THE CLERK:  Thank you, sir.

3           MR. THAYER:  May I proceed, Your Honor?

4           THE COURT:  Certainly.

5                     DIRECT EXAMINATION

6    BY MR. THAYER:

7    Q    Good afternoon, sir.

8    A    Good afternoon.

9    Q    I notice that you got a device which you're adjusting.

10   A    Right.

11   Q    And we may need to make some adjustments with that as we

12   go forward.  If you wouldn't mind, would you just let the jury

13   know kind of what's going on with this, so when they see you

14   making some adjustments, we understand.

15   A    Thank you.  I have severe tinnitus.  It's a severe ringing

16   in both ears.  I also have probably 60 percent hearing loss.

17   It was a result of my exposure to an explosion years ago.  So I

18   have this device to help me better hear and understand

19   conversations.

20           MR. THAYER:  And we will be, Your Honor, playing some

21   tapes and we may need to very quickly adjust volume and so

22   forth if Mr. Lang has some reactions to the volume.

23           THE COURT:  Okay, no problem.

24   BY MR. THAYER:

25   Q    Sir, can you tell us how old you are?

1  A    How old am I?

2  Q    Yes.

3  A    I'm 64 years old.

4  Q    And what do you do now for a living?

5  A    I, for the last ten years after I retired from the Federal

6  Government, I've been the independent monitor and special

7  compliance official overseeing defense contractors that

8  willfully violated the Arms Export Control Act, and basically

9  letting munitions, defense articles and technologies in the

10 wrong hands of people.

11     So what the independent monitor responsibility is,

12 they're appointed by the Government to oversee the defense

13 contractors, to make sure they have a strong compliance program

14 in place, to make sure that there are controls to protect U.S.

15 technology.

16     In that position, I also was responsible for

17 overseeing the ethics and compliance program and program to

18 make sure that companies were not dealing with countries that

19 were under a U.S. embargo.  That was both in the U.S. and

20 internationally.

21 Q    All right.  I detect a ever so slight accent.  Can you

22 tell us where you were born and raised, sir?

23 A    I was born and raised in New York.

24     THE COURT:  I recognize it.

25     (Laughter)

1    Q    Can you tell us a little bit about your educational

2    background?  Where did you live, sir?

3    A    I went to school in New York, graduated with a pre-

4    medicine degree.

5    Q    So where did you go wrong?  Can you tell us what you did

6    after you graduated from college?

7    A    So at the time back in the seventies, my grades were good

8    enough but you had to go to medical school outside the country

9    and then you'd have to come back into the United States and go

10   back to medical school, so I said okay.  So I applied for

11   government jobs because I liked investigating.  I was looking

12   to be a pathologist, so they're investigating, you know, health

13   issues.

14   Q    And did you actually begin a career in government service,

15   sir, at that point?

16   A    Yes, sir, I did.  I began a career in the Food and Drug

17   Administration as an investigator.

18   Q    And how long did you do that?

19   A    I did that for approximately, about seven years.

20   Q    And did you leave the FDA at some point after that seven

21   years?

22   A    Yes.

23   Q    Where did you go?

24   A    I went as a special agent to the Department of Defense,

25   and then from there I was able to get a position with United

1    States Customs Service as a special agent down in Miami,

2    Florida.

3    Q    And can you tell us a little bit about what kind of work

4    you did when you were a U.S. Customs Service special agent in

5    Miami?

6    A    In South Florida, in Miami, we conducted a number of

7    investigations.  I worked on marine smuggling, smuggling via

8    aircraft, and also on violations of the Arms Export Control Act

9    and ITAR, but in that case I was working in a undercover

10   capacity.

11   Q    And before we get to what ITAR means again and so forth,

12   can you tell the members of the jury a little bit about some of

13   your undercover experience while you were a special agent with

14   the U.S. Customs Service?  What kind of undercover roles were

15   you playing and what kind of cases were you in, sir?

16   A    Okay, in Miami, there was an approved undercover

17   operation, again, specifically to investigate violations, or

18   potential violations of people that would illegally smuggle

19   arms, munitions, and we would work a number of cases.  We

20   actually set up a storefront at a warehouse where we would work

21   -- where I would work full time undercover to conduct these

22   investigations in a undercover capacity.

23   Q    And when you say a storefront, what do you mean, sir?

24   A    It was an office with several offices and we had a

25   warehouse and the business that I was working in was a

1    storefront that dealt in aircraft parts.

2    Q    And so what was the purpose of having this undercover

3    storefront?  How was it intended to assist in these

4    investigations?

5    A    It was an avenue, an investigative avenue where we could

6    actually meet with these potential violators in a undercover

7    capacity and record the conversations.

8    Q    Now you mentioned the Arms Export Act and ITAR.  Again

9    just briefly, what are those?

10   A    Those are federal -- federal statute is the Arms Export

11   Control Act, where under that is the International Traffic and

12   Arms Regulations.  Those laws are in place to really outline if

13   you're gonna be in the business of dealing with arms,

14   munitions, defense articles, technologies, that you have to do

15   it within the proper controls.

16          And in this situation, all of the exporting of these

17   arms would require a state license, state department license to

18   export them legally.  If you move them out of the country

19   without that license, you are violating that statute and those

20   regulations.

21   Q    And when you were engaged in this undercover operation,

22   did you have an undercover identity?

23   A    Yes, I did.

24   Q    And what was that, if you remember?

25   A    I believe it was Garrison F. Luhr, or better known as Gary

1    F. Luhr.

2    Q    And how do you spell that last name, Luhr?

3    A    L-U-H-R.

4    Q    L-U-H-R, okay.  And at the storefront, were there other

5    undercover officers who were part of this operation?

6    A    Yes.

7    Q    And what were their roles?

8    A    Their roles were in a supporting role of myself.

9         For example, we had a young female agent that would

10   play the role of a receptionist to let people in, in the office

11   and introduce them to me, and we had people that would work in

12   the warehouse.  And I had a business partner as well who was

13   very familiar with aircraft parts business.

14   Q    And what was the true name of the business partner you

15   just mentioned?  What was his real name?

16   A    His real name is William or Bill Parks.

17   Q    And do you recall what his undercover name was?  If you

18   don't, that's fine.

19   A    I don't.

20   Q    Okay.  Now --

21   A    Could I pour some water, please?

22   Q    Oh, sure.

23   A    Thank you.

24   Q    Now I'm gonna ask you some questions about a time when you

25   met a person by the name of Eugene Cox.  Before we get there

1    and talk about that time period, can you tell the members of

2    the jury whether you were involved in any other investigations

3    within this storefront context?  Did you have other things

4    going on at the same time?

5    A    Yes.  I remember at least two other undercover

6    investigations, long term undercover investigations that were

7    ongoing at the time that I initially met Eugene Cox.

8    Q    Can you just tell us briefly what the nature of those

9    other undercover operations were, those investigations?

10   A    Both investigations involved the illegal export of arms.

11   In one case, the arms were being stolen from the military and

12   being sold, and in some situations exported, and the other case

13   involved again arms that were potentially being smuggled out of

14   the country, not, again outside the state department

15   requirements not requiring a license.

16   Q    And approximately how many years did you work at this

17   undercover capacity?

18   A    At least five years.

19   Q    And is that what they call deep cover, sir?

20   A    Yes.

21   Q    Now during the course of the investigation involving Gene

22   Cox, Eugene Cox and I'll get to that in a second, was there a

23   supervisor who was referred to as the case agent?

24   A    Yes.

25   Q    And who was that person?

1    A    Mike Verre.

2    Q    Do you remember how to spell Mike Verre's last name?

3    A    I believe, if I recall correctly, it's V-E-R-R-E.

4    Q    All right.  So I want to turn your attention to January

5    29th of 1992.  Do you remember having a meeting with Eugene Cox

6    at the undercover storefront -- which was located where, sir?

7    I'm sorry if I didn't ask you that.

8    A    In Miami, Florida, right next to the airport.

9    Q    Okay.  Do you remember having a meeting on January 29th,

10   1992 with Eugene Cox at the undercover store?

11   A    Yes, I do.

12   Q    Can you tell the members of the jury just basically how

13   did that meeting get set up?

14   A    There was a confidential informant, that's how we worked

15   the investigations, and he had information that Gene Cox had

16   friends that wanted sensitive equipment, and that they had just

17   overthrown a country.

18   Q    Now, you mentioned a confidential informant.  What's that,

19   sir?

20   A    A confidential informant is a source of information that,

21   in a number of cases they have information about individuals or

22   groups that are looking to violate certain federal laws.  And

23   that's why the investigative approach in undercover capacity,

24   they would make introductions to individuals like that or

25   groups.

1   Q    And in this case, do you remember the name of the

2   confidential informant who introduced Eugene Cox to you?

3   A    I remember he was not one of my informants but I remember

4   his name was George.

5   Q    Okay.  So if you could, just describe what happens when

6   you have this first meeting with Gene Cox.  Was George there

7   for this meeting?

8   A    Yes, he was.

9   Q    This first meeting with Gene Cox and George and yourself.

10  A    Okay.  I introduced myself and we sat down.  It was

11  George, Gene Cox as well as Bill Parks, and we sat down and I

12  asked, "How can we help you."  And you know, I explained that I

13  was in the business of -- first of all as I mentioned before,

14  the informant said Gene comes to me well recommended and that

15  he needed the sensitive equipment for his friends that have

16  recently overthrown a government.

17           And so I explain what our business was and I said

18  that we were in the aircraft parts business.  And I also

19  bought, sold and trade military surplus.

20  Q    And at some point in that meeting, did Gene Cox indicate

21  who his friends were?

22  A    Yes.  Gene Cox opened up his briefcase and took out a

23  picture that he unrolled and he showed two individuals, and he

24  pointed to one individual and said, "This is Charles Taylor,

25  he's the acting president of an MPRG" -- I don't remember what

1   that stands for.

2          And that the second individual that he pointed to was

3   Tom Woewiyu -- and I apologize, I'm probably not pronouncing

4   that correctly but if I may refer to him as Tom, and he was the

5   minister of defense.

6   Q    All right.  So tell us how the meeting went.  What happens

7   next after he says, "These are my friends, this is the

8   president, he's the minister of defense," what if anything does

9   Gene Cox do?

10  A    So I said, "Okay, how can we help you."  And he said,

11  "What about Sam's, Sam's Surface to air missiles."  And I was

12  okay, Sam's, okay.  And then he, if I recall correctly, he

13  said, "Can you get M16s, AK47s and the ammunition for those

14  type of weapons?"

15  Q    Now during this meeting, was -- did you have a system in

16  place at the undercover location to record these types of

17  meetings?

18  A    Yes, undercover operations that are approved out of

19  Washington, D.C.  They are required to be wired to not only

20  have audio but a video to document those conversations as

21  evidence, as part of an investigation.

22  Q    And how was that done with respect to this meeting in your

23  office?

24  A    There was -- they call them pinhole cameras in the wall,

25  so that camera recorded the entire conversation in the room

1    that we were having as well as recording the video of what was

2    taking place.

3    Q    And did it also pick up audio, sir?

4    A    Yes.

5    Q    And during the course of your subsequent meetings -- and

6    we'll talk about some of the subsequent meetings -- in certain

7    cases did you wear a recording device on your body?

8    A    Yes, I did.

9    Q    You call that a body wire, sir?

10   A    Yes.

11   Q    And in every meeting that you had with Gene Cox or other

12   people, were you able to get video recordings accomplished of

13   all these meetings or did you have some meetings where it was

14   only audio?

15   A    No, the first meeting and second meeting were video and

16   audio.  The third meeting, based on the location, I was just

17   wearing a wire.  And the fourth meeting that I recall, that was

18   also a wire.  And the last meeting was video and audio.

19   Q    All right.  Sir, have you had an opportunity to review the

20   audio/video recording of this first meeting on January 29th,

21   1992 which you just told the jury about?

22   A    Yes, I have.

23   Q    And does that audio and video recording fairly and

24   accurately capture the events that occurred during that

25   meeting?

1    A    Yes.

2              MR. THAYER:  Your Honor, at this point, I would like

3    to play some selections from this hour or so long video for the

4    witness.

5              THE COURT:  You want to do it before lunch or after

6    lunch?

7              MR. THAYER:  We can certainly break for lunch now,

8    Your Honor, if that's a good --

9              THE COURT:  How long, I mean, could you go on for

10   another ten minutes or so or would you rather do it all -- it's

11   up to you.

12             MR. THAYER:  I think it probably would be better if

13   we just did it all at once and rolled into it after lunch.

14             THE COURT:  Okay.  Members of the jury, enjoy your

15   lunch, and remember my recess instructions.

16        (Jury exits at 12:50 p.m.)

17             THE COURT:  We're coming back at 5 after 2.

18             MR. THAYER:  Thank you, Your Honor.

19             MR. WILSON:  Thank you, Judge.

20             THE COURT:  All right, 2:05.

21        (Lunch recess at 12:51 p.m.)

22        (On the record at 2:12 p.m.)

23        (Jury enters)

24             THE CLERK:  Please remain seated.  This court is now

25   again in session.

1          THE COURT:  Next witness, please.

2          MR. THAYER:  Mr. Lang will be in just a moment, Your

3    Honor.

4          THE COURT:  It isn't your next witness, your last

5    witness?  Okay.

6          You're still under oath, Mr. Lang.

7          GARY LANG, GOVERNMENT'S WITNESS, RESUMES

8          MR. THAYER:  May I proceed, Your Honor?

9                   CONTINUED CROSS-EXAMINATION

10   BY MR. THAYER:

11   Q    Good afternoon again, Mr. Lang.

12   A    Good afternoon.

13   Q    When we left, you had just been describing the recording

14   that had been made at your meeting with Eugene Cox at the

15   undercover location on January 29th, 1992.  You told us earlier

16   you reviewed the audio and videotape of that recording and that

17   it fairly and accurately represents what happened during that

18   meeting.

19         MR. THAYER:  Your Honor, at this time I would move

20   the admission of Government's Exhibit HH-1.

21         MR. WILSON:  Your Honor, could we just have a

22   foundation laid for it first?

23         THE COURT:  Sure.

24   BY MR. THAYER:

25   Q    Mr. Lang, you described the process that you followed

during the course of this undercover operation in terms of
having a pinhole camera in place to record what happened during
the meeting.  Can you describe for the members of the jury what
the process was once the meeting was over, and what happened to
the tape and so forth?  How was that maintained?

A     So, you're trained at the end of a undercover
investigation, I believe my earlier discussion there was a case
agent, Michael Verre.  That case agent would at the conclusion
of the recording would take the tape, initial it, and turn it
into the evidence custodian at the office.

        Also at the conclusion of meetings, I would identify
myself with an Alpha number, that's a agent number and the date
and the time usually.

Q     And then would Special Agent Verre log that tape in
somewhere and would it be maintained somewhere?

A     Yes.  He would go to the office and turn it into the
evidence custodian.  He'd have to log it in date and time and
there'd have to be a signature and then it's put in its proper
file and maintained for that investigation.

        THE COURT:  Do you have an objection?

        MR. WILSON:  Well, Your Honor, what I was looking for
is can we just show it to the witness first for identification
purposes.

        THE COURT:  All right.

        MR. THAYER:  Your Honor, I can certainly play a short

1   clip.  I mean, the videotape itself is rather long but we're

2   going to be showing segments so I can certainly show the

3   initial clip and ask the question if that suffices for the

4   Court.

5            THE COURT:  Okay.

6            MR. THAYER:  May we have HH-1 played for the witness.

7

8   BY MR. THAYER:

9   A    And sir, you'll see it hopefully.

10  A    Yes.

11  Q    Can you identify what's being depicted in that?

12  A    There's a picture here, a video clip that's frozen, and in

13  the room, myself, to my right is Bill Parks, he's a special

14  agent supporting me in this undercover capacity.  To my left, I

15  believe that was another agent, I can't recall his name.  And

16  opposite me is Gene Cox to my left, and to the right was

17  George, the informant.

18  Q    All right.

19           MR. THAYER:  Your Honor, I move the admission of

20  Government's Exhibit HH-1.

21           MR. WILSON:  No objection, Your Honor.

22           THE COURT:  You may proceed.

23       (Government Exhibit HH-1 in evidence)

24           MR. THAYER:  May it be published to the jury, Your

25  Honor?

1          THE COURT:  Yes, it may.  Are you gonna play it or is

2   there gonna be a transcript?

3          MR. THAYER:  It will be both.  It will be a rolling

4   transcript over the video.

5          THE COURT:  Oh, okay.

6          MR. THAYER:  And I'm gonna pause every now and then

7   and then I'll ask some questions.

8          THE COURT:  All right.

9      (Video marked HH-1 played at this time.)

10  BY MR. THAYER:

11  Q    Let's just pause it for one second, sir.  If you can just

12  indicate who's who as we're looking at this still?

13  A    Okay.  Standing up is Bill Parks.  I'm to his left.

14         THE COURT:  His left or --

15         THE WITNESS:  So behind where he's standing, if I was

16  to face the wall, it would be --

17         THE COURT:  Oh, you're not on the picture then?

18  Q    Let's just advance it one or two frames so we can get you

19  in the picture.

20  A    Okay.

21  Q    There you are.

22  A    Now, I'm standing up, Bill is sitting down.  Eugene Cox is

23  leaning forward on the couch.  To his left is the informant and

24  to Eugene Cox's right is another special agent, I can't recall

25  his identity.

1    Q    Was that Jack Devaney, was that his name?

2    A    Yes.

3              MR. THAYER:  All right, if we can roll the tape.

4         (Video marked HH-1 continues playing at this time.)

5              THE COURT:  I thought it's gonna be -- it's not gonna

6    be oral?

7              MR. THAYER:  There should be audio, Your Honor.

8              THE COURT:  A little louder, please.  Let's go back

9    to the beginning.

10             Is it on the screen?

11             MR. THAYER:  Excuse me for a moment.

12        (Pause)

13             THE COURT:  Do we need somebody from downstairs?

14             MR. THAYER:  I'm gonna improvise.

15             MR. WILSON:  Your Honor, in the meantime, maybe we

16   can have this taken off the screen.

17             THE COURT:  Yes, sure, take it off the screen.

18   Take everything off the screen if you don't mind.

19             We'll try and get some -- it's not good if you can't

20   hear it.

21             Do you want me to let the jury go outside?  We'll see

22   how long it takes.

23        (Pause)

24             THE COURT:  Can you start it from the beginning.

25             You will have a running copy of what it is too.

1        MR. THAYER:  You know what, Your Honor, we actually

2   have as well, we've got hard copy transcripts in binders.

3        THE COURT:  Well, then let's give those out since it

4   may not -- it might be helpful.

5        One second.

6        MR. WILSON:  Your Honor, may we see you at sidebar?

7        THE COURT:  Sure.

8     (Sidebar begins, 2:24 p.m.)

9        MR. WILSON:  We of course had done a motion *in limine*

10  objecting to this testimony even coming in, but, and I stick by

11  my standing objection, with respect to any arms dealing --

12       THE COURT:  Oh, arms dealing.

13       MR. WILSON:  The fact that it's coming in, we would

14  just ask that the jury be instructed that they're to pay

15  attention to the audio and not rely on the transcript, that

16  it's what they hear in the audio as opposed to the transcript

17  that's been prepared by the Government.

18       THE COURT:  That's gonna be kind of difficult with

19  the --

20       MR. THAYER:  Your Honor, of course, the transcript is

21  to be used as an aid, and the actual evidence is --

22       THE COURT:  That's exactly --

23       MR. THAYER:  But if in fact they have a different --

24  if defense has a different translation, not translation, but

25  different interpretation --

1    THE COURT:  They don't have any responsibility to do

2    that.

3    MR. THAYER:  -- they can put it on.

4    THE COURT:  This is your case.  You're the

5    Government.  You've got the burden of proof.

6    MR. THAYER:  No, I certainly agree with that.

7    THE COURT:  So that's not accurate.  The answer is

8    that I have to see whether they can hear, and basically I hope

9    that we can hear it, and I will instruct them that it's what,

10   as we do every time when there's a transcript, other than one

11   that's in a foreign language, that what they hear is what

12   prevails.

13   MR. THAYER:  I can hear it.

14   (Sidebar ends, 2:26 p.m.)

15   THE COURT:  Okay, members of the jury, I have an

16   instruction for you before we play the tape.  You will -- have

17   they been given the book?

18   MR. THAYER:  Yes, ma'am.

19   THE COURT:  Okay.  Although you have books of

20   translation, it's what you hear that prevails, and that's what

21   should be considered by you.  The other can be used as an aid,

22   but that's not what -- if you hear something different than is

23   written, it's what you hear that prevails.  Okay?  All right.

24   Is that okay with you?

25   MR. WILSON:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MR. THAYER:  Your Honor, for folks who are following

3    the hard copy, jurors, anybody else, we're gonna be starting at

4    page 5 of the binder --

5          THE COURT:  I guess I don't qualify?  And maybe even

6    my law clerk qualifies, and she's very good.

7          MR. THAYER:  But there will always be a running

8    transcript on the screen, Your Honor.

9          THE COURT:  Okay, now -- and what page are we on?

10         MR. THAYER:  It begins on page 5.

11         THE COURT:  One second.  That is HH --

12         MR. THAYER:  Dash 1.

13         THE COURT:  Dash 1.  Okay, and it should begin on

14   page 5.  All right.

15         Do you have any objection to beginning on page 5?

16         MR. WILSON:  That's not what's up here on the screen

17   though, Your Honor.

18         MR. THAYER:  Your Honor, we actually are behind

19   ourselves.  The binder contains the clips themselves, so it's

20   gonna be page 1 in the binder, not page 5.  So what's in the

21   binder is exactly what's gonna be played so we won't need to

22   jump around.

23         THE COURT:  Okay.

24      (Video marked HH-1 continues playing at this time.)

25   Q    Sir, you told us earlier that, and I think we just saw

1   there, that Gene Cox unrolled a photograph and he's just

2   identified Charles Taylor and Tom Woewiyu.  Did you eventually

3   meet either Charles Taylor or Tom Woewiyu?

4   A    I eventually met Tom Woewiyu.

5   Q    And on how many occasions did you eventually meet Tom

6   Woewiyu?

7   A    On three separate occasions.

8        (Video marked HH-1 continues playing at this time.)

9   Q    Sir, when you told Cox that we don't sell it out the front

10  door to you, what did you mean?

11  A    Well, the type of equipment that we're talking about,

12  surface-to-air missiles, M16s, if you're not the government or

13  the manufacturer or you had authority to possess those weapons

14  -- in this case I did not, so I was illegally maintaining those

15  weapons for sale.

16  Q    And with respect to those surface-to-air missiles, did you

17  tell Cox where they came from?

18  A    Yes, I did.  I told him that these missiles did not make

19  it over to the Gulf War, alluding the fact that they were

20  stolen and I got access to them.

21  Q    All right, let's listen to clip 2 which is a little

22  further into the meeting, and we're gonna begin with your

23  colleague Bill Parks speaking.

24       THE COURT:  Let's move the transcript first and then

25  we can --

1        MR. THAYER:  It will pick up right where we are, Your

2   Honor.

3        THE COURT:  Oh, okay, good.  Sorry about that.

4        What's this?

5        MR. THAYER:  We hit a button by accident, Your Honor,

6   and it fast-forwarded so now we have to go back to the

7   beginning.

8        (Video marked HH-1 continues playing at this time.)

9   Q    Mr. Lang, why is it important for you to find out how many

10  men we're talking about, what the manpower is?

11  A    Well, in the beginning he asked for M16s, AK47s, so along

12  with those weapons you have to have ammunition.  So I asked

13  that question to try to figure out how much ammunition they

14  might need for each weapon.

15  Q    And during this meeting and in subsequent meetings,

16  including meetings that you had with Tom Woewiyu, what specific

17  types of surface-to-air missiles did you and Gene Cox and Tom

18  Woewiyu talk about?

19  A    We talked about the red eye, which is the earlier

20  prototype for the stinger missile.  It's only good for one

21  shot, to take an aircraft down.  The stinger missile is the

22  later version that actually can track an aircraft.  So we

23  talked of both of those missiles.

24       We spoke about M16s, M79s which are grenade

25  launchers, M60s which are machine guns.

1   Q    Now you mentioned the red eye being disposable and the

2   stinger having a tracking device.  What kind of projectile did

3   the stinger shoot?

4   A    It actually -- a fairly large projectile, a missile.

5   Q    And what are these things designed to do?

6   A    They're designed to track, if you put on the tracker, to

7   track whatever aircraft is in its range and lock onto it as a

8   target.

9   Q    And are these weapons that have to be mounted on some kind

10  of a vehicle or are they shoulder held?

11  A    These are shoulder fired weapons.  They're infantry, you

12  can be on the ground and walk with this.

13       MR. THAYER:  All right, if we could proceed to clip

14  3, please.

15       (Video marked HH-1 continues playing at this time.)

16  Q    Now when Gene Cox asked for rounds for the AK47, what is

17  he talking about?

18  A    He's asking ammunition, with the weapon price.

19  Q    And what did he say about the AK47 in terms of buyers for

20  whom he was seeking this ammunition?

21  A    He was very interested in the AK47s because the soldiers

22  on the ground, that's what they were carrying.

23  Q    All right, let's continue.

24       (Video marked HH-1 continues playing at this time.)

25       (Transcriber change)

BY MR. THAYER:

Q    So you're -- you're talking about M16 machine guns, is
that right?

A    Yes.

Q    And do they go by another name?

A    They're also known as A1.

Q    And is there also an A2?

A    Yes.

Q    And for the future meetings, if you're talking about A1s
or A2s, you're talking about M16s --

A    M16s.

Q    -- is that right?

A    Yes, sir.

Q    All right.  Let's go to clip 4, please.

            (Videotape, clip 4 is played at this time.)

BY MR. THAYER:

Q    So Cox asks you about the Stinger missiles and you gave
him a price --

A    Right.

Q    -- is that right?  And -- and how much were you pricing
each Stinger missile device?

A    $105,000 for each Stinger missile.

Q    And were you telling him that you had them all in one
place or something else?

A    No.  I had it at several locations.

1   Q    Now, this is January 29th of 1992.  You provide this

2   information to Eugene Cox.  Did you hear from him again within

3   the next several months?

4   A    Yes.  If I recall correctly, it might have been the next

5   month that I received a call from Cox and I got a voicemail and

6   I returned the call to -- to him.

7   Q    And what did he tell you?

8   A    He told me that the time is -- I don't remember the exact

9   words, but he said there was an issue because of an embargo.

10  Q    Okay.  And because of that issue, the embargo, what --

11  what was going to happen?

12  A    We were going to have to slow down the deal.

13  Q    Okay.  And in connection with that embargo, do you

14  remember whether he mentioned anything about peacekeepers or a

15  peacekeeping force?

16  A    Yes.  He described the peacekeeping forces as mentioned

17  earlier.  I think he referred to them as ECOWAS.

18  Q    Okay.  So is it fair to say that you didn't hear from Gene

19  Cox for almost a year after that?

20  A    Yes.

21  Q    There may have been some communication but you didn't have

22  any substantive meetings until April 29th of 1993, is that

23  correct?

24  A    That is correct.  That was my second meeting with him.

25  Q    If you would just briefly describe for the members of the

1    jury how that meeting got set up and what the purpose of that

2    meeting was?

3    A    The -- the meeting was set up, again if I recall

4    correctly, you know, working with the informant and talking to

5    me, he came in to that meeting to discuss next steps, again,

6    saying that things had to be put on hold regarding the embargo.

7    Q    Now, when you sat down with Gene Cox and George the

8    informant again, do you remember where this second meeting

9    occurred?

10   A    This meeting occurred again in the undercover office in

11   Miami.

12   Q    And do you remember whether Cox indicated to you at all

13   whether the circumstances on the ground militarily had changed

14   at all in Liberia?

15   A    Yes.

16            MR. WILSON:  Objection, Your Honor, to -- it's

17   hearsay.

18            MR. THAYER:  Your Honor, it's what's occurring in the

19   course of this investigation and it's information that's going

20   to lead to the next steps and future meetings --

21            THE COURT:  I'll allow -- I'll allow it.

22            THE WITNESS:  He told me that -- that they were

23   getting bombed by the peacekeeping forces, but they were unable

24   to do anything because they didn't have any Stinger missiles or

25   SAMs to shoot them down.

BY MR. THAYER:

Q    And, again, was that -- was this meeting recorded?

A    Yes, it was.

Q    And during the course of this meeting, did you actually have samples of some of these weapons?

A    Yes, I did.

Q    And what did you do with those -- with those samples?

A    After the meeting in the office, we went to the warehouse where we -- we showed all the weapons, the various types that I have described earlier, Stinger, Redeye and 16s, the M16 and 79 we showed him in the warehouse.

Q    And when you say warehouse, was this somewhere you had to drive to or was it connected to the office?

A    It was connected to the office.

Q    And during this display of -- of the arms, what, if anything, did you do?

A    I -- basically, he had asked me to take photographs of the weapons so he could take it back and show it to, if I recall correctly, his boss.  So I worked with him -- there was another undercover agent in the warehouse who showed him the weapons, described them and took the photographs for -- for Eugene Cox.

Q    And based on your interactions with Eugene Cox, who was Eugene Cox's boss?

A    Tom, the Minister of Defense.

Q    After the display of these weapons, did you discuss prices

1    at all with Eugene Cox?

2    A    Yes.  We went back to the office, and if I recall

3    correctly, he asked me if I had a piece of paper, and I took

4    out a piece of paper and I started to write down each item but

5    not describing it as a -- a Stinger.  I would put ST for

6    Stinger.  For Redeyes I would put Red and so on.  I wouldn't

7    put the full name of -- of the weapon.

8    A    Why not?

9    Q    Just didn't -- I didn't want that getting into anybody's

10   hands.

11   Q    And when you were taking these notes, what were you

12   writing down in addition to the -- the name of the weapon or

13   the arm?

14   A    I was writing the prices.  For instance, a Stinger missile

15   for 105,000, a Redeye, if I recall correctly, 50,000, and --

16   Q    And were you also indicating in any way the quantities

17   that you were making available to Eugene Cox --

18   A    Yes.

19   Q    -- and Tom?

20   A    Yes.  Six.  ST would mean six Stinger missiles.  I think

21   it was ten Redeyes, so it would say ten Red.

22   Q    And you mentioned some photographs --

23   A    Yes.

24   Q    -- that were taken.  What, if anything, did Gene Cox do

25   with these photographs?

1   A    Well, in the office, he brought the Polaroids back, and I

2   was taking notes, as I described.  And then Eugene Cox and the

3   informant said we're just going to write what I was saying on

4   the back of each Polaroid photograph.

5   Q    Okay.  So instead of handing Gene Cox your -- your piece

6   of paper, they ended up writing on the back of the photos --

7   A    Yes.

8   Q    -- is that what happened?

9   A    Yes.

10  Q    Did you have any discussions with Gene Cox how you, as an

11  illegal arms broker, were going to get paid for these arms?

12  A    Yes.  During this discussion, I learned that this was not

13  going to be a cash deal.  He indicated before we had gone to

14  look at the -- the weapons, that he wanted to set up a company

15  with me and give me 25 percent of certain resources or minerals

16  that were available in Liberia.

17  Q    And were there any other issues that you and Gene Cox had

18  to discuss in terms of making this deal happen?

19  A    Transportation was the biggest issue, how is it going to

20  get out of the country?

21  Q    Out of which country?

22  A    Out of the U.S.

23  Q    And what was the ultimate destination?

24  A    During this meeting, it was discussed Liberia, but at a

25  subsequent meeting I learned of a different destination.

1    Q    And what was that destination?

2    A    The Ivory Coast.

3    Q    And who gave you that destination, sir?

4    A    Tom, Minister of Defense.

5    Q    And why was the Ivory Coast going to be the new

6    destination?

7    A    Because the Ivory Coast was not under an arms embargo.

8    Q    And did you learn through your subsequent discussions and

9    meetings with Gene Cox and Tom Woewiyu what was going to happen

10   to those arms once they got to the Ivory Coast?

11   A    Once they were -- had landed in the Ivory Coast, then they

12   would be shipped into Liberia was my understanding.

13   Q    All right.  But here on April 29th, 1993, at this second

14   meeting, the issue that you were focusing on in terms of

15   transportation was getting them where?

16   A    Out of the United States.

17   Q    Okay.

18          MR. THAYER:  Your Honor, if we could have HH-2 shown

19   to the witness.

20          THE COURT:  Okay.

21          (Videotape marked Exhibit HH-2 is played for the

22   witness.)

23   BY MR. THAYER:

24   Q    Sir, do you have an image on the screen at this time?

25   A    Yes, I do.

1      (Videotape marked Exhibit HH-2 is played for the

2   witness.)

3   BY MR. THAYER:

4   Q    And what does the image on your screen depict, sir?

5   A    Okay.  In the center of the screen I am sitting with my

6   back towards the camera.  On my left is Gene Cox.  On my right

7   is Bill Parks and across from me on the couch which you really

8   can't see except a little bit of his head is George the

9   informant.

10  Q    All right.  And does this image fairly and accurately

11  represent the office as you recall it at the time?

12  A    Yes.

13  Q    And having reviewed this previously and listened to the

14  audiotape as well as the video, do those recordings fairly and

15  accurately capture the meeting as you recall it?

16  A    Yes, they do.

17          MR. THAYER:  Your Honor, I'd ask that HH-2 be

18  admitted into evidence and published to the jury.

19          MR. WILSON:  No objection.

20          THE COURT:  All right.  Received and it may be

21  published.

22          (Videotape marked Exhibit HH-2 is played at this

23  time.)

24  BY MR. THAYER:

25  Q    Now, based on the discussions that you had with Gene Cox,

1    when he says, "They're bombing the -- bombing our positions,

2    and we don't have anything to overcome it when they do it, we

3    don't have any of the Stingers and SAMs to bring them down,"

4    who is he talking about?

5    A    He's talking about Charles Taylor's soldiers.  In this

6    case, he said 75, 80 percent possession of the company --

7    country.  Excuse me.

8    Q    And who's getting bombed?

9    A    They are.

10   Q    Charles Taylor's soldiers?

11   A    Yes.

12   Q    By whom?

13   A    By ECOWAS, the peacekeeping forces.  In the first meeting,

14   I think he described it as the one percent when he was talking

15   to Bill Parks.

16   Q    All right.

17          (Videotape marked Exhibit HH-2 is played at this

18   time.)

19   BY MR. THAYER:

20   Q    All right, sir.

21          MR. THAYER:  Let's -- let's continue on into the next

22   clip, this clip number two.

23          (Videotape marked Exhibit HH2, clip number two is

24   played at this time.)

25   BY MR. THAYER:

1    Q    So Gene Cox is telling you about the ECOWAS bombers coming

2    in at low -- low range and that he says -- he said -- he said,

3    yeah, he said Stingers.  He said he'd take Stingers.  When Gene

4    Cox says he'd take Stingers, who is he talking about, sir?

5    A    I believe he was referring to Tom, the Minister of

6    Defense.

7    Q    And during the course of some of your meetings with Gene

8    Cox, did he appear to be concerned about being detected by law

9    enforcement?

10   A    Yes.  I believe just about every meeting, we'd have to

11   stop because he was looking at the ceiling, he was raising an

12   issue about he was nervous that people were listening to our

13   conversations.

14              (Videotape marked Exhibit HH-2, clip number two is

15   played at this time.)

16              THE COURT:  What's that?  Yours?

17              MR. THAYER:  I'm not sure whose it is, Your Honor.

18              (Videotape marked Exhibit HH-2, clip number two is

19   played at this time.)

20   BY MR. THAYER:

21   Q    All right.  So Cox said he'll -- he'll let you know or

22   he'll tell you where he wants it.  Who's he and what's he

23   talking about?

24   A    He's referring to Tom, the Minister of Defense, and a

25   subsequent meeting to this meeting actually when asked, Tom

1    told me that it would go to the Ivory Coast.

2    Q    All right.

3              MR. THAYER:  Just go to --

4              (Videotape marked Exhibit HH-2, clip number three is

5    played at this time.)

6    BY MR. THAYER:

7    Q    Now, we've frozen the -- the image and Gene Cox is --

8    unfolds something.  What is that, sir?

9    A    This is the same photograph that he unrolled at the first

10   meeting pointing to Tom, the Minister of Defense, and Charles

11   Taylor.  In this case, he's pointing to Tom, the Minister of

12   Defense.

13   Q    And we'll see in a few moments, I think, that he -- he

14   rolls up the photo again.  Where does he put it?

15   A    He puts it in his briefcase, lays it in his briefcase.

16   Q    All right.  And is that right next to him on a chair?

17   A    Yes, and it's open.

18   Q    And during the course of this meeting, what -- what does

19   Gene Cox do every now and again when he -- when it says "he" or

20   --

21   A    He keeps referring, pointing to the picture sitting in the

22   briefcase.  He's saying he, Tom, Minister of Defense.

23             (Videotape marked Exhibit HH-2, clip number three is

24   played at this time.)

25             MR. THAYER:  I want to go back to the VHS tape again.

1    All right.  Now, just keep the tape rolling.

2              (Videotape marked Exhibit HH-2, clip number three is

3    played at this time.)

4              MR. THAYER:  All right.  If we could go directly to

5    clip four, please.

6              (Videotape marked Exhibit HH-2, clip number four is

7    played at this time.)

8    BY MR. THAYER:

9    Q    Now, here George sounds like he's very excited to -- to go

10   to the warehouse and look at the -- the arms.  You ask what the

11   purpose of the camera is and you've already explained to the --

12   to the jury that Cox wanted you to take photographs to have

13   photographs to take back to -- back to Tom, the Minister of

14   Defense.

15             Did you become aware during subsequent meetings with

16   Tom Woewiyu whether Tom Woewiyu had, in fact, seen those --

17   those pictures?

18   A    Yes.  I believe in a subsequent meeting, he actually

19   referred to -- describing one of the photos, for example, the

20   Stinger missiles where I wrote six ST, so he referred to that.

21   He would have had to have seen the back of the picture to -- to

22   have that knowledge.

23   Q    All right.

24             MR. THAYER:  Go to clip five.

25             (Videotape marked Exhibit HH-2, clip number five is

1    played at this time.)

2    BY MR. THAYER:

3    Q    Now, when -- when Gene Cox says, "How about a conversation

4    with this man," what's he pointing to?

5    A    Again, to the picture of Tom, the Minister of Defense,

6    that he showed earlier and laid it in his briefcase.

7              (Videotape marked Exhibit HH-2, clip number five is

8    played at this time.)

9    BY MR. THAYER:

10   Q    When Cox asks if you can come up to -- to New York, did

11   you actually meet with Cox and Tom Woewiyu in New York?

12   A    Yes, I believe the next month.  It would have been May I

13   traveled to New York to meet with both of them.

14   Q    And George says -- the confidential informant says, "I

15   don't even want to be at this meeting."  Was George at any

16   subsequent meetings?

17   A    I do not believe so.

18   Q    And would that have been sort of standard undercover

19   operation practice to cut out the confidential informant once

20   the undercover has established the relationship?

21   A    Yes, absolutely.

22              MR. THAYER:  Could you go to the next -- next clip.

23              (Videotape marked Exhibit HH-2, clip number six is

24   played at this time.)

25   BY MR. THAYER:

1   Q    What's he talking about here, forming a corporation and 25

2   percent?

3   A    The way I was going to be paid, again I said earlier, this

4   is no longer a cash deal.  In this instance, when he said 25

5   percent, I believe we were talking about 25 percent of the iron

6   ore that was in Liberia.

7   Q    And -- and I think again he says, "I want you to meet

8   him."  Was that referring to Tom Woewiyu, meeting him in the

9   -- in the near future?

10  A    Yes.

11  Q    Now, did Gene Cox give you some literature to look at or

12  some -- some types of documents to look at during the course of

13  this meeting?

14  A    I do not recall.

15  Q    Okay.

16           MR. THAYER:  Well, let's just go to the seventh clip.

17           (Videotape marked Exhibit HH-2, clip number seven is

18  played at this time.)

19  BY MR. THAYER:

20  Q    And, sir, after this you all walked to the warehouse next

21  door, is that right?

22  A    Yes.

23  Q    Okay.  And have you seen the -- the video recording of the

24  display of these -- of these arms to Gene Cox?

25  A    Yes, I have.

1    Q    How is the audio on that?

2    A    The audio is very poor based on the noise of the

3    warehouse, not very good acoustics to hear voice conversations.

4    Q    All right.

5              MR. THAYER:  If we could have H-2-1 shown to the

6    witness, please.

7              THE COURT:  Is that HH?

8              MR. THAYER:  I beg your pardon?

9              THE COURT:  HH?

10             MR. THAYER:  H-2-1.  It's video only, Your Honor.

11             THE COURT:  Oh, okay.  All right.

12             MR. THAYER:  There won't be a transcript.

13             (Videotape marked Exhibit H-2-1 is played for the

14   witness at this time.)

15   BY MR. THAYER:

16   Q    Now, sir, do you have an image?

17   A    In the office right now, still.

18             (Videotape marked Exhibit H-2-1 is played for the

19   witness at this time.)

20   BY MR. THAYER:

21   Q    Now, sir, do you have an image now?

22   A    Yes.

23   Q    And what do you see in the --

24   A    This is a video of the warehouse with a truck that

25   contains the weapons that we were going to display.

1    Q    All right.  And you've seen this video before?

2    A    Yes, I have.

3    Q    And do the events depicted in the -- in the video fairly

4    and accurately represent those that occurred during this

5    meeting?

6    A    Yes, they do.

7              MR. THAYER:  Your Honor, I move for the admission of

8    Government Exhibit H-2-1.

9              MR. WILSON:  No objection.

10             MR. THAYER:  And ask that it be published to the

11   jury.

12             THE COURT:  All right.  Any objection?

13             MR. WILSON:  No objection.

14             (Videotape marked Exhibit H-2-1 is played at this

15   time.)

16   BY MR. THAYER:

17   Q    Just pausing it here, sir.  We can see four individuals

18   standing in front of the truck.  Can you identify who's who

19   moving from the right of the image to the left?

20   A    Yes.  Furthest to the right is Gene Cox with the suit on.

21   To his left is George the informant.  In front of him with the

22   slacks and the white shirt is me, and at the back of the truck

23   with the baseball cap is Tom Trotto, another special agent

24   operating in an undercover capacity.

25   Q    And what was his role, so to speak, this day, Tom?

1  A    Tom's role was actually to bring out the weapons and speak

2  a little bit about them.  He's former military, very

3  knowledgeable about each weapon and described how they were

4  used to Gene Cox during this display.

5  Q    And how did Gene Cox take to -- to Tom Trotto?

6  A    Gene was very nervous about -- about Tom Trotto.  I told

7  him not to worry about it, he was my brother-in-law and not to

8  worry about it.

9  Q    All right.  And why -- why was Gene nervous?  What was --

10  what was there about Tom that made him nervous?

11  A    Tom's appearance and his actions are very much like a

12  police officer.

13  Q    Okay.

14          MR. THAYER:  Let's get the tape working.

15          (Videotape marked Exhibit H-2-1 is played at this

16  time.)

17  BY MR. THAYER:

18  Q    Which weapon is Tom Trotto showing Gene Cox?

19  A    He's showing Gene Cox the Redeye.

20  Q    Okay.

21          (Videotape marked Exhibit H-2-1 is played at this

22  time.)

23  BY MR. THAYER:

24  Q    Sir, if you can remember, what are you explaining to Gene

25  Cox there about the Redeye?

1    A    If I recall correctly, surface to air missile, but after

2    you file the missile, you can throw it away.  I mean, it's -- I

3    mean, it cannot be used again.  So, you know, you're spending

4    $50,000 on one shot and away you go.

5              (Videotape marked Exhibit H-2-1 is played at this

6    time.)

7    BY MR. THAYER:

8    Q    And what are you showing Gene Cox here, sir?

9    A    I'm showing the Stinger missile.  Tom has it on his

10   shoulder.  I just opened it up so you could activate the

11   tracking device.

12   Q    That's that little flap or whatever it was that you opened

13   up?

14   A    Flap that opens up, yeah.

15             (Videotape marked Exhibit H-2-1 is played at this

16   time.)

17   BY MR. THAYER:

18   Q    Do you remember where you're going, sir?  You just left

19   -- you just left the warehouse to -- to fetch something.

20   A    I --

21   Q    Do you remember what you're getting?

22   A    -- Bill came into the warehouse.  I wanted to make sure he

23   locked the front door because I was concerned somebody would

24   come in the front door, and you can see directly into the

25   warehouse coming into the front door.

1    Q    All right.  And while you did that, did you pick up the

2    camera?

3    A    Yes, I did.

4              (Videotape marked Exhibit H-2-1 is played at this

5    time.)

6    BY MR. THAYER:

7    Q    What did you just take a picture of there, sir?

8    A    I took a picture of the Stinger missile.

9    Q    All right.

10              (Videotape marked Exhibit H-2-1 is played at this

11   time.)

12   BY MR. THAYER:

13   Q    I think what we just heard you say, you want the Redeye,

14   too.  Did you end up taking a picture of the Redeye?

15   A    No, we did not.

16              (Videotape marked Exhibit H-2-1 is played at this

17   time.)

18   BY MR. THAYER:

19   Q    What's Tom Trotto bringing out now, sir?

20   A    He's bringing out an M16 A1 in a plastic bag.  They're

21   refurbished and they're oiled so they're -- they're put into

22   plastic.

23              (Videotape marked Exhibit H-2-1 is played at this

24   time.)

25   BY MR. THAYER:

1    Q    So you just took a picture of one of the M16s, is that

2    right?

3    A    Yes, sir.

4    Q    Do you remember what weapons are going to come out next?

5    A    I believe we take out the M79, the grenade launcher and

6    then the M60, the machine gun.  I don't know which one came

7    first.  It might have been the machine gun.

8    Q    Which one is bigger, the M79 or the -- or the M60 machine

9    gun?

10   A    The M60 is a pretty long weapon.  It's a -- it's a machine

11   gun.

12   Q    And what's the difference between an M60 machine gun

13   versus the M16 that's sitting on the chair right there?

14   A    It's larger caliber and it has a belt of ammo.  It shoots

15   a number of rounds, a lot more than the -- than the M16 if I

16   recall.  It's a much more powerful weapon.

17   Q    And it's sometimes referred to as a heavy machine gun, is

18   that right?

19   A    Yes.

20          (Videotape marked Exhibit H-2-1 is played at this

21   time.)

22   BY MR. THAYER:

23   Q    I think we just heard you say M79 grenade, referring to

24   that grenade launcher you're talking about?

25   A    Yes.

1  Q    And what does that do?

2  A    That launches the grenade, again, an infantry weapon.

3  It's used to fire at vehicles, tanks.

4            (Videotape marked Exhibit H-2-1 is played at this

5  time.)

6            THE COURT:  Mr. Thayer, how much longer is this going

7  to be?

8            MR. THAYER:  For this clip, Your Honor?

9            THE COURT:  No, altogether.

10           MR. THAYER:  Altogether, probably going to be another

11 hour and a half.

12           THE COURT:  Oh, it is?  Okay.  Well, let's take a

13 break.  Remember the birdie.  Remember your recess instructions

14 not to discuss this case among yourselves and all the rest.

15           (Jury out, 3:42 p.m.)

16           (Recess taken, 3:42 p.m. to 4:02 p.m.)

17           MR. THAYER:  Thank you, Your Honor.  So we'll just

18 pick up where the video left off.  I think the M79 grenade

19 launcher was being looked at, examined by Agent Cox.

20           (Videotape marked Exhibit HH-2-1 is played at this

21 time.)

22 BY MR. THAYER:

23 Q    What's Tom Trotto showing Gene Kosnalsky (Phonetic)?

24 A    The M16 machine gun.  He just opened the bi-pod so it

25 could -- you could lay on the group with it stationary.

1    Q    Okay.  So those little legs are bi-pods?

2    A    Right.

3    Q    Allows you to fight -- hold it on the ground and fire from

4    the --

5    A    Yeah.

6    Q    -- from a prone position?

7    A    Yes.

8    Q    All right.

9           (Videotape marked Exhibit HH-2-1 continues playing at

10   this time.)

11   BY MR. THAYER:

12   Q    I think we can hear Tom Trotto say, 7.62 millimeter.  What

13   is that referring to?

14   A    That is the round for this particular weapon.  It's a

15   larger round than fired out of the M16.

16   Q    That means it's a bigger bullet?

17   A    Right.

18   Q    And I think we can also hear, belt fed, and a reference to

19   a spare barrel and a cleaning kit.  What's all that about?

20   A    That's -- it is a high-powered machine gun.  Again, I'm

21   not an arms' expert but it's "belt-fed," meaning multiple

22   rounds in a strip that is fed into the machine gun as it is

23   fired.

24           THE COURT:  You can't see the witness, can you?

25           THE WITNESS:  I'm sorry.

1                    THE COURT:  No.  Move forward --

2                    THE WITNESS:  I'm sorry, Your Honor.

3                    THE COURT:  -- and move the other part back.

4                    THE WITNESS:  I'm sorry.

5                    THE COURT:  You're supposed to see everything.  But

6      please let me know if you can't see, unless you don't care, but

7      please let me know.  Okay.

8                    (Videotape marked Exhibit HH-2-1 continues playing at

9      this time.)

10     BY MR. THAYER:

11     Q    Somebody just walked into the frame, sir.  Who is that?

12     A    That's Bill Parks.

13     Q    Okay.  Thank you.

14                   (Videotape marked Exhibit HH-2-1 continues playing at

15     this time.)

16     BY MR. THAYER:

17     Q    Sir, we can just see that you took a series of pictures of

18     the weapons piled up on that table, and what did you end up

19     doing with those photographs, with those Polaroids?

20     A    We walk back into the office where we discuss quantity and

21     prices.

22                   MR. THAYER:  I think we could probably save a couple

23     of minutes and cut the film here, and if we could go to Clip 8.

24                   AUDIO OPERATOR:  Sorry?

25                   THE COURT:  I didn't hear you, your voice dropped.

1           AUDIO OPERATOR:  Yes.

2           MR. THAYER:  I'm sorry, Your Honor, we're going to go

3   to Clip 8.

4           AUDIO OPERATOR:  Did you say H-2-3?

5           THE COURT:  H-2-1-8?

6           MR. THAYER:  It's going to be back on HH-2.

7           THE COURT:  H-2-8, is that correct?

8           MR. THAYER:  Just HH-2, Your Honor.

9           THE COURT:  Oh, HH-2.  The last one was H-2 --

10  H-1 -- H --

11          MR. THAYER:  HH-2-1 was the last one, Your Honor.

12          THE COURT:  Oh, okay.

13          MR. THAYER:  This is HH-2.

14          THE COURT:  All right.  Okay.  Thank you.

15          (Videotape marked Exhibit HH-2 is played at this

16  time.)

17          THE COURT:  This happened before the last --

18          MR. THAYER:  The Court's indulgence.

19          (Pause in proceedings.)

20          (Videotape marked Exhibit HH-2 continues playing at

21  this time.)

22  BY MR. THAYER:

23  Q    So this is -- what we just saw was just before you went

24  into the warehouse, and then we went into the warehouse and now

25  we're going to pick up when you come back from the warehouse,

1   correct?

2   A    Yes.

3              (Videotape marked Exhibit HH-2 continues playing at

4   this time.)

5   BY MR. THAYER:

6   Q    All right.  Sir, in this portion of the film where we just

7   ended Gene Cox is pointing at the chair to his right saying,

8   "don't tell him you're going to meet this guy."   What's going

9   on here?

10  A    Well, he's nervous about Tom Trotto and he's talking about

11  traveling to meet Tom, the Minister's Defense and points again

12  to the photograph that he put in the briefcase and he's doesn't

13  want anybody to know that that's going to happen.

14  Q    All right.  And he also sounded like he was nervous about

15  Billy.  Who's Billy?

16  A    Billy is Bill Parks.  He's my business partner.

17  Q    And can you tell the members of the jury why Cox was

18  worried about Parks?

19  A    Yes, I mean Bill was there too.  If I may lay out the

20  legitimate part of the business, the aircraft business, and a

21  number of times in earlier meetings he discussed, I don't want

22  to jeopardize the overall aircraft business.

23             (Videotape marked Exhibit HH-2 continues playing at

24  this time.)

25  BY MR. THAYER:

1    Q    Now Cox mentions here that he'll look at them and then

2    "we'll destroy them -- we'll destroy them."  What is he talking

3    about?

4    A    He's talking about, he wants to take the pictures to show

5    to Tom, the Minister of Defense, and then said he would destroy

6    them after he showed them the pictures.

7    Q    Well, you heard Mr. Cox just talk about Charles Taylor,

8    how do you know that he wasn't going to show the pictures to

9    Charles Taylor and that's who he was talking about?

10   A    Because I was going to meet Tom up in the next meeting.

11   Q    And when you met Tom at the next meeting did he say

12   anything about the photographs?

13   A    Yes, he indicated by making a comment of what they wrote

14   on the back of the photograph of the Stinger.  I called it 6ST,

15   and he referred to 6ST in the subsequent meeting.

16   Q    All right.

17            (Videotape marked Exhibit HH-2 continues playing at

18   this time.)

19   BY MR. THAYER:

20   Q    And, sir, what are you doing here?  You mention a couple

21   of times about the 6STs and writing down things.  What are you

22   actually writing on?

23   A    I'm writing on a yellow pad because when we walked into

24   the office Gene Cox said, "do you have a piece of paper to

25   write on," so I started to take notes on a legal pad.

1      MR. THAYER:  And we'll look at the electronic version

2   of this, but I don't want to mess up our AV extravaganza.  May

3   I approach, Your Honor?

4      THE COURT:  Sure.

5   BY MR. THAYER:

6   Q    Do you recognize what that is?

7   A    Yes.  This is the sheet I was writing down, 6ST, 10 Reds,

8   1,110 A1s, 24 60, the machine guns, and 15 M79s.  That's my

9   handwriting, and at the bottom of this is Michael Verre's

10  initials and the date of the meeting.

11  Q    Okay.  Michael Verre, being the supervisor?

12  A    The case agent, yes.

13      (Videotape marked Exhibit HH-2 continues playing at

14  this time.)

15  BY MR. THAYER:

16  Q    And what's going on here, sir?

17  A    Well --

18  Q    Tom Cox is saying before, "I confuse myself."  What are

19  they doing now?

20  A    They're discussing the quantities and they're writing on

21  back of the Polaroid photographs.

22  Q    Okay.  So you didn't need your piece of paper anymore to

23  give over to Cox, is that right?

24  A    That is correct.

25  Q    So you held on to it?

1    A    Yes.

2    Q    All right.

3              (Videotape marked Exhibit HH-2 continues playing at

4    this time.)

5    BY MR. THAYER:

6    Q    When Cox says he knows the Red Eye, he spoke of the Red

7    Eye, who's he talking about?

8    A    He's referring to Tom the Minister of Defense.

9              (Videotape marked Exhibit HH-2 continues playing at

10   this time.)

11             MR. THAYER:  All right.  Let's roll into Clip 9,

12   please.

13             (Videotape marked Exhibit HH-2, Clip 9 is played at

14   this time.)

15             MR. THAYER:  And just for the record, Your Honor, we

16   stopped here, 21 minutes and 47 seconds.

17   BY MR. THAYER:

18   Q    Sir, I'll ask you again, and then Cox says, "he'll tell

19   you where to put it."  He says, "he'll tell you where to put it

20   and that's what he wants then."  Who is he talking about?

21   A    He's referring to Tom the Minister of Defense.

22             MR. THAYER:  Let's go to Clip 10, please.

23             (Videotape marked Exhibit HH-2, Clip 10 is played at

24   this time.)

25             (Pause in proceedings.)

1            (Videotape marked Exhibit HH-2, Clip 10 continues

2    playing at this time.)

3            (Pause in proceedings.)

4            MR. THAYER:  With the Court's indulgence if we could

5    please have one moment.

6            THE COURT:  Look, let's call -- let's go to sidebar a

7    second.

8            (Sidebar discussion as follows:)

9            THE COURT:  Okay.  Let's finish this tomorrow

10   morning.  I'd like to know -- I'd like -- I said let's finish

11   this tomorrow morning.

12           MS. HENRY:  Yes, Your Honor.

13           THE COURT:  I have an issue that was raised so the

14   two of you have to get together and try and work out what's

15   going to happen with the agent, number one.

16           Number two is that you wanted to present something

17   and I believe you have an objection to something you think

18   they're going to --

19           MR. WRIGHT:  Are you talking about the expert?

20           THE COURT:  The expert, yes.

21           MR. WRIGHT:  Oh, the expert.

22           THE COURT:  And let's talk about all that.  Let them

23   go home, we figure out how to coordinate so we don't waste them

24   a lot of time and I'll let them now leave.  There's no reason

25   to have them stand around while you're fiddling around with the

1   computer.  Okay?

2              MR. WRIGHT:  I apologize, Your Honor.

3              THE COURT:  No, it's not -- you don't owe me any

4   apology, it's just the reality of --

5              MR. WRIGHT:  And the expert should be filing

6   something shortly, Your Honor.

7              THE COURT:  Okay.  But you can argue with me and then

8   I'll read it --

9              MR. WRIGHT:  And then file it.  Okay.

10             THE COURT:  Because you have to give him time to

11  answer if he wants.

12             MR. WRIGHT:  Yes.  And we got --

13             UNIDENTIFIED COUNSEL:  He'll answer it --

14             THE COURT:  Okay.

15             (Sidebar discussion ended.)

16             THE COURT:  Members of the jury, I'm going to have

17  -- make sure that everything is synchronized better tomorrow

18  morning and that's number one, you know, these things happen.

19             I'm not a -- I don't -- whenever there's a computer

20  you always run into this kind of problem, so that's not a

21  problem.

22             But -- and there are a couple legal issues that

23  instead of taking them up tomorrow morning, we'll take them up

24  now.

25             So I'm going to remind you of your recess

1    instructions not to discuss this case among yourselves until

2    all the evidence is in.  You'll receive the final instructions

3    from me because only then can you discuss the case fairly and

4    intelligently.

5            When you go home, no talking with your family, your

6    friends, co-workers, anyone about this case other than just

7    sitting in trial.  Do not do -- do not talk with the witnesses

8    or the parties on any subject.  Do not make an investigation of

9    your own.  Do not do any research.  Do not look at any the

10   events that have been talked about on the computer or any other

11   electronic or digital device.  The only information you should

12   receive is that which you receive here in court.

13           Tomorrow morning at -- is there anything Jim?  Okay.

14   9:45.  Have a good evening.

15           (Jury exits courtroom at 4:32 p.m.)

16           THE COURT:  Can you take everything off the -- talk

17   about it in open court.  You get it coordinated tonight, it's

18   not a big deal.

19           THE COURT:  All right.  You may step down.

20           THE WITNESS:  Thank you, Your Honor.

21           (Witness excused.)

22           THE COURT:  Okay.  Let's talk about -- let's talk

23   about what the agent is going to be able to say.  Who's going

24   to argue that?  Are you going to argue that?

25           MR. THAYER:  What the agent is going to be able to

1    say, Your Honor?

2            THE COURT:  Yes, and whether or not the document is

3    going to be admissible.  Are you arguing about the document or

4    the --

5            MR. WILSON:  The TRC document, Your Honor --

6            THE COURT:  Yes.

7            MR. WILSON:  -- which is what I questioned her about?

8            MS. HENRY:  Your Honor, I believe that the Government

9    is seeking -- the thing that we were talking about redacting

10   earlier was the report from the decision -- Immigration

11   decision --

12           THE COURT:  That's right.

13           MS. HENRY:  -- and whether we could agree to certain

14   redactions based on that.  And I think that Mr. Wilson was

15   attempting to ask the agent some questions and the Government

16   regarding --

17           THE COURT:  Well, he can't ask -- she came on -- if

18   he wants to call her, that's fine, I have no problem with that.

19           MS. HENRY:  Yes, Your Honor.

20           THE COURT:  But he can't ask -- she was a parrot, I'm

21   mean, you'll forgive me, that's what her position was.

22           MR. WRIGHT:  Well, Your Honor, if we're talking about

23   the TRC and report and calling her, she's just someone who may

24   have read portions of the TRC, but she has no firsthand

25   knowledge of it --

1            THE COURT:  Well, then if that's the --

2            MR. WRIGHT:  -- other than anyone else who happens to

3    pick it up and read is and see what it says.  I mean asking her

4    questions about the TRC --

5            THE COURT:  Okay.  That's --

6            MR. WRIGHT:  -- is akin to just asking --

7            THE COURT:  Okay.  What's your position on that?

8            MR. WRIGHT:  -- to asking me questions about

9    anything.

10           THE COURT:  You could have somebody else come?

11           MS. HENRY:  Yes, Your Honor.  I believe -- yeah, I

12   believe the witness tomorrow is going to talk about -- the

13   Government witness is going to talk about the TRC report

14   tomorrow.  The Immigration decision was based on the findings

15   in the TRC report, so we can deal with that tomorrow.

16           THE COURT:  Is that correct?  I have to read it.

17           MR. WRIGHT:  Well, one of the things --

18           THE COURT:  I haven't read it yet.

19           MR. WRIGHT:  -- she relied upon is she like Special

20   Agent Lohmeier read it, read portions of it and that is

21   correct, that is part of -- part of the basis -- one of the --

22   part of the bases, I should say, I guess it's plural, part of

23   the bases for her denying citizenship.

24           THE COURT:  I wasn't talking about her coming back

25   tomorrow.  I was talking about what your witness from the --

1    from the -- who denied -- not certification --

2              MS. HENRY:  Citizenship.

3              THE COURT:  -- I'm back in civil cases -- that denied

4    citizenship, that's what we're talking about.  That has nothing

5    to do with the agent.

6              MR. WRIGHT:  Well, Your Honor, I thought we were

7    talking about what the Immigration Service's officer who denied

8    citizenship relied upon factually.

9              THE COURT:  Yeah, well that --

10             MR. WRIGHT:  And one of the things that she relied

11   upon factually was the TRC report because she read portions of

12   it much like the agent, much like other people.

13             THE COURT:  Well, that has nothing to do with it.

14   You're going to -- you're going to -- as I understood the

15   motion this morning, you're going to bring in the agent.

16             MR. WRIGHT:  I think, respectfully, Your Honor, very

17   respectfully, I think the motion this morning went to a

18   different document.  I think the motion this morning went to

19   the decision and whether certain portions of the decision --

20             THE COURT:  Well, that's what I'm talking about.

21             MR. WRIGHT:  -- that's something different than

22   the -- that's something different than --

23             THE COURT:  That's right, I agree with you.

24             MR. WRIGHT:  -- TRC.  So I'll let --

25             THE COUR5T:  You and I are --

1              MR. WRIGHT:  -- Mr. Thayer address that, Your Honor.

2              THE COURT:  Mr. Wright you're on the same -- you and

3    I are on the same page.

4              MR. WRIGHT:  Yes, Your Honor, yes, Your Honor.

5              THE COURT:  Exactly.

6              MR. WRIGHT:  Okay.

7              THE COURT:  Exactly.  I stopped her from testifying

8    this morning because it was silly.

9              MR. WRIGHT:  Yes, Your Honor.

10             THE COURT:  But I'm talking about the bringing in of

11   the agent.  That's what I'm talking about.

12             MS. HENRY:  The Immigration agent.

13             MR. WRIGHT:  The Immigration Service --

14             THE COURT:  Of course, the Immigration agent.

15             MS. HENRY:  Yes.

16             MR. WRIGHT:  Okay.

17             THE COURT:  And they said they have to show

18   materiality and that's why you brought it in, that's what I

19   understood.

20             MR. THAYER:  That is correct, Your Honor.

21             THE COURT:  Is that correct?

22             MS. HENRY:  That's correct, Your Honor.

23             THE COURT:  Okay.  Now you're objecting to it being

24   brought in, and are you objecting to the agent coming in or

25   only the document?

1          MS. HENRY:  We were objecting to the document.

2          THE COURT:  Okay.

3          MS. HENRY:  And I believe Your Honor ruled and said

4   that you were going to let it in but we need to talk about what

5   appropriate redactions would be before it went to the jury.

6          THE COURT:  Well, I want to first talk about whether

7   it should be let in at all and then we'll talk about

8   redactions.  So what's your reason for saying it shouldn't be

9   let in?

10          MS. HENRY:  Your Honor, the basis of our motion was

11  that the decision covers a lot of ground, and it usurps the

12  role of the jury because it's talking about case law, and it's

13  talking about findings that they make, that they find that it

14  was --

15          THE COURT:  One second.  Let me go get -- let me go

16  get --

17          MS. HENRY:  Okay.

18          THE COURT:  -- my copy of it.

19          MR. WILSON:  Your Honor, may Ms. Henry and I have a

20  moment?

21          THE COURT:  Sure, of course.

22          (Pause in proceedings.)

23          THE COURT:  Do you have it?

24          UNIDENTIFIED PERSON:  Yes.

25          THE COURT:  Oh great.  See, it was right on the -- I

1    left it there so I could read it.  Okay.

2           So let's look at the decision and certainly there are

3    some parts of it that shouldn't be let in, there's no question

4    about that.

5           MS. HENRY:  Is that --

6           THE COURT:  I think there's a lot that shouldn't be

7    let in, as a matter of fact.

8           MS. HENRY:  So did we, Your Honor, but we -- oh, in

9    this you mean.  There's a lot of things.

10          Specifically what we're concerned about, Your Honor,

11   is there's -- at the very end of the report there's information

12   about that he failed to willfully refused to support your

13   dependance during statutory period --

14          THE COURT:  Well, that doesn't belong there.

15          MS. HENRY:  So that's the part that we got because

16   that hasn't been -- the jury hasn't heard anything about that.

17          THE COURT:  You have no problem leaving that out, do

18   you?

19          MR. THAYER:  No, Your Honor.

20          THE COURT:  Okay.  All right.

21          MS. HENRY:  And, I mean -- and, the issue, Your

22   Honor, which we're going to -- the -- if you look at Page 3, I

23   believe, of the report, and to the word, starts with the

24   discussion --

25          THE COURT:  Yeah?

1          MS. HENRY:  Okay.  She talks about -- she gets

2     through the CFR regulations that's in the beginning, and she

3     talks about -- if you look, Your Honor, to -- talks about, you

4     know, her summary of what she had found out about the

5     defendant's role in the NPFL.  In the second paragraph she --

6     the last sentence that she writes, "It's for the purpose of

7     your natural --

8          THE COURT:  Which page is this?

9          MS. HENRY:  Page 3, Your Honor, sorry, last full

10    paragraph she talks about that --

11         THE COURT:  Based on your involvement?

12         MS. HENRY:  Correct.  And that she concludes that he

13    failed to possess moral character, which I understand that the

14    Government wants to get in because that is the basis for the

15    denying of citizenship.

16         THE COURT:  I didn't hear you.  I didn't --

17         MS. HENRY:  I understand the Government wants that

18    because that's the basis for the denying of the citizenship

19    request.

20         And then she states that, "For the purposes of your

21    naturalization application USCIS has relied solely on the

22    factual findings of the Truth and Reconciliation Commission of

23    Liberia," and then she goes on to talk about the TRC and

24    several more pages on that.

25         We're fine with this part coming in and talking about

1    what she based her findings on.

2                THE COURT:  Tell me what you want out, not what

3    you --

4                MS. HENRY:  Oh, sorry.  I guess we want the part

5    about --

6                THE COURT:  Maybe you ought to go over it again

7    tonight --

8                MS. HENRY:  Okay.

9                THE COURT:  -- and we're going to talk about it first

10   thing tomorrow morning --

11               MS. HENRY:  That's fine.

12               THE COURT:  -- because it doesn't sound to me like

13   you've really prepared what you want me to redact.

14               MS. HENRY:  Yes, Your Honor.  We had some discussion

15   with counsel but we can look a little more closely.  But I

16   think --

17               THE COURT:  No.  Well, why don't you do it

18   tonight --

19               MS. HENRY:  Okay.

20               THE COURT:  -- and see whether you could avoid this

21   by tomorrow.  But I -- I -- you know, your reading it while I'm

22   sitting here doesn't make much sense.

23               MS. HENRY:  Yes, Your Honor.

24               THE COURT:  So we will -- and she's going to testify

25   tomorrow, is that what your plan is?

1              MR. THAYER:  Yes, Your Honor.

2              THE COURT:  What time was think -- what time do you

3        think you'll be finished with the tapes?

4              MR. THAYER:  With the tapes, Your Honor, it might be

5        another hour or so.  We have two more witnesses from the same

6        operations but they will be much shorter.

7              THE COURT:  And what are they going to -- what same -

8        - oh, you mean the -- from the --

9              MR. THAYER:  The undercover operation, Your Honor.

10              THE COURT:  Oh, okay, okay.  All right.  How long

11        should they be, you think?

12              You think we'll be finished by the morning -- the end

13        of the morning?

14              MR. THAYER:  Yes, Your Honor.  We should be done

15        before lunch.

16              THE COURT:  Okay.  And then you'll have the -- this

17        person --

18              MR. THAYER:  We'll have the actual Naturalization

19        officer who conducted the --

20              THE COURT:  Yeah, well that's what this is about.

21              MR. THAYER:  This is a different witness though,

22        Judge.

23              THE COURT:  Oh, really?

24              MR. THAYER:  So there were two USCIS witnesses.

25              THE COURT:  All right.

1          MR. THAYER:  The one is the officer who interviewed

2    Mr. Woewiyu on January 30th, 2009.

3          THE COURT:  And that person is going to testify?

4          MR. THAYER:  That person will testify first.  And

5    then Officer Peggy Lin, who actually authored the decision at

6    issue right now will be the second.

7          THE COURT:  Sounds good to me.  And then Wednesday

8    -- so you'll probably close tomorrow.

9          MR. WRIGHT:  We will rest, Your Honor.

10          MR. THAYER:  We will rest.

11          THE COURT:  You will rest -- I meant you'll rest.

12          MR. WRIGHT:  Yes, Your Honor.

13          THE COURT:  In New York we used it call it closing,

14    so you'll rest.  Okay.

15          MR. WILSON:  And we'll have some witnesses available,

16    Your Honor, in the afternoon tomorrow just in case if they rest

17    --

18          THE COURT:  All right.  And how long do you think

19    your case will be?

20          MR. WILSON:  It's hard to say at this point, Your

21    Honor.  There's been no final decision on whether Mr. Woewiyu

22    will testify so that's a big factor in terms of estimating

23    time.

24          There's -- we will be presenting the attorney who

25    represented him at the hearing.  We will have a number of

1    character witnesses, characters witnesses --

2              THE COURT:  Yeah, that's going to go fast.

3              MR. WILSON:  -- three minutes a piece, Your Honor.

4              THE COURT:  That will be quick.

5              MR. WILSON:  Whether the Government has

6    cross-examination for them, they may.  And then we have Steven

7    Britt, who we propose to call as a --

8              THE COURT:  Well, that's what I want to hear about.

9              MR. WILSON:  -- propose to call as an expert.

10             THE COURT:  And is that what you have?

11             MR. WRIGHT:  Your Honor, yes, we plan on filing a

12   motion.  We got notice yesterday, late yesterday afternoon at

13   about 6:09 p.m. on Sunday.

14             THE COURT:  Approximately 6:09?

15             MR. WRIGHT:  Yes, Your Honor, approximately at 6:09.

16             MR. WILSON:  And 32 seconds.

17             MR. WRIGHT:  And we object as we're filing a motion

18   to preclude when I get back to the office, Your Honor.

19             THE COURT:  Okay.  Okay.  Tell me what --

20             MR. WILSON:  Your Honor, he's --

21             THE COURT:  -- who he is?

22             MR. WILSON:  -- his practice is in largely

23   Immigration, he does criminal matters also.  But our office has

24   hired him in the past to advise us once the decision came down

25   from the Supreme Court that said that -- the decision that said

1     that defense attorneys have the obligation to advise their

2     client on the immigration consequences of a plea.

3              If Your Honor recall that was a case where the

4     Supreme Court said that the defendant should have been advised

5     of the immigration consequences of his plea --

6              THE COURT:  I recall that.

7              MR. WILSON:  -- and placed a burden on the defense to

8     make sure the defendant understood that prior to a plea.

9          And since that time Mr. Britt has been one person that

10    we've hired quite frequently to give us immigration expert

11    advise on how a plea to either the charges in the indictment

12    would go or whether there would be alternative charges that --

13             THE COURT:  What does this have to do with this case,

14    there's no plea here.

15             MR. WILSON:  I know.  At any rate, he's somebody that

16    we've consulted with in the past --

17             THE COURT:  All right.  Okay.

18             MR. WILSON:  -- on immigration matters.  So we

19    consulted with him on this case and he does have plenty of

20    experience in -- he used to work for INS before he worked for

21    the U.S. Attorney's Office.  So he has experience in the

22    citizenship application process and what happens from -- what

23    the considerations are both from UCI -- USCIS standpoint and

24    from the attorney's standpoint advising their client, what the

25    process is from application of the filing N-400 to going to the

1    hearing, which is the next step, to what the possibilities are

2    that might happen at a hearing.

3           For instance, we have learned and this is not an area

4    that Ms. Henry are familiar with, we've never handled a United

5    States Citizenship application before, the jury, we would

6    expect, certainly doesn't know the ins and outs of this, and

7    this is a particular area that specialist practice in, you

8    know, not every general practice attorney does these because it

9    is a particular area --

10          THE COURT:  So what are you trying to negate that

11   they have presented?

12          MR. WILSON:  They're going to be putting on two

13   Immigration CIS officers who are going to testify from their

14   perspective what goes on.  He's going to provide a defense

15   expert perspective on what happens from start to finish.

16   There's such a document, it's called an N-14.  It's not used by

17   the service in every citizenship application, it was in this,

18   it's used in some of them.  An N-14 is simply a request for

19   more information after the hearing.

20          In this case, as in other cases sometimes, an N-14 is

21   presented to the applicant and his counsel right at the

22   hearing, we need additional information.  In this case there

23   were actually two N-14s that were supplied to the defendant

24   regarding his application before they said we need more

25   information before we make a decision and he then -- and we'll

hear Mr. Basso testify about this, he presented the additional
information.

Mr. Britt will ultimately opine that the application
process is not complete until the decision is actually made,
that supplementary information can be provided at any time up
until the time the decision is made.

In this case we have a clear step.  We have a January
2006 application, a January 2009 interview, two N-14s that were
sent to Mr. Woewiyu and his lawyer, and a August of 2009
response to the second N-14 which is not -- it's sizable, it
has about 25 pages to it, and then a decision that wasn't made
until a year later, August of 2010.

And Mr. Britt will just supply testimony that that's
not extraordinary that it happened that way, but he'll opine
that the process --

THE COURT:  Did he present evidence in that period of
time?

MR. WILSON:  Did our client?

THE COURT:  Yes.

MR. WILSON:  Yes, he did in August of 2009, Your
Honor, and that will be one of the Government's -- it's listed
as one of the Government's exhibits --

THE COURT:  Okay.  I thought so.

MR. WILSON:  -- but if they don't put it in, we'll
put it in.

1          THE COURT:  No.  I mean I recall that, but I just

2     wanted to make -- to verify that that was accurate.

3          MR. WILSON:  Yes.

4          MR. WRIGHT:  Your Honor, if I may, Your Honor, this

5     isn't the proper topic for expert testimony.  He's going to

6     opine about what he believes the process entails.  Let me say

7     this from the very beginning and based on the limited

8     information.  I happen to know Mr. Britt because we worked

9     together, although I was in the office before him he came to

10    our office in 1991.  He has not been a special agent -- he was

11    never an Immigration Services Officer, but he has not been a

12    special agent with INS, within INS since 1990 or thereabouts.

13         So it's been -- and this talk about him being with

14    INS, that was about 28 years ago he was with INS.  He was never

15    an Immigration Services Officer and --

16         THE COURT:  But is it -- what he's going to testify

17    to is it so, do they have until that period of time?

18         MR. WRIGHT:  Well, Your Honor, they may be able to

19    supplement and we have two Immigration Services officers who

20    are going to talk about factually what happened, not opine of

21    what their opinion is should happen.  They will talk factually

22    about what happened and what happened with this defendant.

23         It sounds like what they're trying to do is go to an

24    applicable legal defense and say somehow that the oath doesn't

25    make a difference.  I mean that's what we're headed towards.

1    What they're trying to say is that it is an open process --

2              THE COURT:  Well, I'm not sure of that, let's find

3    out.  What's your response to that?

4              MR. WILSON:  I'm not sure what Mr. Wright was getting

5    at, Your Honor, but they're going to present --

6              THE COURT:  I'm sure what he's getting at.

7              MR. WILSON:  -- two officers who --

8              THE COURT:  What he's saying is that the oath is the

9    oath, and that is done the first time --

10             MR. WILSON:  Well, that's an matter of argument for

11   the jury.  And Mr. Britt is not going to say that the oath

12   doesn't matter, that's not what he's going to say at all.  He's

13   going to say that the process remains open until the decision

14   is made, and that's not something that's within the ordinary

15   can of a juror.  It's something that an expert can talk about.

16   There's -- and he's not relying on his having been an employee

17   of the Immigration Naturalization Service 28 years ago, he's

18   relying on his knowledge that's gathered as an Immigration

19   attorney since the time that he's been in private practice

20   after he left the United States Attorney's Office.

21             THE COURT:  Well, wait a second.  In order to prove

22   your case, Mr. Wright, do you have to present the -- do you

23   have to present the fact that he was denied citizenship?

24             MR. WRIGHT:  Well, that goes to materiality with

25   regard to some of the misrepresentations he made.  So -- but,

1    if I may, Your Honor, very respectfully say --

2            THE COURT:  Well, then that does -- then you have to

3    go a step further.  It's not just what the representation --

4    what you're saying to me is that you need to go forward with

5    -- that it's important that he was denied citizenship.  If it

6    was important that he was denied citizenship, then somebody has

7    a right to question that.

8            MR. WRIGHT:  Well, if I may say this, Your Honor, it

9    would not change, the position would not change had he not, you

10   know, even if he -- if he -- if they had never rendered a

11   decision.  So our decision, although it is conclusive on

12   materiality, you know, the materiality requirement is simply

13   that it's capable of.

14           But if I may, we have two Immigration Services

15   officers who will testify that they did make request for -- one

16   of them made a request for evidence, which is a RFE, and then

17   seven months later another one made a request.  And that's just

18   factual.  They in fact -- the first one interviewed him.  She

19   will talk about what she did during the interview, she will go

20   through the process.

21           THE COURT:  Oh, yes, sure.

22           MR. WRIGHT:  And then the second one will talk about

23   factually what she looked at including the TRC report and other

24   matters in denying it which in -- the fact that she denied it

25   on some of the bases that were used -- that were the product of

1    his misrepresentations goes to materiality, that's true.

2                I suggest to the Court that it's not necessary and it

3    won't aide the jury to have a lawyer get up and opine about,

4    well, the process remains open.  I'm not sure how that's

5    relevant.

6                THE COURT:  Well, that's what we're going to find

7    out.

8                MR. WRIGHT:  And the reason I say that, Your Honor,

9    is the only way that becomes relevant is if in fact there's

10   some sort of an argument which does not have a legal basis that

11   the oath doesn't make any difference.

12               THE COURT:  That's not -- you're obviously thinking

13   it's important or you wouldn't have brought in these witnesses.

14   Let me find out why you think that it's relevant because that

15   does interest me.  I don't quite understand.

16               MR. WILSON:  Your Honor, Mr. Woewiyu's intent is at

17   the heart of this case, his intent in how he answered these

18   questions.  And, obviously, that supplemental response says

19   something about what his intent is because the supplemental

20   response provides a lot more information than what was

21   presented in the application and what was presented in the

22   hearing in front of the -- very brief hearing, Your Honor. I

23   think the testimony is that it was about 15 minutes.  That's

24   what we expect.

25               But the -- so the supplement which was a more

1    considered response was made and it's important.  It's

2    important for what it was said about -- what it says about what

3    his intent -- did he have an intent to defraud, did he have an

4    intent to mislead anybody because they're not arguing that --

5    they haven't made any allegations that anything that he said in

6    the response was untrue and the jury is going to get to see

7    what that response is.  Having heard all the other evidence,

8    they're going to get a chance to see what that response is.

9           And Mr. Britt -- the jury doesn't know how the

10   citizenship application process ordinarily goes, and he has --

11   he has a right to present a defense and he should --

12              THE COURT:  Yeah, but it has to be relevant.

13              MR. WILSON:  Right.  But he shouldn't have to

14   rely -- their witnesses are going to get up and testify and he

15   shouldn't have to rely on what the two Government' witnesses

16   testify about how this process goes or how this process went in

17   this particular situation.

18          The jury should -- the jury could be helped by the

19   testimony of somebody who practices in this area, who, I would

20   suggest, Your Honor, his credentials are very strong --

21              THE COURT:  I'm not going to question his

22   credentials, I'm not going to question any of that, only the

23   relevance of his testimony.

24              MR. WILSON:  So the relevance is that he's saying how

25   this process goes.  He's not going to make -- give an opinion

1    on the ultimate questions in this case.

2             THE COURT:  No, I'm not going to let him do that.

3             MR. WILSON:  He's just going to give an opinion as to

4    how the process ordinarily goes in a citizenship application.

5             THE COURT:  All right.

6             MR. WILSON:  What the possibilities are each step of

7    the way, because there are various possibilities each step of

8    the way, and that's what he's going to -- that's what he's

9    going to give an opinion about to the jury, and that's

10   something that would help them, and it's not something that is

11   within their ordinary scope of knowledge, Your Honor, because

12   it's wasn't within Ms. Henry's ordinary scope of knowledge.

13            THE COURT:  Well, that's not the issue.

14            MR. WRIGHT:  Your Honor, I'd like to say one things,

15   Your Honor, very respectfully.  Counsel begin arguing with

16   regard to the importance of Mr. Woewiyu's intent, his intent.

17   Steve Britt has nothing to say at all about his intent.

18   And --

19            THE COURT:  Well, their defense seems to be that he

20   really didn't understand what he was -- at least this is what

21   was said in opening, understand what the questions were exactly

22   because they're open to many interpretations, and as I

23   understand the defense, they're saying that -- and first of all

24   for Mr. Britt that it's allowable, and second of all in the

25   follow-ups he did explain in a way that he understands, that's

1    what I -- that's what -- the way he understood the questions.

2            MR. WRIGHT:  And that's argument, Your Honor.  And

3    that's fine, but what does Mr. Britt have to say.

4            THE COURT:  Well, let me see what you present

5    tomorrow -- to me what you're going to present and I will rule.

6            MR. WRIGHT:  Thank you, Your Honor.

7            THE COURT:  Okay.

8            (Court proceedings adjourned at 4:58 p.m.)

9                            * * * * *

1 **C E R T I F I C A T I O N**

2

3     We, Roxanne Galanti, Sandra Carbonaro, Lois Vitarelli

4 and Ritajean E. Wioncek, court approved transcribers, certify

5 that the foregoing is a correct transcript from the official

6 electronic sound recording of the proceedings in the above-

7 titled matter.

8

9 _____

10 ROXANNE GALANTI

11

12 _____

13 SANDRA CARBONARO

14

15 _____

16 LOIS VITARELLI

17

18 _____     November 4, 2018

19 RITAJEAN E. WIONCEK

20 DIANA DOMAN TRANSCRIBING, LLC

21

22

23

24